### UNITED STATES DISTRICT COURT
### EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **KEESHA GOODE and VICTORIA** | : | **Civil Action** |
| **GOODMAN, on behalf of themselves** | : | |
| **and others similarly situated,** | : | |
| **Plaintiffs** | : | **No.** |
| **v.** | : | |
| | : | |
| **LEXISNEXIS RISK & INFORMATION** | : | |
| **ANALYTICS GROUP, INC.,** | : | |
| **Defendant** | : | |

### CLASS ACTION COMPLAINT

I.     <u>Introduction</u>

1.     This is a consumer class action under the Fair Credit Reporting Act

("FCRA"), 15 U.S.C. § 1681 *et seq.,* brought on behalf of thousands of workers in the retail

industry against a company that that sells background information to employers for use in

investigating applicants for employment.  Under the FCRA, "consumer reports" subject to

the statute's protections include not simply those used in establishing the consumer's

eligibility for credit, but also those used for "employment purposes."  15 U.S.C. §

1681a(d)(1)(B).

2.     The defendant LexisNexis Risk & Information Analytics Group, Inc. has

classified Plaintiffs and thousands of other low-wage retail workers as thieves within a

proprietary database called "Esteem," and has distributed this damaging information to

potential employers, without complying with the minimal statutory requirements of the

FCRA.  Esteem classifies individuals as thieves based upon alleged "admission

statements" submitted by its subscribing employers.  Then, in response to subsequent

Esteem "inquiries" submitted by other Esteem subscribers regarding pending

employment applications, Defendant prepares and disseminates standardized Esteem

theft reports which reference "verified admission statements" supporting them.  Because so many of the nation's retailers subscribe to Esteem, the practical consequence of an inaccurate entry within Esteem is effectively to preclude employment or promotion for the seven years the  alleged theft incident is reported to Esteem members.

3.     The FCRA was enacted "to insure that consumer reporting agencies exercise their *grave responsibilities* with fairness, impartiality, and a respect for the consumer's right to privacy," 15 U.S.C. § 1681(a)(4) (emphasis added), by operating "in a manner which is fair and equitable to the consumer, with regard to the confidentiality, accuracy, relevancy" of the consumer information they disseminate.  § 1681(b). Congress included in the statutory scheme a series of due-process-like protections that impose strict procedural rules on "consumer reporting agencies" and users of "consumer reports." This action involves Defendant's systematic violation of two of those important rules.

4.     The first of these rules mandates that *before* any "adverse action" on an employment application occurs, the consumer must be advised of any "consumer report" used in that action and provided a written explanation of her rights under the FCRA, including the right to obtain a copy of her individual file and to dispute the accuracy of the information contained in that file.  15 U.S.C. § 1681b(b)(3).   Prior notice gives the consumer the opportunity to try to correct the inaccurate information before the employer receives a supposedly "verified" report from a third-party agency that the consumer is a thief.  By itself sending out FCRA "pre-adverse action" notices to consumers *after* it has reported them to potential employers as being thieves, Defendant is, on a class-wide basis, violating the "grave responsibility" imposed on it by 15 U.S.C. § 1681b(b)(3).

5.      The second rule, contained in 15 U.S.C. § 1681g(a), requires Defendant to furnish to a requesting consumer "all information in the consumer's file at the time of the request."  In violation of this rule, consumers who request copies of their Esteem files from Defendant are denied copies of the "admission statements" which form the basis of Esteem theft reports.

6.      Plaintiffs Keesha Goode and Victoria Goodman first discovered their presence in the Esteem database after submitting employment-related applications to Esteem subscribers.  Ms. Goode was denied employment based on the existence of an alleged, signed admission of theft by her in the Esteem database, submitted to Esteem by a former employer.  Ms. Goodman was denied a promotion, and then fired, as a result of an alleged, signed admission of theft by her in the Esteem database, submitted by a former employer.  Neither received the mandatory "pre-adverse action notice" required by the FCRA and both were denied copies of their respective "admission statements" even when they requested the contents of their respective file pursuant to the FCRA. Thus, while neither Plaintiff was ever charged with theft, they both lost job opportunities as a result of a report about an alleged "admission statement" of theft concerning which they were not informed and which Defendant has not furnished them.

7.      Plaintiffs are seeking monetary relief for themselves and a putative class of similarly situated consumers in the Esteem database.  They seek statutory and punitive damages, with attorney's fees and costs, under 15 U.S.C. § 1681n, to remedy Defendants' systematic violation of the two procedural requirements of the FCRA described above.

## II.     Parties

8.      Plaintiff Keesha Goode is an adult individual residing in Philadelphia, PA.

9.     Plaintiff Victoria Goodman is an adult individual residing in Philadelphia, PA.

10.     Defendant LexisNexis Risk & Information Analytics Group, Inc. (hereafter "LexisNexis") is a corporation headquartered in Alpharetta, Ga.  Among other things, LexisNexis markets and operates several employment background products, including "Esteem."

11.     Esteem was previously owned and operated by ChoicePoint Workplace Solutions, Inc., a division of ChoicePoint, Inc.   As a result of a 2008 merger and acquisition, ChoicePoint, Inc., and its various subsidiaries, including ChoicePoint Workplace Solutions, Inc. ("ChoicePoint"), became a part of LexisNexis Risk & Information Analytics Group, Inc. Some of the events relevant to this action occurred prior to the effective date of the merger and, therefore, involve actions by ChoicePoint; references to actions by "LexisNexis" or "Defendant" shall include actions by ChoicePoint during that earlier period of time.

## III.     Jurisdiction and Venue

12.     This Court has jurisdiction over this matter based upon 28 U.S.C. § 1331 and 15 U.S.C. §1681p in that all claims brought arise under the federal Fair Credit Reporting Act, 15 U.S.C. § 1681 et seq.

13.      Venue is properly in this District, pursuant to 28 U.S.C. § 1391(b), because a substantial part of the events or omissions giving rise to Plaintiff's claim occurred in this District, and because Defendant "resides" in this District as defined in 28 U.S.C. § 1391(c).

IV.     **Statement of the Facts**

a.     **Background:  The *Esteem* System**

14.     Among several employment screening products owned and marketed by LexisNexis is a product named "Esteem."

15.     According to LexisNexis, Esteem is a "Retail Theft Contributory Database" that "helps organizations identify applicants with history of theft or fraud." It is a "membership-based contributory program [which] allows companies to legally share theft and fraud incident information."

16.     Within Esteem, employee theft reports are referred to as "internal" incidents, while shoplifting incidents are referred to as "external" incidents.  This action pertains to "internal" reports in Esteem.

17.     The subscribing member-participants in Esteem include some of the nation's largest retail chains, such as Rite Aid, CVS, Walgreens, Target, Home Depot, Lord & Taylor, Petsmart, Marshalls and Pathmark.

18.     Participation in the Esteem network is governed by an "Esteem Member Services Agreement," executed by the individual corporate subscriber and LexisNexis. Attached hereto as Exhibit 'A' is the form agreement that Defendant directed subscribers to sign, which, until sometime prior to the 2008 acquisition of ChoicePoint, was publicly available on the Esteem website.

19.     Esteem is operated in accordance with operating standards which were, and upon information and belief still are, called the "Rules of Participation."  Before

Defendant's acquisition of ChoicePoint, a copy of these "Rules" was included as part of

the Member Services Agreement, and, upon information and belief, still are.

20.     Under the Rules of Participation, and as a contractual *quid pro quo* for

being able to initiate an Esteem "inquiry" for the purpose of checking on the background

of a job applicant, Esteem subscribers are required to "contribute" new records of theft

incidents involving their own employees or customers.

21.     The Rules of Participation define a reportable theft incident as containing

the following four characteristics:

- The incident must involve a theft of merchandise, cash or company property, but a termination for non-criminal reasons or as a result of a company loss not strictly related to theft or fraud committed by that consumer should not get reported.

- The individual who is the subject of the report must be at least sixteen (16) years of age at the time of the incident.

- The dollar value of the particular theft must be at least $5.

- Unless the employer has actually referred the incident for criminal prosecution, it must obtain and send to Defendant a "signed admission statement."

22.     Despite Defendant's representation that employee terminations for non-

fraudulent reasons or for violations of policies not strictly related to theft or fraud are not

part of the Esteem database, Defendant has not adopted any Rule of Participation that

further defines the kinds of incidents that should be reported, nor has Defendant issued

any guidance or directive to Esteem subscribers, or provided any training to subscribers,

designed to ensure that terminations for non-fraudulent reasons or for violations of

policies not strictly related to theft or fraud are kept out of the Esteem database.

23.     When an Esteem-participating employer "contributes" a new Esteem

report to Defendant, this submission consists of two parts.  The first is a uniformly

6

formatted data transmission, composed of several defined fields of information concerning the incident (name, address, birth date and Social Security number of the purported thief; the date and store location of the incident; and the amount of the theft). The second is a faxed copy of a "signed admission statement" regarding the incident.

24.     Defendant creates a record in its system for each new incident report contributed by a member employer.  This record consists of identifying data pertaining to the specific incident, a classification by Defendant of the type of theft described in the admission statement, and an electronic image of the "signed admission statement."

25.     Previously, ChoicePoint displayed on its website a model incident report/admission statement form for subscribing members to use, a form that contained a space for the subject of the report to sign a statement that "I hereby admit to the theft of _____, valued at $ ____, from _____(company) on _____ (date)."

26.     However, Defendant does not require Esteem members to use the model form or any other form when submitting incident reports and signed admission statements, nor does the company impose on members any rules, procedures or criteria regarding what constitutes an "admission," how admissions may be obtained, the form of the admission statements, or what, if anything, employees signing an "admission statement" must be informed of about Esteem or the purpose of the statement.

27.     Defendant does not review "admission statements" for compliance with the Rules of Participation when it receives them. Rather, any review by Defendant occurs, if at all, in the future when another subscribing member submits an "inquiry" regarding the consumer when the consumer applies for employment with the inquiring member.

28.     When Defendant receives an Esteem inquiry regarding an applicant for employment, Defendant searches its system and, if it finds a possible match between the applicant's personal information and an Esteem record on file, it conducts a procedure it calls "verifying" the incident report.  This "verification" activity consists of a clerical comparison of three electronic files in its system:  (1) the personal data in the "inquiry" from the subscribing member; (2) the incident data originally provided by the contributing employer and (3) the "admission statement" supporting the incident report. If the clerk conducting the "verification" confirms that the consumer named in the inquiry matches an incident report and that the date and amount of the supposed theft match a signed "admission statement" which contains the date and dollar amount listed in the report, she prepares a "verified" incident report for the inquiring subscriber.

29.     Defendant's personnel conducting the "verification" perform a clerical review of the "admission statement," verifying that the date shown in the Esteem record and the amount of some employer loss are referenced in the statement and that the statement appears to be signed by the consumer.  They also check whether the form used and/or the text of the statement includes some form of acceptance of responsibility by the consumer for an employer loss, but they do not have the discretion to judge whether the acceptance of responsibility rises to the level of an actual admission to having committed a theft.

30.     In "verifying" an "admission statement," Defendant does not require the statement to include the word "admit" or "admission", nor the word "theft."  And, where the statement refers to circumstances that could be interpreted as something other than a

theft, Defendant does not require the contributing member to furnish any clarifying information and, instead, resolves all doubt in favor of the contributing member.

31.     If a match occurs, and the Esteem clerical personnel "verify" the match, they generate a report to the inquiring Esteem member, i.e., the prospective employer. Such reports are provided in a uniform format that lists the identifying personal information of the consumer "Subject"; the "Theft Location Details", meaning the name of the Esteem employer that contributed the original theft report and the particular store location where the supposed theft occurred; and "the Theft Incident Details."

32.     The actual "admission statement" which is the supposed factual basis of the report is not provided to the inquiring Esteem member.

33.     The "Theft Incident Details" supplied in a standard Esteem report include the following data fields:

   a.  "Admission Status",
   b.  "Legal Action",
   c.  "Incident",
   d.  "Type of Offense",
   e.  "Incident Date" and
   f.  "Theft Amount."

34.     In all cases of so-called "verified" Esteem reports, the entry for "Admission Status:" states the following:  "Verified admission statement." While implying that someone has verified the accuracy of the so-called "admission statement," in fact, the only verification conducted by Defendant is the clerical activity described above.

35.     In a standard Esteem report the "Legal Action" field is ordinarily left blank, since the incidents contained within the Esteem database generally do not involve any criminal proceedings.

36.    Under the "Incident" field, the standard Esteem report will either state "Internal" (meaning that the subject was an employee) or "External" (meaning that the subject was a shopper).

37.    Under the "Type of Offense" field, the incident is classified according to a list of possible incident categories, such as "Theft of Merchandise" or "Cash Register Fraud."  Sometimes this classification is supplied by the contributing member, while other times Defendant's clerical personnel conducting the "verification" will select a category from a drop-down list of categories on their computer screen based on their interpretation of the incident described in the "admission statement."

38.    In the "Incident Date" field, the report will ordinarily list the date of the "admission statement," rather than the date of the supposed theft being "admitted."

39.    In the field "Theft Amount," the Report will list any amount referenced in the "admission statement," even if, for example, the statement is an estimate of multiple incidents in the past.  Thus, for example, while the Rules of Participation limit reportable incidents to those being in the amount of $5 or more, an "admission" regarding a series of incidents over an extended period in the past, estimated at adding up to $6, would be reported as a $6 theft occurring on the date of the admission.

40.    Under the FCRA, a "user" of a consumer report who intends to make an "adverse action" on a job application "based in whole or in part" on information obtained from the consumer report must provide a copy of the report to the job applicant, along with a notice of the applicant's dispute rights under the FCRA, *before* taking the adverse action, 15 U.S.C. § 1681b(b)(3)(A).  After an adverse action occurs, the consumer employment applicant must receive a second notice, mandated by 15 U.S.C.§1681m.

(Hereafter, the Plaintiffs will refer to the first of those notices as the Pre-Adverse Action Notice, and the second as the Adverse Action Notice.)

41.     The reasons for the "pre-adverse action" requirement with regard to employment situations are to notify the job applicant that he is about to be rejected based on the content of a report and provide him an opportunity to challenge the accuracy or relevancy of the information with the credit reporting agency or the user before that job prospect is lost.

42.     As an additional service offered to Esteem members, Defendant will itself send out FCRA Pre-Adverse Action and Adverse Action Notices to consumers for the employer to whom the consumers apply for an employment position.  This service is attractive to Defendant's large-chain members who are constantly hiring new employees.

43.     Many subscribing employers use the Esteem inquiry as a final stage in the evaluation of an employment application, often submitting the inquiry to Esteem after determining that the consumer applicant is otherwise qualified for employment.  In such circumstances, the potential employer has already decided to hire the consumer, conditioned only on the consumer clearing LexisNexis background checks, including a search of the Esteem database.

44.     In some cases, the Esteem "inquiry" made by the potential employer is little more than an automated data-feed of payroll records from the employer to Defendant, resulting in Defendants' computer recognizing the new entries into the payroll records and automatically triggering a search of the Esteem system for matching records pertaining to those new entries.

45.     If the Esteem search is negative, the consumer is hired, but if an Esteem "match" occurs and the record on file is "verified," Defendant classifies the consumer job applicant in accordance with "adjudication" scores agreed to by Defendant and the employer Esteem member, and reports back to the Esteem member—usually in the form of a batch file report containing the results of multiple Esteem searches—with adjudication scores assigned to the particular consumer job applicants.

46.     Defendant attempts to respond to Esteem inquiries quickly and touts the speed of its responses in its promotional communications to members.  Upon information and belief, this response occurs within 48 hours or less of the initial inquiry, whether that inquiry is done individually or through the above-described automatic data sharing. Among the tools it employs to facilitate this speedy response to member inquiries, Defendant uses color-coding to communicate the "adjudication" scores it assigns to the individual consumers, e.g., using red to highlight all scores of "noncompetitive."

47.     For those employer members of Esteem who elect to have Defendant, for an extra fee, send out FCRA Pre-Adverse Action Notices for them, those notices are sent to consumers days after Defendant has already "adjudicated" the Esteem search and communicated that "adjudication" back to the employer member.  Thus, by the time Defendant sends out the Pre-Adverse Action Notice for the employer member, some adverse action on the consumer's employment application has already occurred.  The consumer is not notified in advance that he is likely to be rejected based on an Esteem report (or may not even know that he is part of a retail theft database), nor does he have a chance to dispute the report with Defendant or to inform the prospective employer of the circumstances around his prior employment that are being labeled as a theft.

48.     In its dual role as both (a) the consumer reporting agency which assembles and communicates consumer information from and to its members and (b) as an agent for its employer members on whose behalf it "adjudicates" applicants for employment and sends FCRA notices to those applicants, the sequence of Defendant's actions are as follows:  Consumer applies to Employer; Employer transmits Consumer's identity information to Defendant; Defendant initiates a search of its Esteem database and, in the event of a match, it "verifies" that it has an image of  purported "admission statement" of theft by the Consumer; then, in its capacity as the Employer's agent and, depending on the criteria negotiated between Defendant and the Employer, Defendant itself "adjudicates" the employment application; finally, after that "adjudication" has already occurred, it sends the Pre-Adverse Action Notice to the Consumer on the letterhead of the Employer, followed several days later by the Adverse Action Notice.

49.     Defendant "uses" Esteem records, i.e., both the incident report information and the admission statement, when it renders employment-related "adjudications."

50.     As described, Defendant routinely sends out Pre-Adverse Action Notices and Adverse Action Notices to consumers on the letterhead of the employer member to whom the consumer has applied for employment, advising them of their rights under the FCRA, including the right to dispute the accuracy and completeness of the theft record in the Esteem system.  However, while the consumer is sent a copy of the summary Esteem incident report with those notices, the consumer is not provided with a copy of the actual admission statement that Defendant received from the original contributing member and that it maintains in its system.

51.     Defendant does not require the employer that contributed the actual admission statement to provide a copy to the consumer either.  Thus, in the employment background system owned, organized and maintained by Defendant, the consumer is advised of her right to dispute the accuracy of an alleged signed admission of criminal conduct without ever providing the consumer with a copy of the incriminating statement.

52.     Even when, in response to either of the two FCRA notices, or at any other time, the consumer asks Defendant for a copy of his/her file in the Esteem system, Defendant does not ordinarily provide a copy of the "admission statement."

<b>b.      <u>The Facts Pertaining to Plaintiff Keesha Goode</u></b>

53.     Plaintiff Keesha Goode is a young, single mother who, during the period November 2006 to October 2008, was employed as a customer service representative and cashier in a Forman Mills store.

54.     Forman Mills is a subscribing member of Esteem.

55.     During the latter part of October, 2008, Ms. Goode was terminated from her position at Forman Mills.

56.     Around May, 2009, Plaintiff applied for a job at a store in the Family Dollar Stores chain.  Family Dollar Stores is also a subscribing member of Esteem.

57.     Sometime soon after she submitted that job application, Ms. Goode received a computer-generated Pre-Adverse Action Notice, purportedly sent by Family Dollar Stores.  The notice, a copy of which is attached as Exhibit 'B', advised her that Family Dollar Stores had requested a "criminal background report" from Defendant in connection with her application for employment and that information in the report "may adversely affect your employment status." The notice further advised her of her right to

obtain "a free disclosure of your file" from Defendant and to dispute with Defendant the accuracy or completeness of "any information" in the report.

58.     The Pre-Adverse Action Notice also stated that "ChoicePoint did not participate in any employment decision and will be unable to provide any specific reasons as to why [Family Dollar Stores] may choose to take an adverse employment action." This statement was false and/or misleading in that Defendant did participate and did itself take an "adverse action" with regards to Plaintiff's job application.

59.     The Pre-Adverse Action Notice, while purporting to be from Family Dollar Stores, upon information and belief, was actually sent by Defendant pursuant to the Esteem member services agreement between Defendant and Family Dollar Stores.

60.     Upon information and belief, at the time the said notice had been sent to Plaintiff Goode and in conformity with Defendant's customary practice, Defendant had already "adjudicated" her job application pursuant to its agreement with Family Dollar Stores. This action included "verifying" the admission statement it maintained in its file regarding the supposed theft incident; informing Family Dollar Stores of the Esteem match and providing Family Dollar Stores with a copy of the same incident report sent to Plaintiff. All of these actions occurred before Defendant sent the Pre-Adverse Action Notice on behalf of Family Dollar Stores.

61.     The Pre-Adverse Action Notice sent to Ms. Goode included with it a copy of an Esteem incident report, dated May 7, 2009, that states:

Type of Offense:  Theft of Merchandise;

Date of Incident:  10/29/2008;

Theft Amount:  $34.97;

Admission Status:  Verified admission statement.

(A copy of the Esteem report is attached as Exhibit 'C'.)

62.     In accordance with its usual practice, Defendant did not provide Ms. Goode a copy of the "admission statement" referenced in the incident report.

63.     Ms. Goode was never criminally charged with theft nor does she have knowledge of any complaint regarding any theft by her ever being referred to any police authority by her former employer.

64.     Sometime during the Summer of 2009, after learning about the Esteem system and its having caused her to lose an employment opportunity, Plaintiff Goode sought legal advice.  Upon advice of counsel, she sent a letter to ChoicePoint WorkPlace Solutions, a copy of which is attached as Exhibit 'D'.  In this letter she advised ChoicePoint that she disputed the accuracy of the information being published about the Forman Mills incident; that "I was accused of not reporting on a former employee who was stealing merchandise, but I did not steal anything myself;" and she expressly requested "a copy of all information about me that [Defendant] has regarding this report."

65.     In a computer-generated response to Plaintiff's letter, dated August 6, 2009, Defendant informed Plaintiff that it had "completed our reinvestigation of the disputed information and verified that the original information provided on the background report was reported accurately." Again, Defendant failed to provide a copy of the "admission statement" it maintained in its system and on which it based its report to Dollar Family Stores, instead merely including another copy of the Esteem "incident report" it had previously supplied.  Defendant invited Plaintiff to "add a statement to your file disputing the accuracy or completeness" of the information it had about the incident;

offered to inform those potential employers who, like Dollar Family Stores, had received

a copy of an incident report about her that she disputed its accuracy or completeness; and

offered, if asked, to provide "a description of the procedure used to reinvestigate the

disputed information."  (Attached as Exhibit 'E' is a copy of the August 6, 2009 form

letter from Defendant.)

66.     Plaintiff Goode responded to Defendant with a second letter in which she

asked for the offered description of the supposed reinvestigation conducted by Defendant

and again asked for copies of "whatever information you are relying on."  She concluded:

"I cannot disprove information without knowing what it is, and where it came from."  (A

copy of the text of that follow-up letter is attached as Exhibit 'F'.)

67.     Defendant never responded to the follow-up letter.

68.     To date, Ms. Goode still has not been provided a copy of the so-called

"admission statement" being maintained by Defendant in its Esteem system.  Without it,

she remains unable to pursue the dispute to which she is entitled and faces continuing

impediments to future employment since she is being classified as a thief in a nationwide

employment database.

    **c.**      **The Facts Pertaining to Plaintiff Victoria Goodman**

69.     Plaintiff Victoria Goodman is an individual who, during a one-year period

from approximately June, 2005 to June, 2006 was employed by Dollar General as a

cashier and stock person in a Dollar General store in Philadelphia.

70.     Sometime in June, 2006, Ms. Goodman was approached by a loss

prevention employee of Dollar General, advising her that she was being investigated for a

possible theft that occurred a few days earlier and that she should go home and await the conclusion of the investigation.

71.     Dollar General is a subscribing member of Esteem.

72.     Upon information and belief, in accordance with its Esteem Member Services Agreement, Dollar General submitted information about Plaintiff Goodman to Defendant—including a copy of a so-called "admission statement"—and Defendant, in turn, created a new theft record in the Esteem system.  This electronic file pertaining to Plaintiff Goodman consists of (a) data transmitted by Dollar General about the incident and (b) an electronic image of a statement Dollar General represented as being signed by Plaintiff.

73.     As time progressed, Ms. Goodman heard nothing more from Dollar General regarding the supposed investigation, and regarding her ability to return to work.  Receiving no notification from Dollar General that she could return, she applied for Unemployment Compensation.

74.     Dollar General did not contest Plaintiff's Unemployment Compensation application and Plaintiff was thereby approved for benefits.  Had she, in fact, been discharged for committing a theft or other "willful misconduct," Dollar General would not have been liable for her Unemployment Compensation.

75.     Soon after she was approved for Unemployment Compensation benefits, Ms. Goodman applied for a job in a Rite Aid store.  She was hired, and started as a cashier on October 2, 2006.

76.     Plaintiff Goodman worked continuously as a cashier at Rite Aid from October 2, 2006 to mid-November, 2009 at which time she applied for a posted position as a store supervisor.

77.     Rite Aid is a subscribing member of Esteem.

78.     Upon information and belief, Rite Aid submitted an inquiry to the Esteem system about Ms. Goodman, on or about November 18, 2009, as part of the processing of her application for her promotion to supervisor.

79.     Rite Aid fired Plaintiff on November 30, 2009.

80.     After she was fired, Plaintiff received a computer-generated Pre-Adverse Action Notice dated December 2, 2009, purporting to be from Rite Aid.  The notice—a copy of which is attached hereto as Exhibit 'G'—advised Ms. Goodman that "information [Rite Aid] had received in a Consumer Report obtained by ChoicePoint Services, Inc., may adversely affect your employment status with Rite Aid Corporation," and further advised her that:

> "You have the right to obtain, free of charge, a copy of the Consumer Report from ChoicePoint Services, Inc., and a complete report is enclosed with this letter.  You further have the right to dispute with ChoicePoint Services Inc. the accuracy or completeness of any information contained in the Consumer Report."

After providing contact information for ChoicePoint, the letter was signed "Rite Aid Corporation."

81.     The Pre-Adverse Action Notice, while purporting to be from Rite Aid Corp., was actually sent by Defendant, pursuant to the Esteem member services agreement between Defendant and Rite Aid Corp.

82.     The Pre-Adverse Action Notice also included the following statement:

"ChoicePoint Services Inc. will not participate in any employment decision at Rite Aid Corporation and will be unable to provide you with specific reasons as to why Rite Aid Corporation may choose to take an adverse employment action."

This statement was false and/or misleading in that Defendant did participate and did itself take an "adverse action" with regards to Plaintiff's job application.

83.     Upon information and belief, Rite Aid transmitted its Esteem inquiry about Ms. Goodman to Defendant in accordance with an automated data feed negotiated between Rite Aid and Defendant.  In this data-sharing arrangement, all new entries in Rite Aid's payroll database automatically trigger an Esteem inquiry for the person who is the subject of the new inquiry.  Based on the existence of that arrangement, Plaintiff Goodman believes and therefore avers that, at the time Defendant received an Esteem inquiry about her from Rite Aid, Rite Aid had effectively approved her for the promotion subject only to her clearing a background check conducted by Defendant.

84.     More than two weeks before Defendant sent the Pre-Adverse Action Notice to Plaintiff Goodman on behalf of Rite Aid, it had already "adjudicated" the inquiry by, among others, "verifying" the so-called "admission statement" it had regarding the 2006 incident at Dollar General, and coding its "adjudicative" response as "noncompetive" or some other code that had the result not only of Plaintiff being rejected for the Rite Aid promotion to supervisor but also being fired from her existing position as cashier.

85.     The December 2, 2009 Pre-Adverse Action Notice included a copy of an Esteem incident report issued by Defendant to Rite Aid on or about November 18, 2009. (A copy of the Esteem report is attached as Exhibit 'H'.)

86.     The Esteem report (Exhibit H) listed the following facts about a purported theft incident occurring at Dollar General "Store 7879":

Type of Offense:  Theft of Merchandise;

Date of Incident:  8/1/2006;

Theft Amount:  $100.00;

Admission Status:  Verified admission statement.

87.     In accordance with its usual practice, Defendant did not provide Ms. Goodman a copy of the "admission statement" referenced in the incident report.

88.     Ms. Goodman was never charged with theft nor, to her knowledge, did her former employer ever report any theft by her to a police authority.  Further, the employer did not contest her claim for Unemployment Compensation, as it could have if it believed her termination was the result of willful misconduct.

89.     On December 7, 2009, Plaintiff Goodman received a second letter purportedly from Rite Aid, the Adverse Action Notice, advising her that "Unfortunately, we will not be able to offer you employment at this time . . . based in whole or in part on information about you contained in a consumer report received from ChoicePoint Services, Inc."  The letter repeated the same information about obtaining "a free copy of the consumer report" and about how "to dispute the completeness or accuracy of any information contained in the report by contacting ChoicePoint Services Inc. directly."  (A copy of the Adverse Action Notice is attached as Exhibit 'I'.)

90.     Upon information and belief, the Adverse Action Notice, like the Pre-Adverse Action Notice sent days earlier, while purporting to be from Rite Aid Corp., was sent by Defendant pursuant to its Esteem member services agreement with Rite Aid Corp.

91.     Plaintiff Goodman, following the instructions in the two letters she received, submitted a hand-written dispute letter to Defendant, sometime during December, 2009.  In this communication she informed Defendant, among other things, that (a) the birthdate for her on the Esteem report is not hers; (b) she never signed any admission statement regarding an incident at a Dollar General store and (c) on August 1, 2006, the date of the supposed "verified admission statement," she was not employed by Dollar General, having left that company in June, 2006.  A copy of the dispute letter is attached as Exhibit "J."

92.     On December 22, 2009, Defendant sent Ms. Goodman a computer-generated letter from Defendant responding to her dispute.  According to this letter, Defendant had "completed our reinvestigation of the disputed information and . . . verified that the original information provided on the background report was reported accurately."  The letter further offered to provide Plaintiff "with a description of the procedure used to reinvestigate the disputed information" and offered to allow Plaintiff "to add a statement to your file disputing the accuracy of completeness of the information" to be included with future reports to be provided potential employers and to be provided to any Esteem members who, like Rite Aid, had already received a copy of the report.  (A copy of this letter is attached as Exhibit 'K'.)

93.     Not satisfied with the December 22, 2009 response from Defendant, Plaintiff sought legal advice from Community Legal Services ("CLS"), the civil legal services program serving Philadelphia.  On April 21, 2010, CLS sent a demand letter to Defendant, requesting (a) a copy of the so-called "verified admission statement, (b) the offered description of Defendant's "reinvestigation" procedures, and (c) proof that notice

of Ms. Goodman's dispute had, in fact, been sent to Rite Aid and any other Esteem

member that had received the inaccurate background report about her.  (A copy of the

letter from CLS is attached as Exhibit 'L'.)

94.    As a result of a union grievance she filed, Ms. Goodman was reinstated as

a cashier at Rite Aid in June, 2010.  However, she never received a copy of the "verified

admission statement" from Defendant, nor did she receive any response to the other

requests contained in the April 21, 2010 letter.  Ms. Goodman faces continuing

impediments to future promotions or hiring in so far as she is being classified as a thief in

a nationwide employment database.

**V.      CLASS ACTION ALLEGATIONS**

95.    Plaintiffs allege a Class consisting of each consumer about whom

Defendant furnished an Esteem report within a defined class period and who received an

adverse action notice prepared and sent by Defendant and/or who requested, specifically,

a copy of his/her "admission statement" or, more generally, a copy of his/or consumer

file at Esteem. The proposed class definition is as follows:

> All natural persons residing in the United States (including all territories and other
> political subdivisions of the United States) who were the subject of an Esteem
> "internal" consumer report within two years preceding the filing of this action and
> during its pendency, based upon a file that contained at least one Esteem "verified
> admission statement" and (a) to whom LexisNexis mailed a Pre-Adverse Action
> Notice on the letterhead of a third-party employer customer and/or (b) who
> requested from Defendant a copy of their Esteem consumer file.

> Excluded from the class definition are any consumers who released
> Defendant in any earlier actions that raised any of the same legal claims
> asserted in this action; any  employees, officers, directors of LexisNexis,
> any attorney appearing in this case, and any judge assigned to hear this
> action.

96.     The Plaintiffs allege two overlapping putative sub-classes.  The first, the

**Pre-Adverse Action Notice Sub-Class,** alleges that Defendants violated 15 U.S.C.

§1681b(b)(3).  This provision requires that any person who uses a consumer report with

the intention of taking an adverse action related to an employment application, must,

prior to taking any such adverse action, first provide to the consumer a copy of the report

and a disclosure of the consumer's rights under the FCRA.  In its administration of the

Esteem for its employer customers, however, Defendant is itself taking adverse actions

with regards to employment applications before it mails out the required Pre-Adverse

Action Notice on behalf of employers.  This sub-class is defined as follows:

> All members of the Class to whom LexisNexis mailed "pre-adverse
> action" correspondence on the letterhead of a third-party employer
> customer.

97.     The second, the **Disclosure Sub-Class**, prosecutes a claim under 15

U.S.C. §1681g and is premised upon the fact that Defendant uniformly refuses to provide

all information in its file regarding a person when that consumer requests a copy of their

Esteem file. Specifically, Defendant does not provide consumers copies of the

"admission statements" in their file.  This sub-class is defined as follows:

> All members of the Class who requested from Defendant a copy of their Esteem
> consumer file.

98.     **Numerosity.  FED. R. CIV. P. 23(a)(1).**  The Class and Sub-class

members are so numerous that joinder of all is impractical. Their names and addresses

are identifiable through documents maintained by the Defendant, and the Class members

may be notified of the pendency of this action by published and/or mailed notice.

99.     **Existence and Predominance of Common Questions of Law and Fact.**

**FED. R. CIV. P. 23(a)(2).** Common questions of law and fact exist as to all members of

the Class. Without limitation, the focus of the litigation regarding the two class claims

brought by Plaintiffs will be Defendants' uniform conduct and procedures, including: its

"adjudication" of Esteem inquiries on behalf of Esteem members and the timing of any

FCRA Pre-Adverse Action Notices it sends consumers on behalf of such Esteem

members; whether Defendant's procedures required or even permitted its employees and

automated systems to send consumers their full files; the nature of Defendant's

agreements with employer members regarding its participation in employment decisions

made by those members; and whether Defendant acted willfully in its failure to design

and implement procedures to assure FCRA compliance.   Even the appropriate amount of

uniform statutory and/or punitive damages under 15 U.S.C. §1681n is a common

question.

100.   **Typicality. FED. R. CIV. P. 23(a)(3)**).  Plaintiffs' claims are typical of the

claims of each Class member.  They have the same claims for statutory and punitive

damages that they seek for absent class members.

101.   **Adequacy.** Plaintiffs are adequate representatives of the class and each

sub-class because their interests coincide with, and are not antagonistic to, the interests of

the members of the class and sub-classes they seek to represent, they have retained

counsel competent and experienced in such litigation, and they intend to prosecute this

action vigorously.  FED. R. CIV. P. 23(a(4).  Plaintiffs and their Counsel will fairly and

adequately protect the interests of members of the Class.

102.   **Superiority.**  Questions of law and fact common to the Class members

predominate over questions affecting only individual members, and a class action is

superior to other available methods for fair and efficient adjudication of the controversy.

FED. R. CIV. P. 23(b)(3).  The statutory and punitive damages sought by each member are

such that individual prosecution would prove burdensome and expensive given the

complex and extensive litigation necessitated by Defendant's conduct.  It would be

virtually impossible for the members of the Class individually to redress effectively the

wrongs done to them.  Even if the members of the Class themselves could afford such

individual litigation; it would be an unnecessary burden on the courts.  Furthermore,

individualized litigation presents a potential for inconsistent or contradictory judgments

and increases the delay and expense to all parties and to the court system presented by the

complex legal and factual issues raised by Defendant's conduct.  By contrast, the class

action device will result in substantial benefits to the litigants and the Court by allowing

the Court to resolve numerous individual claims based upon a single set of proof in just

one case.

## VI.    PLAINTIFFS' LEGAL CLAIMS

### COUNT I: FAIR CREDIT REPORTING ACT, 15 U.S.C. § 1681b(b)(3)
### (CLASS CLAIM)

103.    Plaintiffs reallege and incorporate by this reference all preceding

allegations.

104.    Each of the Plaintiffs is a "consumer," as defined by FCRA, 15 U.S.C. §

1681a(c).

105.    Esteem theft reports are "consumer reports" within the meaning of 15

U.S.C. § 1681a(d).

106.    The FCRA provides that any person "using a consumer report for

employment purposes" who intends to take any "adverse action based in whole or in part

on the report," must provide the consumer a written description of the consumer's rights

under the FCRA, as prescribed by the Federal Trade Commission, *before taking such adverse action*. 15 U.S.C. § 1681b(b)(3)(A).

107.    For purposes of this requirement, an "adverse action" includes "any . . . decision . . . that adversely affects any current or prospective employee." 15 U.S.C. § 1681a(k)(1)(B)(ii).

108.    Defendant LexisNexis is a "consumer reporting agency," as defined by FCRA, 15 U.S.C. § 1681a(f).  However, by virtue of its agreements with some subscribing companies such as Family Dollar Stores and Rite Aid, Defendant is also a "person" that regularly "uses" Esteem reports when, in responding to an Esteem inquiry, it "verifies" an Esteem match, "adjudicates" the inquiry, assigns an "adjudication score" to the consumer applying for employment and reports that "adjudication" to the inquiring Esteem member, knowing that such a report is, in the context of an employment application, a critical step in an employment decision.

109.    When it "verifies" an Esteem match and assigns a "non-competitive" score to the consumer, Defendant is taking an action that "adversely affects" the consumer, more specifically, one that will result in the consumer not being hired, as occurred in the case of Plaintiff Goode, or being denied a promotion and/or fired, as occurred in the case of Plaintiff Goodman.

110.    When, as an additional "member service," Defendant sends the Pre-Adverse Action notice required by 15 U.S.C. § 1681b(b)(3) to a consumer on behalf of an inquiring employer, it does so *after* it has already taken the adverse action described above.  For example, in the case of Plaintiff Goodman, in response to an Esteem inquiry made by Rite Aid, on November 18, 2009, regarding an application for employment by Plaintiff Goodman, Defendant "verified" an Esteem theft report about Plaintiff and/or "adjudicated" her as a "non-competitive" applicant for employment with Rite Aid. However, when it sent her a Pre-Adverse Action notice dated December 2, 2009 (Exhibit "G") on behalf of Rite Aid, it did so after the adverse action had already occurred. On

information and belief, the Pre-Adverse Action Notice purportedly sent to Plaintiff
Goode by Family Dollar Stores (Exhibit "B") was also sent by Defendant, pursuant to an
Esteem Member Services Agreement with Family Dollar Stores, and was sent after a
similar adverse action had already occurred. In both cases, Plaintiffs were denied the
chance to dispute that they had committed theft and explain their situation to the
prospective employer.

111. The Pre-Adverse Action Notices sent to Plaintiffs Goodman and Goode
were form letters, similar to the ones sent to members of the Pre-Adverse Action Notice
Sub-class.

112. In addition to being wrongfully sent after the respective adverse actions
had already occurred, the common statement in such form notices that Defendant does
not participate in employment decisions and has no information about those decisions is
false and/or misleading, in that, as described above, Defendant does participate and does
have information regarding the reasons consumers are not being hired or promoted based
on Esteem background inquiries.

113. By order of the United States District Court for the Eastern District of
Virginia in an earlier class action, *Stephen M. Beverly et al. v. ChoicePoint Inc., et al*.,
Civil Action No. 3:07cv541, Defendant was ordered to allow a "reasonable period" to
elapse between the sending of Pre-Adverse Action Notices on behalf of employers and
the taking of any adverse action, and, in that matter, pursuant to a May 1, 2009 consent
order, agreed that such a "reasonable period" would be five days. A copy of the May 1,
2009 consent order in that matter is attached as Exhibit M.

114. For all the above reasons, and in violation of the order in *Beverly v.
ChoicePoint*, Defendant is willfully violating 15 U.S.C. § 1681b(b)(3)(A) by itself taking
adverse actions related to pending employment applications *before* it sends Pre-Adverse
Action Notices on behalf of Esteem employer-subscribers.

115.    Plaintiffs and members of the Pre-Adverse Action Notice Sub-Class are entitled to statutory damages of not less than $100 and not more than $1,000 and punitive damages, reasonable attorney's fees and costs, pursuant to 15 U.S.C. § 1681n.

**COUNT II:  FAIR CREDIT REPORTING ACT, 15 U.S.C. § 1681g(a)**
**(CLASS CLAIM)**

116.    Plaintiffs reallege and incorporate by this reference all preceding allegations.

117.    Defendant, in its capacity as a "consumer reporting agency," is required by the FCRA, 15 U.S.C. § 1681g(a), to furnish to a requesting consumer "all information in the consumer's file at the time of the request."

118.    The information that Defendant maintains regarding consumers in its Esteem database consists of (a) uniformly submitted electronic fields of information about the supposed theft incident and (b) the written "admission statement" that the Esteem member who "contributes" the information represents to be an admission about the supposed theft.

119.    Despite having received a request from each of the Plaintiffs and from other class members for copies of their individual files, Defendant willfully failed and continues to willfully fail, to provide them with a copy of their respective signed "admission statements."

120.    Within the FCRA scheme, one of the mechanisms for policing the accuracy of potentially damaging information being disseminated by consumer reporting agencies is the right to initiate a dispute and reinvestigation of the information pursuant to 15 U.S.C. § 1681i.

121.    The failure of Defendant to provide consumers with the actual "admission statement" forming the basis of the Esteem theft reports is particularly egregious in that, by such failure, Defendant is systematically undermining the possibility of meaningful consumer disputes by requiring consumers to dispute the accuracy of "admission statements" it does not let consumers see.

122.    Plaintiffs and the members of Disclosure Sub-class are entitled to statutory damages of not less than $100 and not more than $1,000 and punitive damages, reasonable attorney's fees and costs, pursuant to 15 U.S.C. § 1681n.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief as follows:

1.  an order certifying the proposed class and/or sub-classes herein under Federal Rule 23 and appointing Plaintiffs and the undersigned counsel of record to represent same;

2.  the creation of a common fund available to provide notice of and remedy Defendant's FCRA violations;

3.  statutory and punitive damages for themselves and the class;

4.  attorneys fees, expenses and costs;

5.  pre-judgment and post-judgment interest as provided by law; and

6.  such other relief the Court deems just and proper.

**TRIAL BY JURY IS DEMANDED**.

**KEESHA GOODE and VICTORIA GOODMAN, for themselves and on behalf of all similarly situated individuals.**

30

By:  /s/ Irv Ackelsberg
Irv Ackelsberg
Howard I. Langer
John J. Grogan
Edward A. Diver
LANGER GROGAN & DIVER, PC
1717 Arch Street, Suite 4130
Philadelphia, PA 19103
(215) 320-5660
Fax:  (215) 320-5703
Email: iackelsberg@langergrogan.com

James A. Francis
Mark D. Mailman
FRANCIS & MAILMAN, PC
100 S. Broad Street, 19th Floor
Philadelphia, PA 19110
(215) 735-8600

Sharon M. Dietrich
Nadia Hewka
COMMUNITY LEGAL SERVICES, INC.
1424 Chestnut Street
Philadelphia, PA 19102
(215) 981-3700

Leonard A. Bennett
CONSUMER LITIGATION ASSOCIATES, PC
12515 Warwick Boulevard # 101
 Newport News, VA 23606
 (757) 930-3660

DATED:  May 3, 2011