IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA
_____

KEESHA GOODE and VICTORIA GOODMAN,
on their own behalf and on behalf of others similarly situated,

Plaintiffs

vs.

LEXISNEXIS RISK & INFORMATION ANALYTICS GROUP, INC.,

Defendant
_____

C.A. No. 11-2950-JD
_____

**Plaintiffs' Brief in Opposition to Defendant's Motion to Dismiss**
_____

Irv Ackelsberg
LANGER GROGAN & DIVER, PC
1717 Arch Street, Suite 4130
Philadelphia, PA 19103
(215) 320-5660

James A. Francis
FRANCIS & MAILMAN, PC
100 S. Broad Street, 19th Floor
Philadelphia, PA 19110
(215) 735-8600

Sharon M. Dietrich
COMMUNITY LEGAL SERVICES, INC.
1424 Chestnut Street
Philadelphia, PA 19102
(215) 981-3700

Leonard A. Bennett
CONSUMER LITIGATION ASSOCIATES, PC
12515 Warwick Boulevard # 101
Newport News, VA 23606
(757) 930-3660
*Attorneys for the Plaintiffs*

Table of Contents

Table of Authorities ............................................................................................................ ii

I.     INTRODUCTION ........................................................................................... 1

II.    FACTS ALLEGED ........................................................................................ 4

      A.    Defendant's Employment Background Activity under "ESTEEM" .............. 4

      B.    The Facts Pertaining to Plaintiffs .................................................................. 7

III.    ARGUMENT ................................................................................................ 10

      A.    Legal Standard ............................................................................................. 10

      B.    The Complaint Sufficiently Alleges A Violation of FCRA Section
           1681b(b)(3) .................................................................................................. 12

           1.    An "Adverse Action" Includes any "Action" or "Determination"
                Made "in Connection with" an Employment Action, Not Simply
                the Ultimate Decision to Reject the Application ............................. 13

           2.    Liability under § 1681b(b)(3) Is Not Limited To Employers ........... 19

      C.    The Complaint Sufficiently Alleges a Violation of 15 U.S.C. § 1681g(a) ... 25

           1.    Defendant's Interpretation of § 1681g(a) Is Not Reasonable
                Because the Express Purpose of § 1681g(a) Is to Provide
                Consumer Access to "All Information" in the Consumer's "File,"
                Not Just the "Consumer Report" Furnished to an Inquiring
                Employer ......................................................................................... 28

           2.    *Cortez* Supports Allowing Plaintiffs' Willfulness Allegation to
                Stand, Nothwithstanding the Timing of that Decision..................... 32

           3.    The Willfulness Allegation Is Not Appropriately Challenged by a
                Motion to Dismiss .......................................................................... 33

IV.    CONCLUSION ............................................................................................ 35

Table of Authorities

**Cases**

*Adams v. National Engineering Service Corporation*, 620 F. Supp 2d. 319 (D. Conn. 2009) ................................................................................................................................ passim

*Bell Atlantic Corp. v. Twombly*, 550 U.S. 554 (2007) ..................................................... 10, 11, 12

*Buck v. Hampton Twp. Sch. Dist.*, 452 F.3d 256 (3d Cir. 2006).............................................. 11

*Cortez v. Trans Union, LLC*, 617 F.3d 688 (3d Cir. 2010)................................................ passim

*Crane v. American Home Mortgage*, Civ. No. 03-5784, 2004 WL 1529165 (E.D. Pa. July 7, 2004) ........................................................................................................... 3, 13, 17

*Cushman v. Trans Union Corp.*, 115 F.3d 220 (3d Cir. 1997). ........................................ 34, 35

*Ehrheart v. Lifetime Brands, Inc*., 498 F. Supp. 2d 753 (E.D. Pa. 2007) ..................................... 34

*Fischl v. General Motors Acceptance Corp.*, 708 F.2d 143 (5th Cir. 1983) ........................... 21, 34

*Fowler v. UPMC Shadyside*, 578 F.3d 203 (3d. Cir. 2009)............................................................ 11

*Gillespie v. Trans Union Corp*., 482 F.3d 907 (7th Cir. 2007)................................................. passim

*Hedlund v. Hooters of Houston*, 2008 WL 2065852 (N.D. Tex. 2008)....................................... 34

*Johnson v. ADP Screening and Selection Services, Inc.*, 768 F. Supp. 2d. 979 (D. Minn. 2011) 15

*Korman v. Walking Co*., 503 F. Supp. 2d 755 (E.D. Pa. 2007) .................................................... 33

*Miller v. Sunoco, Inc*., 2008 WL 623806 (E.D. Pa. March 4, 2008) ............................................ 34

*Neitzke v. Williams*, 490 U.S. 319 (1989) ...................................................................................... 11

*Obabueki v. Int'l Business Machines Corp.*, 145 F. Supp. 2d 371 (S.D.N.Y. 2001),............. 15, 16

*Phillips v. County of Allegheny*, 515 F.3d 224 (3d Cir. 2008)................................................ 10, 11

*Pinker v. Roche Holdings Ltd*., 292 F.3d 361 (3d Cir. 2002) ....................................................... 11

*Pinner v. Schmidt*, 805 F.2d 1258 (5th Cir. 1986) ....................................................................... 34

*Reynolds v. Hartford Fin. Servs. Group*, 435 F.3d 1081 (9th Cir. 2006) ..................................... 34

*Safeco Ins. Co. of America v. Burr*, 551 U.S. 47 (2007)............................................................... 33

*Scheuer v. Rhodes*, 416 U.S. 232 (1974) ....................................................................................... 11

*Smith v. HireRight Solutions, Inc.*, 711 F. Supp. 2d 426 (E.D. Pa. 2010) ................................... 11

*Stevenson v. TRW, Inc.*, 987 F.2d 288 (5th Cir. 1993)................................................................. 34

*Thomas v. Cendant Mortgage*, Civ. No. 03-1672, 2004 WL 2600772 (E.D. Pa. Nov. 15, 2004) 17

*Treadway v. Gateway Chevrolet Oldsmobile, Inc.*, 362 F.3d 971 (7th Cir. 2004) ...................... 17

*Umland v. PLANCO Financial Services, Inc.*, 542 F.3d 59 (3d Cir. 2008)................................... 11

*Weidman v. Federal Home Mortg. Corp.*, 338 F. Supp 2d 571 (E.D. Pa. 2004)............. 22, 23, 24

**Statutes**

15 U.S.C. § 1681a(4).................................................................................................................... 2

15 U.S.C. § 1681a(b) .................................................................................................................. 20

15 U.S.C. § 1681a(f) ................................................................................................................... 20

15 U.S.C. § 1681a(k) ............................................................................................................ passim

15 U.S.C. § 1681a(r)(1), .............................................................................................................. 21

15 U.S.C. § 1681a(u). ...................................................................................... 20
15 U.S.C. § 1681b(a)(3). ................................................................................. 21
15 U.S.C. § 1681b(b)(3) ............................................................................ passim
15 U.S.C. § 1681g(a) ................................................................................ passim
15 U.S.C. § 1681m ............................................................................ 18, 19, 23
15 U.S.C. § 1681n ............................................................................................ 27
15 U.S.C. § 1681s-2 ........................................................................................ 21

**Other Authorities**

Collins Thesaurus of the English Language – Complete and Unabridged 2nd Edition (2002).... 16
H.R.Rep. No. 103-486, Explanation of Legislation (April 28, 1994)........................................... 17
National Consumer Law Center, Fair Credit Reporting (7th Ed. 2010)....................................... 16
William Haynes, Federal Trade Commission, Staff Opinion Letter Re: Sections 603(d)(1),
    604(b), Section 606, 607(e), 609, and 610 of the Fair Credit Reporting Act (June 9, 1998) ... 22

I.    <u>**INTRODUCTION**</u>

Plaintiffs Keesha Goode and Victoria Goodman are retail workers who have been branded as thieves in a commercial employment database called "ESTEEM." They have not been criminally charged, let alone convicted of any theft, but are nonetheless being reported as thieves to potential employers by Defendant LexisNexis, the owner and operator of ESTEEM. The basis of Defendant's theft reports are supposed "signed admission statements" which a former employer submitted to Defendant. Defendant collects and retains copies of such statements from ESTEEM subscribers for use in subsequent criminal background inquiries made by other employer subscribers. If, in response to a prospective employer's background inquiry, Defendant determines that the job applicant is in its ESTEEM database, it will report that fact to the employer, summarize the admission statement in a "theft incident report" and classify the individual as unemployable. Both plaintiffs were denied jobs in connection with such determinations by Defendant.

Defendant's involvement in this process—its initial organization of collected theft reports, its use of those reports to evaluate subsequent job applications, and its employability determinations made on behalf of employers—is active and decisive. Once it receives an inquiry about a particular consumer, LexisNexis searches its ESTEEM database and, if it discovers a possible match, generates an ESTEEM theft report. In a separate operation it calls "verifying," it evaluates that report and the "admission statement" in the electronic file it maintains for the consumer, and determines whether, in its judgment alone, the theft report is accurate. Once it has "verified" an admission statement and theft report, it "adjudicates" the consumer as being unemployable (termed "noncompetitive") and then it takes two simultaneous actions: it notifies the employer of its decision and it unilaterally generates and mails a notice to the consumer

applicant, informing him or her, that an adverse action "may" be taken based upon the use of an ESTEEM report.

Defendant's conduct is governed by the Fair Credit Reporting Act ("FCRA"), which imposes "grave responsibilities," 15 U.S.C. § 1681(a)(4), on users of commercially obtained employment background information and on consumer reporting agencies that disseminate such information. This action involves two FCRA violations. First, any "person" who uses a "consumer report" to take an adverse employment-related action must provide the consumer an opportunity to challenge the report *before* taking the action. This notice must include a copy of the report and a description of the consumer's rights under the FCRA. 15 U.S.C. § 1681b(b)(3). Second, in Defendant's separate role as a Consumer Reporting Agency ("CRA"), it must provide a requesting consumer a copy of "all information in the consumer's file." 15 U.S.C. § 1681g(a)(1). Defendant is systematically violating both of those FCRA requirements.

Defendant's Motion should be denied in its entirety because it fails to set forth any basis for dismissal. The Motion is premised upon an incomplete and deficient canvassing of pertinent authority. It neglects dispositive FCRA decisions within our Circuit and this district. It fails to grasp the legislative purposes underlying the FCRA obligations at issue. And, most significantly, it misreads the statutory text itself.

Defendant characterizes Plaintiffs' § 1681b(b)(3) claim as an effort "to convince the Court that LexisNexis is liable under the FCRA for the adverse employment decisions allegedly taken by the employers." *Id*. Defendant argues that this claim is based on a "counterintuitive" construction of the statutory definition of "adverse action," a reading supposedly at odds with well-established judicial and agency interpretations. *Id*. It is Defendant's reading of the statute that is incorrect. It ignores the plain language of the complete statutory definition, which

2

encompasses not just the ultimate decision to hire or not hire, but any other, earlier "action or determination . . . made in connection with an application." 15 U.S.C. § 1681a(k)(B)(iv). Thus, even if Defendant is not making the ultimate decision (though Plaintiffs allege that they are), their "adjudication" to a potential employer that a particular employee is "noncompetitive" is itself an adverse action. Multiple courts have confirmed that this is the proper construction of the statutory text. *See, e.g., Adams v. National Engineering Service Corporation*, 620 F. Supp 2d. 319 (D. Conn. 2009); *Crane v. American Home Mortgage*, Civ. No. 03-5784, 2004 WL 1529165 *6 (E.D. Pa. July 7, 2004).

Defendant's reading is also deficient because it limits applicability of FCRA section 1681b(b)(3) to employers, not the broad array of "users" and "persons" that the FCRA actually regulates.

Regarding the section 1681g claim challenging Defendant's refusal to provide copies of the "admission statements," Defendant fails to address controlling authority. In *Cortez v. Trans Union, LLC*, 617 F.3d 688 (3d Cir. 2010), the Third Circuit defined a CRA's section 1681g obligations. Defendant attempts to relegate *Cortez* to "dicta," mentioning it only in a footnote. *See* Defendant's Memorandum in Support of Motion of Dismiss ("Def. Mem.") at 15, n.10.  It also repeatedly relies on a Seventh Circuit case, *Gillespie v. Trans Union Corp*., 482 F.3d 907 (7th Cir. 2007), which does not support its argument. As the statutory language and *Cortez* make clear, Plaintiffs' Complaint sufficiently alleges that Defendant willfully violated FCRA section 1681g. If a consumer requests *all* information upon which an adverse determination was made in connection with a job application, it is objectively unreasonable to deny that consumer access to the one document in her file that led to that determination. How can a sophisticated CRA plausibly argue that it makes sense to inform consumers that they have the right to challenge the

3

conclusion that they are thieves, but at the same time refuse to let them see the sole document on which that conclusion rests?

This is not a close case.  Plaintiffs have alleged serious and widespread FCRA violations by a commercial employment background company that is making highly prejudicial employment-related determinations for an entire industry.  There is nothing counterintuitive or unreasonable about these claims.  On the contrary, they flow directly from the "grave responsibilities" Congress has imposed on companies like Defendant.  The motion to dismiss should be denied.

II.     **FACTS ALLEGED**

   a.  **Defendant's Employment Background Activity under "ESTEEM"**

ESTEEM is a commercial employment screening products owned and operated by Defendant LexisNexis Risk & Information Analytics Group, Inc. as a result of its 2008 acquisition of ChoicePoint Workplace Solutions, Inc.  Class Action Complaint ( "CAC"), ¶¶ 10-11.[1] Defendant describes ESTEEM as a "membership-based contributory program [that] allows companies to legally share theft and fraud incident information."  CAC ¶ 15.  Used by many of the nation's retail store chains as part of their routine background screening of applicants for employment, ESTEEM claims to be a depository of information supplied by ESTEEM members about theft incidents involving their former employees. CAC ¶¶ 14-17.

---

[1] The ChoicePoint acquisition by the LexisNexis Risk & Information Analytics Group, a division of Reed Elsevier, was widely reported in the press. *See* E. Nakashima and R. O'Harrow Jr., "LexisNexis Parent Set to Buy ChoicePoint," Washington Post, Feb. 22, 2008, available at http://www.washingtonpost.com/wp-dyn/content/article/2008/02/21/AR2008022100809.html. Defendant claims in its Motion that, since the acquisition, defendant now bears the name "LexisNexis Screening Solutions, Inc."  The Court need not, for purposes of this Motion, determine Defendant's current, proper name.

The "theft and fraud incident information" Defendant disseminates to ESTEEM subscribers concerns thefts of store merchandise, property or cash, in dollar amounts of at least $5, where the original employer obtained and furnished to Defendant a "signed admission statement" regarding the theft. CAC ¶ 21. The actual submission of a new theft report into the ESTEEM system consists of two parts:  first, a data transmission from the employer to Defendant that includes several specified fields of information concerning the individual and the incident, and second, a faxed copy of the supposed admission statement. CAC ¶ 23. Once it receives this information, Defendant creates a record on its system regarding the reported incident, a record that includes an electronic image of the faxed admission statement. CAC ¶ 24.

When a different employer transmits an "inquiry" to Defendant about a particular job applicant, Defendant searches its system to see if there is a match between the person who has applied for employment and the reports in its ESTEEM database, conducting a procedure it calls "verifying" the earlier theft incident report. CAC ¶ 28. These employer "inquiries" are often automated data transmissions from the prospective employer to Defendant of names of individuals the employer has already decided to hire, subject to the individual clearing the criminal background processing conducted by Defendant, including an ESTEEM search. CAC ¶¶ 43-44. Defendant quickly reports back to the inquiring employer the results of its search, touting the speed of its response as one of the benefits of ESTEEM.  CAC ¶ 46.  These reports are in the form of electronic batch files which contain color-coded scores for each job applicant, including a red, "noncompetitive" score for any positive ESTEEM matches (together with electronic links to an incident report like the one sent to the consumer). CAC ¶¶ 45, 46, 31-39. Defendant refers to this activity as an "adjudication" of the job application. CAC ¶¶ 45-46.

As an additional service to ESTEEM subscribers, Defendant itself sends out the Pre-Adverse Action notice mandated by 15 U.S.C. § 1681b(b)(3), on the letterhead of the inquiring employer. CAC ¶ 42. These notices are mailed *after* Defendant has already "adjudicated" the application and provided the "adjudication scores" to its employer customer. CAC ¶ 47.  This is the timing violation of § 1681b(b)(3) that Plaintiffs raise in Count I of the Complaint, because the ESTEEM adjudication is itself an "adverse action."

In its dual role as both (a) the CRA which assembles and communicates consumer information and (b) as an agent for its employer members on whose behalf it "adjudicates" applicants for employment and sends FCRA notices to those applicants, the sequence of Defendant's actions is as follows: Consumer applies to Employer; Employer transmits Consumer's identity information to Defendant; Defendant initiates a search of its Esteem database and, in the event of a match, it "verifies" that it has a theft report involving the Consumer and an image of a purported "admission statement" supporting the report; then, in its capacity as the Employer's agent and, depending on the criteria earlier provided by the Employer, Defendant "adjudicates" the employment application; finally, *after* that "adjudication" has occurred, it notifies the Employer of its decision and sends the Pre-Adverse Action Notice to the Consumer on the letterhead of the Employer, followed several days later by the Adverse Action Notice it also sends on behalf of the Employer.  CAC ¶ 48.

When Defendant mails the untimely Pre-Adverse Action to the consumer, it includes a copy of the theft incident report it provided to the inquiring employer, but it does not include with the report a copy of the supposed admission statement on which its "adjudication" is based. CAC ¶ 50. Nor does Defendant require the employers that contribute the admission statements to ESTEEM in the first place to provide copies of the statements to the consumer.  CAC ¶ 51.

6

After being provided with a copy of the theft report and a notice of their FCRA rights, many consumers request that Defendant provide the contents of their file. In responding to such requests, Defendant does not routinely provide copies of the admission statements. ¶ 52. Thus, consumers are told they have the right to dispute the accuracy of the information in the theft report, and the right to obtain "all information" in their file, yet they are not given the one document in Defendant's file on which their label as a thief is based.

 **b.**  <u>**The Facts Pertaining to the Plaintiffs**</u>

Keesha Goode applied for employment at a store in the Family Dollar Store chain in May 2009. CAC ¶ 56. Sometime soon after she submitted that application, she received a computer-generated notice on the letterhead of Family Dollar Store, advising her that Family Dollar Store had requested a "criminal background report" from Defendant that "may" adversely affect her application.[2] The notice included an enclosed copy of the background report. The notice advised her of various rights under the FCRA, including her right to initiate a dispute with Defendant regarding any inaccuracy in the report, as well as her right to obtain "free disclosure" of the "file" on which the report was based. CAC ¶¶ 57-58 and Exhibit B. In fact, the Notice, while seeming to be from Family Dollar Store, was sent by Defendant, pursuant to its ESTEEM member services agreement with Family Dollar Store. CAC ¶ 59. The theft report provided to Plaintiff and to Family Dollar Store, a copy of which is attached to the Complaint as Exhibit C and is dated May 7, 2009, describes the theft incident as follows:

---

[2] The consumer reporting agency named in the letter was ChoicePoint Workforce Solutions, Inc., Defendant's predecessor. Plaintiffs believe that, as of May 2009, the acquisition of ChoicePoint had already occurred but that the name in the communications with consumers had not yet been changed. Plaintiffs use the term "Defendant" to encompass actions actually conducted by LexisNexis, or by LexisNexis in its capacity as successor to ChoicePoint.

        Theft Location Details:
        Member:             Forman Mills
                   * * *
        Type of Offense:    Theft of Merchandise
        Date of Incident:    10/29/2008
        Theft Amount:      $34.97
        Admission Status:   Verified admission statement.

CAC ¶ 61 and Ex. C.

Ms. Goode had worked previously at Forman Mills, but since she never committed any theft during her tenure there, had never been charged with theft, and had no knowledge about any theft complaint being referred to the police by her former employer, she sought legal advice. CAC ¶¶ 63-64.  As a result, in the Summer of 2009, she sent a letter to Defendant, a copy of which is attached to the Complaint as Exhibit D, in which she disputed the accuracy of the theft report, and stated that "I was accused of not reporting on a former employee who was stealing merchandise, but I did not steal anything myself" and requested "a copy of all information about me that [Defendant] has regarding this report." CAC ¶ 64 and Ex. D.[3]  On August 6, 2009, Defendant responded with a computer-generated form letter which informed Ms. Goode that Defendant had "completed our reinvestigation of the disputed information and verified that the original information provided on the background report was reported accurately;" again, no copy of the admission statement was provided. CAC ¶ 65.  Goode sent Defendant a second letter in which she again asked for copies of "whatever information you are relying on," stating, "I cannot disprove information without knowing what it is, and where it came from."  CAC ¶ 66 and

---

[3] Defendant characterizes Paragraphs 54-55 as an admission by Plaintiff that she was "fired for stealing merchandise" from Forman Mills. Defts. Mem. at 3. She made no such admission.  What she alleged is that she was accused of not reporting a former employee who stole merchandise, not of having herself committed a theft. ¶ 64.  Interestingly, while Defendant attached to its Motion a copy of the "admission statement" on file for co-Plaintiff Goodman, it neglected to attach any such document for Ms. Goode. To this day, she still does not know if a purported admission statement even exists.

Exhibit F.  Ms. Goode never received a response to that second letter, or a copy of the supposed admission statement. CAC ¶¶ 67-68.

In November 2009, Victoria Goodman, who at the time had been working for Rite Aid as a cashier for three years, applied for a promotion to store supervisor. CAC ¶ 76. On November 30, 2009, Rite Aid fired her as a result of an ESTEEM report provided by Defendant to Rite Aid as part of the processing of her promotion application. CAC ¶¶ 77-80.  On December 2, 2009, after she had already been fired, she received a notice from Defendant, on the letterhead of Rite Aid, stating that Rite Aid had received a consumer report from Defendant that "may affect your employment status," advising her of her rights under FCRA, and enclosing a copy of the report. CAC ¶¶ 80-82, 85, and Exhibit G. The notice included the statement—which Plaintiff alleges is false and/or misleading—that Defendant "will not participate in any employment decision." CAC ¶82. The theft report provided to Rite Aid and to Plaintiff, a copy of which is attached to the Complaint as Exhibit H, and is dated November 18, 2009, describes the theft incident as follows:

> Theft Location Details:
> Member:              Dollar General
>                     * * *
> Type of Offense:     Theft of Merchandise
> Date of Incident:    8/1/2006
> Theft Amount:        $100.00
> Admission Status:    Verified admission statement.

CAC ¶ 86 and Ex. H.

Ms. Goodman was previously employed by Dollar General, but she denies ever having been charged with theft or ever signing any statement admitting to theft. CAC ¶¶ 88, 91.  Like Ms. Goode, she sent a letter to Defendant disputing the accuracy of the theft report it had provided Rite Aid, and like Ms. Goode, received back a form letter from Defendant, advising her

that its "reinvestigation of the disputed information" had been completed and that Defendant had concluded that the ESTEEM report was accurate. CAC ¶¶ 91-92 and Exs. J and K.  After receiving that letter from Defendant, Goodman obtained legal counsel who sent a letter demanding a copy of the so-called "verified admission statement" and a description of Defendant's reinvestigation. ¶ 93, Ex. L.  Defendant did not respond to that letter or provide her with a copy of the admission statement, but, as a result of a successful union grievance, Rite Aid rehired her as a cashier. ¶ 94.

For the first time, in its Motion, Defendant attached a copy of the signed statement underlying its report that Ms. Goode admitted to a theft of $100 of merchandise. Def. Mem., Ex. 2. That document, on its face, can hardly be characterized as an admission of theft. First, the writing is clearly by two different people. The upper portion, in one handwriting, describes an attempt to leave the Dollar General store with a $12 fan and $2 of soda which was not included on the sales receipt for various items purchased. The lower portion, in the handwriting of the signator, Victoria Goodman, simply refers to a fan that she "really thought I bought" but "forgot to pay for." Obviously, discovery will be directed at how Defendant "verified" that Ms. Goodman had, in fact, admitted in writing to stealing $100 of merchandise, and what it did in its reinvestigation when, a second time, it concluded that its report was accurate.

## III.   <u>ARGUMENT</u>

### A.   <u>Legal Standard</u>

On a Rule 12(b)(6) motion to dismiss, the general rules of pleading require only a short and plain statement of the claim showing that the pleader is entitled to relief; detailed factual allegations are not necessary.  *See Bell Atlantic Corp. v. Twombly*, 550 U.S. 554, 555 (2007) ("A complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations."); *Phillips v. County of Allegheny*, 515 F.3d 224, 233 (3d Cir. 2008). The court must

"'accept all factual allegations in the complaint as true and view them in the light most favorable to the plaintiff' [and] 'determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief.'" *Umland v. PLANCO Financial Services, Inc.*, 542 F.3d 59, 64 (3d Cir. 2008) (*quoting Buck v. Hampton Twp. Sch. Dist.*, 452 F.3d 256, 260 (3d Cir. 2006) and *Pinker v. Roche Holdings Ltd.*, 292 F.3d 361, 374 n. 7 (3d Cir. 2002)).

"'Rule 12(b)(6) does not countenance . . . dismissals based on a judge's disbelief of a complaint's factual allegations.'" *Twombly*, 550 U.S. at 556 (quoting *Neitzke v. Williams*, 490 U.S. 319, 327 (1989)). "A well-pleaded complaint may proceed even if it appears 'that a recovery is very remote and unlikely.'" *Id.* (quoting *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974)). As the Third Circuit held in *Phillips*, *Twombly* "'simply calls for enough facts to raise a reasonable expectation that discovery will reveal evidence of' the necessary element." 515 F.3d at 234 (*quoting Twombly*, 550 U.S. at 556).

The standard is no different for cases brought under the FCRA, including those which set forth claims that a consumer reporting agency acted in willful violation thereof.  As this Court recently observed in an FCRA case, relying on *Phillips* and other post-*Twombly* decisions, "nothing in *Twombly, Iqbal*, or *Fowler* [*v. UPMC Shadyside*, 578 F.3d 203 (3d. Cir. 2009)] has altered some of the fundamental underpinnings of the Rule 12(b)(6) standard of review . . . [Rule 8] requires only a short and plain statement of the claim showing that the pleader is entitled to relief and need not contain detailed factual allegations."  *Smith v. HireRight Solutions, Inc.*, 711 F. Supp. 2d 426, 431 (E.D. Pa. 2010) (citations omitted) (denying motion to dismiss FCRA claims).

**B.**     **The Complaint Sufficiently Alleges A Violation of FCRA Section 1681b(b)(3)**

Count I of the Complaint asserts a violation of 15 U.S.C. § 1681b(b)(3), which imposes a

special FCRA obligation on any "person" who "[uses] a consumer report for employment

purposes." 15 U.S.C. § 1681b(b)(3)(A). Such a person,

> "before taking any adverse action based in whole or in part on the report, . . . shall
> provide to the consumer to whom the report relates--
> (i) a copy of the report; and
> (ii) a description in writing of the rights of the consumer under this subchapter, as
> prescribed by the Federal Trade Commission under section 1681g(c)(3) of this title.

*Id.* This Pre-Adverse Action notice requirement in § 1681b(b)(3) applies only to employment-

related actions and is in addition to the general Adverse Action notice requirement of § 1681m

that applies to all "adverse actions." Defendant LexisNexis violated this requirement when, after

using the theft reports in its ESTEEM database, it failed to provide a Pre-Adverse Action

notification *before* negatively "adjudicating" the ESTEEM inquiries.

Defendant does not argue that Plaintiffs' allegations are insufficiently vague or unspecific

to warrant a *Twombly* dismissal, nor could they, given the level of detail in Plaintiffs' Complaint.

Rather, Defendant argues that Plaintiffs fail to state a claim under § 1681b(b)(3) as a matter of

law based on two misconceptions about the elements of a § 1681b(b)(3) violation. First,

Defendant disputes that its "adjudication" of Plaintiffs' background history as being

"noncompetitive" was an "adverse action" as that term is defined by the FCRA.  In Defendant's

view, no adverse action occurred until the employers, having received Defendants' ESTEEM

report, communicated their final decision to reject Plaintiffs' applications. Def. Mem. at 6-9.

Second, Defendant contends that § 1681b(b)(3) only applies to employers. Defendant argues that

even if its do-not-hire reports regarding the Plaintiffs were "adverse actions," it performed those

actions solely as an agent for the employers who, according to Defendant, are the only parties

that can be liable for failing to provide Pre-Adverse Action notifications to Plaintiffs.  *Id*. at 9-12.

Both of these arguments are wrong.  They are contrary to the FCRA's plain language, the

pertinent case authority, and the purposes of the FCRA.

> **1.    An "Adverse Action" Includes any "Action" or "Determination" Made "in Connection with" an Employment Action, Not Simply the Ultimate Decision to Reject the Application.**

The FCRA definition of "adverse action," found at 15 U.S.C. § 1681a(k),[4] distinguishes

between credit, insurance, licensing and employment, providing a separate core definition of

"adverse action" in each of those areas,[5] and then expanding each of those separate core

definitions with a common, "catch-all" definition at § 1681k(1)(b)(iv). *See Crane v. American*

*Home Mortgage*, Civ. No. 03-5784, 2004 WL 1529165 *6 (E.D. Pa. July 7, 2004).Thus, the

complete definition of "adverse action" applicable to employment-related actions combines the

---

[4] **(k) Adverse action.**
    **(1) Actions included.**
    The term "adverse action"--
    (A) has the same meaning as in section 1691(d)(6) of this title; and
    (B) means--
        (i) a denial or cancellation of, an increase in any charge for, or a reduction or other adverse or unfavorable change in the terms of coverage or amount of, any insurance, existing or applied for, in connection with the underwriting of insurance;
        (ii) a denial of employment or any other decision for employment purposes that adversely affects any current or prospective employee;

        (iii) a denial or cancellation of, an increase in any charge for, or any other adverse or unfavorable change in the terms of, any license or benefit described in section 1681b(a)(3)(D) of this title; and
        (iv) an action taken or determination that is--
            (I) made in connection with an application that was made by, or a transaction that was initiated by, any consumer, or in connection with a review of an account under section 1681b(a)(3)(F)(ii) of this title; and
            (II) adverse to the interests of the consumer.

[5] Credit is covered by § 1681k(1)(A), insurance by § 1681k(1)(2)(i), employment by § 1681k(1)(ii) and licensing by § 1681k(1)(iii).

core definition of subsection (ii) with the general catch-all in subparagraph (iv).  Read together, that complete definition is as follows:

> The term "adverse action" . . . (B) means—
>      * * *
> (ii) a denial of employment or any other decision for employment purposes that adversely affects any current or prospective employee [and]
>      * * *
> (iv) an action taken or determination that is—
> > (I) made in connection with an application that was made by, or a transaction that was initiated by, any consumer, or in connection with a review of an account under section 1681b (a)(3)(F)(ii) of this title; and
> > (II) adverse to the interests of the consumer.

15 U.S.C. §1681a(k)(1)(B).

There is no basis in the statutory text for limiting employment-related "adverse actions" only to the ultimate denial of employment. The first part of the definition, in subsection (B)(ii), makes clear that the definition encompasses "a denial of employment *or any other decision for employment purposes that adversely affects any current or prospective employee*." (emphasis added).  It was that "any other decision" language in §1681a(k)(1)(B)(ii) that led another district court to reject the same argument being made by Defendant here, concluding that the provision reaches not only the ultimate decision to hire, but also the previous, intermediate decisions on which the decision to hire is based.  *See Adams v. National Engineering Service Corporation*, 620 F. Supp 2d. 319, 332 (D. Conn. 2009) (allowing § 1681b(b)(3) claim against consumer reporting agency that furnished an inaccurate criminal background report to a prospective employer that had tentatively decided to hire the plaintiff, conditional on plaintiff clearing the background check).

The reasoning in *Adams* makes sense in the factual context alleged in this case.  When LexisNexis "adjudicates" an ESTEEM inquiry, it is itself engaging in a decision-making activity.

After finding a match with a theft report in its system, it reviews the report and the imaged admission statement, and it determines whether, in its judgment, the consumer admitted to the theft described in the report.  If it makes that judgment, it sends the theft report to the inquiring employer with a scored decision, classifying the consumer as "noncompetitive."  Such actions are "decisions for employment purposes that adversely affect [a] prospective employee." 15 U.S.C. § 1681a(k)(1)(B)(ii). Any narrower interpretation would nullify the broad "or any other decision" language in this clause.

Without offering any contrary textual analysis (or mentioning *Adams*), Defendant relies primarily on *Obabueki v. Int'l Business Machines Corp.*, 145 F. Supp. 2d 371 (S.D.N.Y. 2001), a case having little, if any, bearing on this one.  In *Obabueki*, a summary judgment decision, a prospective employee asserted a § 1681b(b)(3) claim, contending that the adverse action in his case occurred during internal company discussions when staff decided to rescind a previously made job offer.  The court there concluded that Plaintiff had failed to introduce evidence proving that an adverse determination had already occurred during those earlier company discussions.  Unlike *Adams* and this case, *Obabueki* did not involve an objective, recorded and completed determination made by a third party and relied on by the employer making the ultimate hiring decision.  Also, the court in *Obabueki* was essentially making a finding of fact that no decision had been made during those earlier internal discussions, a point that highlights why it is inapplicable to an analysis of the sufficiency of Plaintiffs' Complaint in the context of a motion to dismiss.[6]

---

[6] *Johnson v. ADP Screening and Selection Services, Inc.*, 768 F. Supp. 2d. 979 (D. Minn. 2011), the other case cited by Defendant, is similarly off point. The *Johnson* court, in a four page opinion, did not consider the definition of adverse action at all and was only presented with the argument that a fourteen-day period between the Pre-Adverse Action Notice and disqualification for a position was unreasonably brief under the FCRA.  *Johnson*, 768 F. Supp. 2d. at 983-84.

15

This distinction is fatal to Defendant's use of the case.  In the New York case, the jury was still out as to whether or not the applicant had been found disqualified at some earlier time, before the formal, final decision was made. This is not true *sub judice*.  The Complaint plainly alleges facts that Defendant must now ignore in its effort to stretch IBM's summary judgment victory in *Obabueki* into a rule of law that governs this case.  Unlike in *Obabueki*, Plaintiffs allege that the ESTEEM determination was "a final stage in the evaluation of an employment application[,]" after the prospective employers had already decided to hire them. CAC ¶ 43.

*Obabueki* is inapposite for an additional reason.  The parties there neglected to raise with the court the other half of the definition of employment-related adverse actions, contained in § 1691a(k)(1)(B)(iv), a provision that has been fairly labeled "a sweeping catchall".  National Consumer Law Center, Fair Credit Reporting, §8.5.4.2 (7th Ed. 2010).  This subsection, which was intended to supplement subsection (ii), explicitly includes any adverse "action taken or determination . . . made in connection with an application." This language is more than ample to cover ESTEEM adjudications rendered by Defendant.  Thus, even if one does not regard Defendants' actions as being employment "decisions" that are "other than" the resulting denial of employment under (B)(ii)—though they clearly are—they were, at the very least, adverse "determinations made in connection with" applications for employment under (B)(iv). *See e.g.* Collins Thesaurus of the English Language – Complete and Unabridged 2nd Edition (2002) (synonyms for "adjudication": judgment, finding, ruling, decision, settlement, conclusion, verdict, determination).

---

That argument is not relevant to Plaintiffs' claims here. Further, in *Johnson*, the Court drew a helpful distinction to the facts in this case, namely, that the employment decision there was not made to reject the application, but instead merely to put it on hold. *Id.* No similar facts or allegation are suggested in this case. The ESTEEM decision was final and definitive.

Besides not mentioning subsection (B)(iv), Defendant also neglects to mention the numerous decisions that, in the context of credit decisions, hold that subsection (B)(iv) is an all-purpose catch-all, even applicable to categories of "adverse actions" defined in other clauses of § 1681a(k)(1).  *See, e.g., Treadway v. Gateway Chevrolet Oldsmobile, Inc.*, 362 F.3d 971, 982-3 (7th Cir. 2004) (catch-all definition applicable even though more specific credit-purpose definition available in § 1681k(1)(A) also applied); *Crane v. American Home Mortgage* (same); *Thomas v. Cendant Mortgage*, Civ. No. 03-1672, 2004 WL 2600772 *7 (E.D. Pa. Nov. 15, 2004) (same).

In *Crane*, the court explained Congress's intent in adding the catch-all to the core categorical definitions of "adverse action."  Citing the relevant legislative history, the court rejected a lender's argument that credit-related decisions are covered by § 1681a(k)(1)(A), not the more general catch-all in subsection (B)(iv), reasoning that:

> [T]here is no indication that Congress intended credit transactions to be evaluated exclusively under subsection (A), as AHM maintains. In fact, the legislative history indicates otherwise. (citing cases). Congress stated that the 1994 revisions to the FCRA added
>
>> ". . . a catch-all phrase that makes clear that any action taken or determination made with respect to a consumer application or a consumer-initiated transaction that is adverse to the interest of the consumer constitutes an adverse action . . . Although the definition section provides a list of transactions that are considered to constitute examples of adverse actions, this list is illustrative and not definitive. It is the Committee's intent that, whenever a consumer report is obtained for a permissible purpose under section 604(a), any action taken based on that report that is adverse to the interests of the consumer triggers the adverse action notice requirements under section 615."
>
> H.R.Rep. No. 103-486, Explanation of Legislation (April 28, 1994). Thus, the legislative history belies AHM's argument that a broad interpretation of subsection (B)(iv) renders subsection (A) superfluous, with the general provision swallowing the specific.

*Crane v. American Home Mortgage*, 2004 WL 1529165 at *6.

17

Having ignored *Crane* and these decisions altogether, Defendant does not identify any reason why the scope of employment-related "adverse actions" should be viewed more narrowly than credit-related "adverse actions."  Indeed, such a uniquely narrow reading of the employment-related definition is not supported by the structure and language of § 1681a(k)(1). As these decisions interpreting the catch-all conclude, the catch-all is just that, an additional wild-card definition intended to the expand the scope of all of the previously stated, core definitions of adverse action.

Besides there being no textual basis for interpreting the statutory definition as being more restrictive for employment-related "adverse actions," the purpose of the Pre-Adverse Action Notice mandated by 15 U.S.C. § 1681b(b)(3) is to give consumers *more* protection in the area of employment than the other areas covered by the FCRA, not less. While Congress decided to impose a notice requirement at the time any person makes any "adverse action" in a covered circumstance, 15 U.S.C. § 1681m, it also imposed a supplemental, earlier notice obligation, before the adverse action is taken, in the area of employment. By compelling this special, Pre-Adverse Action Notice to consumers in respect to employment-related decisions, in addition the Adverse Action Notice applicable to "adverse actions" generally, Congress could not have intended an interpretation of "adverse action" that would exclude the applicability of the catch-all in § 1681a(k)(1)(B)(iv) to employment-related actions and thereby render meaningless the special notice obligation.  *See Safeco Ins. Co. of America v. Burr*, 551 U.S. 47, 65 n. 15 (2007) (instructing that "Congress's intent to define 'adverse action' [should be interpreted] in light of the notice requirement").

18

The purpose of the Pre-Adverse Action Notice requirement is to provide prospective employees *two* opportunities to be alerted to the existence of the potentially harmful consumer report, "before" an adverse action is taken, 15 U.S.C. § 1681b(b)(3), and after one, § 1681m.[7]  It makes no sense, given that purpose, to read "adverse action" more narrowly for employment-related actions than for the other kind of actions covered by the FCRA, especially since there is no support for such a reading in the statutory language.

In short, Plaintiffs have sufficiently alleged that Defendant took actions or made determinations that were adverse to their interests with regard to their applications for employment.  Indeed, as alleged, it was Defendant's actions and determinations in both cases that was the basis for them not being hired.  Like the employer in *Adams v. National Engineering Service Corp.,* Plaintiffs allege that employer subscribers use ESTEEM as the final step in their hiring process, sending a background inquiry to Defendant after they have essentially already decided to employ the applicant, conditioned on the applicant being cleared by Defendant.  CAC ¶¶ 43-46. As alleged, it is Defendant's "adjudication" that was the difference in both cases between being hired or rejected. *Id*.

### 2.    Liability under § 1681b(b)(3) Is Not Limited To Employers

Even if ESTEEM adjudications are "adverse actions" which trigger the notification obligation of 15 U.S.C. § 1681b(b)(3), Defendant argues that it is the prospective employers, not

---

[7] It is obvious from the facts alleged that Defendant concedes, as it must, that employment-related actions require both notices since it sends both Pre-Adverse Action and Adverse Action notices.  *See* CAC ¶¶ 47-48, and Exhibits G and I (Defendant sent both a Pre-Adverse Action Notice and Adverse Action Notice Plaintiff Goodman; CAC ¶ 113 and Ex. M (Defendant entered into a consent decree in the Eastern District of Virginia, specifying a minimum five-day delay between the two notices).

Defendant, to whom this obligation attaches. This argument has no basis in the statutory language.

The § 1681b(b)(3) obligation attaches to a "person" who "uses" a report to make an adverse employment-related action, not to an "employer:"

> Except as provided in subparagraph (B), *in using* a consumer report for employment purposes, before taking any adverse action based in whole or in part on the report, the *person* intending to take such adverse action shall provide to the consumer to whom the report relates—
>
> > (i)      a copy of the report; and
>
> > (ii)     a description in writing of the rights of the consumer under this subchapter, as prescribed by the Federal Trade Commission under section 1681g (c)(3) [1] of this title

15 U.S.C. § 1681b(b)(3) (emphasis added).

A person under the FCRA is "any individual, partnership, corporation, trust, estate, cooperative, association, government or governmental subdivision or agency, or other entity.  15 U.S.C. § 1681a(b).  Defendant is obviously a "person."

Defendant is also a "consumer reporting agency" (CRA) but there is nothing that prevents a CRA from being a "person."  On the contrary, a CRA is, by definition, a "person" that engages in specified business activities.[8]  Nor is there anything in the FCRA that prevents one entity from playing multiple defined roles or functions within the statutory scheme.  Resellers can be consumer reporting agencies.  *See* 15 U.S.C. §§ 1681a(f) and 1681a(u). A credit card company can be a user of credit information, a furnisher of credit information, and a card issuer. *See* 15

---

[8] 15 U.S.C. § 1681a(f) provides:
> The term 'consumer reporting agency' means any *person* which, for monetary fees, dues, or on a cooperative nonprofit basis, regularly engages in whole or in part in the practice of assembling or evaluating consumer credit information or other information on consumers for the purpose of furnishing consumer reports to third parties, and which uses any means or facility of interstate commerce for the purpose of preparing or furnishing consumer reports." (emphasis added)

U.S.C. § 1681b(a)(3), § 1681a(r)(1), and § 1681s-2.  Similarly, Defendant here, by using the

ESTEEM report in order to conduct its background adjudications of applications on behalf of

employer subscribers, is acting both as a CRA and a user, a result wholly consistent with the

FCRA.

Without analyzing the statute at all, let alone offering any statutory argument why

§ 1681b(b)(3) only applies to employers, Defendant relies on two opinion letters drafted by FTC

staff counsel in June, 1998.  But the pertinent passages of these letters only state that, where a

CRA provides Pre-Adverse Action notifications on behalf of employers, the employers remain

liable for any FCRA violation pertaining to such notification.  These letters, to the extent they

have any authoritative value in the first place, are only opining that employers in such situations

are also liable for potential violations of § 1681b(b)(3).[9]  They do not express the view that a

CRA that itself takes an adverse actions on behalf of an employer should not be treated as a

"user" that must comply with the law.

The cited opinion letters answer the question of whether the employer is freed of all

notice obligations when the CRA performs the notice function.  That this question is even posed

presupposes that the CRA participating in adverse action decision-making is itself also

responsible.  The restated question considered by the FTC was really, "Since the CRA is already

responsible as an adjudicating entity, is the employer also responsible?"  In answering the

---

[9] Prior to 1999, the FTC had no rulemaking authority under the FCRA. While Congress did grant some limited authority to the FTC to issue regulations and interpretations in the Gramm-Leach-Bliley Act, Pub. L. No. 106-102, § 506(b) (Nov. 12, 1999), both of the staff opinion letters relied on by Defendant are dated June 9, 1998.  Even by their own terms, the views expressed in the opinion letters, copies of which Defendants attached to their Motion, "are those of the Commission's staff and do not necessarily reflect the views of the Commission or any individual Commissioner." Def. Mem., Exhibit 3 at 2; Exhibit 4 at 3. Thus, these letters do not bind even the FTC, let alone this court. *See Fischl v. General Motors Acceptance Corp.*, 708 F.2d 143, 149 n.4 (5th Cir. 1983) (FTC staff opinion letters are "advisory in nature," not "binding interpretations").

question of what liability an employer faces, the FTC expressly rejected Defendant's view of the law and cautioned CRAs that while "your employer clients may arrange for you to make the disclosures, obtain written permission, and provide the notices required by these provisions", "[i]f you assume these responsibilities, you should ensure that your procedures comply with the FCRA."  William Haynes, Federal Trade Commission, Staff Opinion Letter Re: Sections 603(d)(1), 604(b), Section 606, 607(e), 609, and 610 of the Fair Credit Reporting Act, at 2, n.1 (June 9, 1998) (Def. Mem., attached as Exhibit 4).

Outside of its tactical testing of new arguments in this case, Defendant has expressly conceded in other litigation, *Beverly v. Wal-Mart Stores, Inc*., C.A. No. 3:07cv469 (E.D. Va.), that it is a user of its own background information, responsible for complying with § 1681b(b)(3). *Beverly* involved a claim that both Defendant and Wal-Mart were jointly violating § 1681b(b)(3) by giving prospective employees inadequate time to raise disputes between Pre-Adverse Action notices sent by Defendant for Wal-Mart and the follow-up Adverse Action notice.  In a May 2009 consent decree, a copy of which Plaintiffs attached to their Complaint, CAC ¶ 113 and Ex. M, Defendant agreed to "conform its business practices so that the mailing of Adverse Action Notices on behalf of its customers shall occur no earlier than five business days after the mailing of the Preadverse Action Notices." Consent Decree (Ex. M) at ¶ 6. While *Beverly* involved background products other than ESTEEM, it is unreasonable for Defendant to argue here, given its concession in *Beverly*, that only ESTEEM customers, not Defendant itself, have obligations under § 1681b(b)(3).

The only other authority cited by Defendant for its argument that only an employer, not a CRA, can commit a § 1681b(b)(3) violation is *Weidman v. Federal Home Mortg. Corp.*, 338 F. Supp 2d 571 (E.D. Pa. 2004). *Weidman* is not an employment case and therefore does not

22

involve § 1681b(b)(3), which applies only to employment.  That case involved adverse credit decisions and the notification requirement in      § 1681m.  The plaintiff in *Weidman* was denied credit allegedly based on various lenders' use of credit reports generated by the proprietary underwriting system called Loan Prospector, owned by the mortgage giant, Freddie Mac. Mr. Weidman alleged that Freddie Mac, through Loan Prospector, was itself making adverse credit decisions since the software evaluates applications for credit based on information supplied by the three credit bureaus and then renders an "accept" or "caution" determination that it communicates to lenders.

In rejecting Weidman's claim, the court concluded that Freddie Mac could not be a CRA, based on the FTC's "joint-user" commentary that suggests that "an agent or employee that obtains consumer reports does not become a consumer reporting agency by sharing such reports with its principal or employee," *Weidman*, 338 F. Supp.2d at 575 (quoting FTC Commentary on the FCRA) (omitting emphasis added by court).  Having concluded that agents cannot be CRA's, the court then decided that an agent should not be able to take adverse actions for its principal either.  By analogy, Defendant argues here, since ESTEEM subscribers are the ones making the ultimate employment decisions and Defendant is only acting as their agent in processing background reports for them, it should not be responsible for the employers' obligations under § 1681b(b)(3).

Both the reasoning of *Weidman* and Defendant's attempt to extend that reasoning to this case are wrong for many reasons.  First, there is nothing in the statutory definition of "adverse action" or in § 1681b(b)(3) that exempts "agents" from liability. Primarily for that reason, no other court has followed *Weidman* in using the FTC Commentary to construct such an exemption. *See Adams v. National Engineering Service Corp.*, 620 F. Supp. 2d at 327 (refusing

to follow *Weidman* and instead relying on the broad statutory language of "adverse action" in the FCRA).

Second, even on its own terms, the FTC Commentary cited in *Weidman* only addresses the definition of a "consumer reporting agency." It says nothing about entities who use consumer reports under § 1681b(b)(3). Since § 1681b(b)(3) applies to users of consumer reports, not to CRA's, the FTC Commentary is not even applicable to the claim at issue here.

Third, the court in *Weidman* was concerned that the practical consequence of allowing the claim against Freddie Mac to go forward would be that the consumer would get two, duplicative notices at the same time, one from Freddie Mac and one from the lender who used Loan Prospector in reaching its adverse credit decision. 338 F. Supp. 2d at 577 ("Particularly where, as here, consumers already receive notice of any adverse credit decision taken by a principal/lender, it would be duplicative to impose a similar burden on an agent providing evaluative assistance at the principal's request.") But that practical issue is not present here.  There is no risk of duplicative notices since Defendant sends both the Pre-Adverse and Adverse Action notices for the customer. The consumer gets one of each.  The only relevant issue in this case is not whether Defendant should send Pre-Adverse Action notices but rather whether Defendant must send such a notice before rendering its employability determination and communicating that determination to the customer.

Fourth, to the extent this Court finds the reasoning in *Weidman* at all persuasive, the role played by Defendant in the ESTEEM system is not analogous to the role played by Freddie Mac in credit decisions made by lenders using Loan Prospector. *Weidman* accepted the view that it would be unfair to treat Freddie Mac as an FCRA actor when its role with regards to Loan Prospector evaluations was so passive. 338 F. Supp. 2d at 575 ("Unlike Experian, Trans Union, and Equifax,

paradigmatic examples of consumer reporting agencies, Defendant Freddie Mac is not in the business of collecting and storing the population's consumer credit information for distribution to a variety of users.")  Defendant LexisNexis, in contrast, is in the business of "collecting and storing" employment background information "for distribution to a variety of users."  And, as part of that business, Defendant itself uses that information in actively rendering employability determinations.  There is nothing unfair, given the broad scope of the "adverse action" definition and the purpose of the Pre-Adverse Action notification mandated by § 1681b(b)(3), to apply the mandate to LexisNexis under the circumstances alleged here.

### C.     The Complaint Sufficiently Alleges a Violation of 15 U.S.C. § 1681g(a)

Count II of the Complaint alleges a violation of 15 U.S.C. § 1681g(a), which states:

> Every consumer reporting agency shall, upon request, and subject to section 1681h (a)(1) of this title, clearly and accurately disclose to the consumer: (1) *All information* in the consumer's file at the time of the request . . .[10]

*Cortez v. Trans Union, LLC*, 617 F.3d 388, 711 (3d Cir. 2010) (quoting§ 1681g(a)) (emphasis in original). Plaintiffs, in requesting all the information in their file, were denied copies of the admission statements that formed the basis of the theft reports.  Their claim is straightforward. Having asked Defendant for all information—or, in Ms. Goodman's case, having explicitly asked for the admission statement, *see* CAC, Ex. L—Defendant violated § 1681g(a) by simply sending them duplicative copies of the theft reports already provided, without giving them the admission statements on which those reports were based.

As pled in the Complaint, this is not a merely technical or harmless violation. The entire FCRA scheme depends on a consumer's ability to dispute harmful reports and thereby force the

---

[10] FCRA sections 1681g(a)(1)(A) and 1681g(a)(1)(A) provide exceptions to this general rule allowing for the exclusion of the consumer's full nine digit social security number and credit score from inclusion in a consumer's disclosure.  Neither exception is applicable here.

CRA and the original furnisher of the damaging information to reinvestigate the accuracy of the information being disseminated about them. *See* CAC ¶ 120.  The failure of LexisNexis to provide consumers with the actual "admission statements" that form the basis of theft reports to prospective employers undermines the integrity of the dispute process by requiring the consumers to challenge or clarify admission statements they are not allowed to see.  *See* CAC ¶ 121.

Plaintiff Goodman's case illustrates how essential the statements can be to a consumer's ability to dispute an ESTEEM theft report.  Plaintiff Goodman, who lost a promotion based on a report that she admitted stealing $100 in merchandise from a previous employer, initiated a dispute, but she did not have a copy of the purported signed admission and LexisNexis failed to provide her one.  Only after she filed this action did Defendant finally give her a copy, attached as an Exhibit to its Motion. *See* Def. Mem., Ex. 2. Now that she has been finally allowed to see the statement, it appears that her so-called admission involved a $12 fan that was not included among the items on a sales receipt, not $100 of merchandise.  And, the portion of the statement that appears to be in her handwriting, says "I really thought I bought the fan," not that she admitted trying to steal it. While there appears above her writing some additional statements made by some other person about some other merchandise, this document hardly adds up to an unambiguous admission by Ms. Goodman to the theft described in the report. Defendant does not explain why it was reasonable to withhold the statement while inviting her to dispute the accuracy of the report, let alone how it concluded, in its so-called verification and adjudication

processes, that the theft report was a complete and accurate representation of the so-called admission statement.[11]

In fact, Defendant does not deny in its Motion that it violated § 1681g(a) by failing to provide Plaintiffs copies of their admission statements. Rather, it seeks to strike their allegation that this violation was "willful" within the meaning of 15 U.S.C. § 1681n, which provides for statutory damages up to $1,000 and "punitive damages as the court may allow" against any person "who willfully fails to comply with any requirement imposed [by the FCRA]." Thus, for purposes of the Motion, Defendant concedes (a) that it was not furnishing ESTEEM admission statements to requesting consumers and (b) that, as a result, Plaintiffs have stated a potential violation of § 1681g(a). Defendant's only dispute is the possibility that any such violation could be "willful."

Defendant's argument regarding willfulness is that its policy of not providing copies of the admission statements is consistent with the law as it existed in 2009—i.e., before the Third Circuit's decision in *Cortez*—when it failed to provide Plaintiffs their respective statements.[12] According to Defendant, its reasonable view of its obligations under § 1681g(a) was that it only had to provide consumers the same consumer report it provided employers, and nothing more. Def. Mem. 12-13. Its authority for that interpretation is primarily the Seventh Circuit opinion in *Gillespie v. Trans Union Corp.*, 482 F.3d 907 (7th Cir. 2007).

Defendant's position is wrong for several reasons. It ignores the statutory language of § 1681g(a) and the statute's intended purpose. It misconstrues *Gillespie*, a decision that barely

---

[11] Co-plaintiff Goode cannot provide the same illustration in her case, since LexisNexis has still failed to provide a her a copy of the admission statement she supposedly signed. That has not stopped LexisNexis from disseminating a report that says that there is such a statement.

[12] Defendant implies that it may have changed its policy after the Third Circuit's decision in *Cortez*, stating that it "obviously" could not have predicted that decision in 2010 when it acted on Plaintiffs' 2009 requests for information in their file. Def. Mem. at 15 n. 10.

speaks to the facts present here.  It conflates the meaning and treatment under the FCRA of a

"consumer file" with the different term, "consumer report."  It wrongly suggests that the Third

Circuit's interpretation of § 1681g(a) in *Cortez* is irrelevant, just because it was decided after the

events underlying this case.  And, finally, it ignores relevant decisions regarding "willfulness"

under the FCRA, particularly those decisions that have denied efforts by defendants to challenge

willfulness allegations via a motion to dismiss.

> **1.      Defendant's Interpretation of § 1681g(a) Is Not Reasonable Because the Express Purpose of § 1681g(a) Is to Provide Consumer Access to "All Information" in the Consumer's "File," Not Just the "Consumer Report" Furnished to an Inquiring Employer**

What is most puzzling about Defendant's bold assertion that its conduct regarding

§ 1681g(a) requests "was consistent with all authority," Def. Mem. 13, is how little statutory

exposition it then conducts. Any attempt to discern the meaning of a statutory mandate must

begin with the language of the statute itself.  That language undermines Defendant's position that

it has no obligation to provide copies of admission statements to requesting ESTEEM

consumers.

As the Third Circuit noted in *Cortez*, 617 F.3d at 711, the term consumer "file" is a

defined term in the FCRA:

> The term "file," when used in connection with information on any consumer, means all of the information on that consumer recorded and retained by a consumer reporting agency regardless of how the information is stored.

15 U.S.C. § 1681a(g).  Since Congress separately defined "consumer report," 15 U.S.C. §

1681a(d), it is hardly reasonable to argue, as Defendant effectively does in its Motion, that both

terms have the same exact meaning.  *See* Def. Mem. at 16 ("the phrase 'all information in the

consumer's file' means the consumer report—and only the consumer report").  Moreover, since,

under § 1681b(b)(3), a Pre-Adverse Action employment notice must not only provide a copy of

the "consumer report" but also notice of the consumer's right to obtain "all information" in her "file," it is nonsensical to presume that what Congress meant by "all information in the file" was simply a duplicate copy of the already provided report.[13]

Indeed, it is hard to see how anyone could reasonably view the ESTEEM admission statement as anything but "information on that consumer recorded and retained by a consumer reporting agency," that, under § 1681a(g), must be provided upon request.  The admission statement—which is faxed to Defendant LexisNexis at the time the initial theft report is first submitted by the "contributing" employer, retained as an electronic image in the ESTEEM database, and is the key document in any subsequent "verification" and "adjudication" activity conducted by Defendant—is, without doubt, the most important recorded, retained information in the ESTEEM file.

The purpose of the § 1681a(g) disclosure requirement in the context of this case makes the Defendant's interpretation of its obligations even more unreasonable.  Consumers who are facing possibly adverse employment actions based on a potentially damaging "consumer report" are entitled to (1) a copy of the report and (2) a written description of their rights under the FCRA.  15 U.S.C. § 1681b(b)(3).  Among those rights is the right to request "all information" in the consumer's "file," § 1681a(g), and, armed with that information, the right to dispute the accuracy of the report. 15 U.S.C. § 1681i. It is wholly unreasonable, given those purposes and

---

[13] Defendant cites a variety of other provisions pertaining to consumer reports—not consumer files—in 15 U.S.C. §§ 1681g(c) (detailing a CRA's obligation to provide consumers a summary of their rights under the FCRA), 1681j(a)(1)(A) and 1681j(a)(1)(C) (providing the methodology for consumers to obtain their credit information from CRAs), and 1681m(a)(3)(A) (proscribing the ways in which consumers must be notified of their rights under the FCRA) as support for its argument that it is not required to provide all information in a consumer's file.  Def. Mem. at 16-17.  However, FCRA section 1681g does not pertain to consumer reports; it imparts an obligation on CRAs to provide "all information in the *consumer's file* at the time of the request." (emphasis added)

the relevant statutory language, for LexisNexis to conclude that it could satisfy its § 1681a(g) obligation by responding to a consumer request for the all information in the file by providing only a second copy of the already furnished consumer report, thereby leaving the consumer unable to test the accuracy of the admission statement itself.

Defendant claims that it was following the Seventh Circuit's decision in *Gillespie v. Trans Union,* but as with the language of the statute, *Gillespie* does not support Defendant's position. *Gillespie* addressed the claim of consumers who claimed a right under 15 U.S.C. § 1681g(a) to the internal notation of the date when adverse information is to be purged from a consumer's report ("purge date"). The Seventh Circuit interpreted the term "file" in § 1681g(a) as including any information on the consumer "that might be furnished, or has been furnished, in a consumer report on the consumer." *Gillespie*, 482 F.3d at 909. Reasoning that Trans Union's internal notation of purge dates associated with negative credit information is only meant to guide its internal management of the information and is not part of the information that is ordinarily furnished to inquiring creditors, the Court concluded that Trans Union was not required to provide the notation to consumers making a § 1681g(a) request.

As the Third Circuit noted in *Cortez*, however, an internal record-keeping notation in a consumer file is not the same thing as a document that is substantively harmful to a consumer's reputation and formed the basis of a negative consumer report. *Cortez*, 617 F.3d at 712 (distinguishing a noted purge date from an "OFAC" alert that raises the possibility that a consumer is associated with international terrorism or narco-trafficking). While *Gillespie* might provide a rationale for LexisNexis deciding that, in responding to a § 1681g(a) request, it need not provide copies of all of its internal files pertaining to its "verification" and "adjudication" of

ESTEEM inquiries, it does not make reasonable LexisNexis's decision to deny consumers a copy of the most important information in their file.

Defendant's argument that section 1681g only requires a CRA to provide the consumer with the identical information it communicated to the user is contradicted by the standard established by *Gillespie* and *Cortez*, namely, that what the statute requires of a CRA is to produce all information in the file "that *might* be furnished, or has been furnished" in a consumer report. *Cortez v. Trans Union*, 617 F.3d at 711-12 (quoting *Gillespie*) (emphasis added). Plaintiffs here meet that test for at least two reasons.

First, ESTEEM reports are, by definition, purported summaries of incidents described in signed, written admission statements, supposedly "verified" by LexisNexis. Therefore, the information contained in the admission statement *is* information that "has been furnished" in a consumer report. To use a different example, imagine a consumer requesting from a credit bureau a complete copy of his file after the bureau sold only his FICO score to a lender. In such a case, the consumer file supporting the reported FICO score would certainly be encompassed by a consumer request for "all information" in the file.  LexisNexis could not credibly argue that the consumer be left without a means to review—and, as appropriate, dispute—the substantive credit items in his file responsible for the lower FICO score. Similarly, LexisNexis's decision to deliver to employers only summaries of admission statements, accompanied by adjudication scores ("noncompetitive"), cannot insulate itself from subjecting the underlying admission statements to consumer review.

Second, although ESTEEM employers only see the summaries of the admission statements, Defendant itself reviews the admission statements as part of the "verification" process it does on behalf of the employers. When LexisNexis conducts this review *for the*

*employer*, the admission statement is literally part of what is being furnished to the employer, even though the employer does not receive a physical copy. Indeed, this is exactly the point Defendant itself makes when it argues in opposition to Count I that it is an agent for its employer customers. Defendant cannot have it both ways. If, as LexisNexis claims, it is functioning as an agent for the employers when it studies the admission statements, it cannot reasonably resist providing copies of the statements to consumers making § 1681g(a) requests on the grounds that the employers have never seen the statements.

> ## 2. *Cortez* Supports Allowing Plaintiffs' Willfulness Allegation to Stand, Nothwithstanding the Timing of that Decision

*Cortez* is the definitive, authoritative case governing § 1681g claims. *See Cortez v. Trans Union*, 617 F.3d at 711-13. Defendant barely mentions that decision, citing it only in a footnote, where it claims *Cortez* provides only dicta relevant to this case. This vastly understates the authoritative weight of *Cortez*.

Defendant acknowledges that a finding of willfulness would be based on a determination that its policy position in not providing admission statements to requesting consumers is objectively reasonable, based on prevailing legal authority. What *Cortez* demonstrates is just how unreasonable that position was. The Third Circuit's exposition of § 1681g did not involve breaking any new legal ground that Defendant could not have reasonably anticipated. On the contrary, what the Court did in *Cortez* was simply demonstrate how clear the statutory language is and how "all information" in the consumer "file" would obviously encompass an item as potentially harmful to the consumer as an OFAC alert associating him with possible connections to terrorism or narcotics trafficking. It is just as obvious that the ESTEEM admission statements are a significant component of Plaintiffs' ESTEEM files. In words applicable to the position

taken by Defendant here, *Cortez* criticized Trans Union for "attempt[ing] to avoid the obvious reach of [the] language [in § 1681a(g)]."

*Cortez* shows that *Gillespie* provides little support to Defendant's strained reading of the statute.  Indeed, *Cortez* cites *Gillespie* as support for the proposition that "Congress intended the protections of [§ 1681g(a)] to apply to all information furnished *or that might be furnished in a consumer report*." *Cortez*, 617 F.3d at 711 (emphasis added).  In short, as authoritatively held by the Third Circuit, neither the statute, nor *Gillespie*—the only other authority Defendant cites— support the reasonableness of Defendant's view that § 1681g(a) only required it provide second copies of the already provided consumer reports to Plaintiffs.

### 3.    The Willfulness Allegation Is Not Appropriately Challenged by a Motion to Dismiss

To establish a willfulness claim a plaintiff must prove that a defendant acted in reckless disregard of the FCRA.  *See Safeco Ins. Co. of America v. Burr*, 551 U.S. 47 (2007). But in seeking to have Plaintiffs' willfulness allegations stricken at this juncture, Defendant is putting the cart before the horse.  Defendant's assertion about what analysis it undertook with regards to § 1681g(a) requests by ESTEEM consumers is largely an assertion of fact. Putting aside the objective unreasonableness of the legal rationale it is offering here, there is no telling what discovery will show regarding the actual reasons Defendant decided to deny ESTEEM consumers copies of their admission statements.  It is, for example, possible that Defendant decided that providing copies of admission statements would produce more disputes and uncertainty regarding these so-called admissions and thereby slow the ESTEEM machinery down.

For such reasons, courts routinely have held that resolution of a willfulness challenge should await full discovery and dispositive motion briefing.  *Korman v. Walking Co*., 503 F.

Supp. 2d 755, 761 (E.D. Pa. 2007) (Robreno, J.) (pointing out that *Safeco* arose in a different litigation context and holding that determination of willfulness not appropriate at motion to dismiss stage); *Miller v. Sunoco, Inc*., 2008 WL 623806, *2 (E.D. Pa. March 4, 2008) (Kauffman, J.) (same); *Ehrheart v. Lifetime Brands, Inc*., 498 F. Supp. 2d 753, 756 (E.D. Pa. 2007) (Padova, J.) (motion to dismiss denied where the complaint sufficiently alleged that defendant's violation of FCRA was either knowing or reckless, finding "accordingly . . . the Complaint plausibly alleges that Defendant's violation . . . was willful"). *Accord, Hedlund v. Hooters of Houston,* 2008 WL 2065852, *3-4 (N.D. Tex. 2008) (citing cases).

In addition to making an argument that is premature, Defendant also argues for the wrong standard.  A plaintiff need not allege a knowing violation (although the fact that Defendant here must have had knowledge of its own failure to provide "all information in the consumer's file at the time of the request" is hardly controvertible), but only that the defendant recklessly committed an act in reckless or conscious disregard of the rights of others, and Plaintiff has done that.  *See Cushman v. Trans Union Corp.*, 115 F.3d 220, 227 (3d Cir. 1997).  This is a lower standard than the standard for willful violations or punitive damages claims under most common law torts.  Although the terms "willful" or "willfully" are not defined in the FCRA, case law has held that neither malice nor evil motive need be established for a finding of a willful violation.  *Id.*; s*ee also Stevenson v. TRW, Inc.*, 987 F.2d 288, 294 (5th Cir. 1993) (citing *Fischl v. General Motors Acceptance Corp.*, 708 F.2d at 151).

Many courts have noted that willfulness under the FCRA is demonstrated by recklessness and not by a knowing violation of the law.  *Cushman*, 115 F. 3d at 227; *Stevenson*, 987 F2d at 293 (citing *Pinner v. Schmidt*, 805 F.2d 1258, 1263 (5th Cir. 1986)).  *See also Reynolds v. Hartford Fin. Servs. Group,* 435 F.3d 1081, 1097-99 (9th Cir. 2006), *rev'd on other grounds by*

*Safeco Ins. Co. of America v. Burr*, 551 U.S. 47 (2007) (discussing meaning of "willfully" under FCRA and relying on *Cushman*).  Such reckless or conscious disregard may be found when a defendant adopts a policy either knowing it to be in "contravention of the rights possessed by consumers under the FCRA or in reckless disregard for whether the policy contravenes those rights." *Cushman*, 115 F. 3d at 227; *see also Reynolds,* 435 F.3d at 1097-99.

The Plaintiffs pleaded that the Defendant recklessly committed an act in reckless or conscious disregard of the rights of others. CAC ¶¶ 37, 49, 99 and 119.  Such allegations are sufficient for Plaintiffs' willfulness claim to withstand the instant Motion to Dismiss.

## IV.    CONCLUSION

For all the foregoing reasons, Plaintiffs respectfully requests that the Court deny the Defendant's Motion to Dismiss and enter an Order requiring Defendant to file an Answer to the Complaint within fourteen (14) days.

Respectfully submitted,

/s/ Irv Ackelsberg
Irv Ackelsberg
Howard Langer
John J. Grogan
Edward A. Diver
LANGER GROGAN & DIVER, PC
1717 Arch Street, Suite 4130
Philadelphia, PA 19103
(215) 320-5660
Fax:  (215) 320-5703
Email: iackelsberg@langergrogan.com

James A. Francis
Mark D. Mailman
FRANCIS & MAILMAN, PC
100 S. Broad Street, 19th Floor
Philadelphia, PA 19110
(215) 735-8600

Sharon M. Dietrich
Nadia Hewka
COMMUNITY LEGAL SERVICES, INC.
1424 Chestnut Street
Philadelphia, PA 19102
(215) 981-3700

Leonard A. Bennett
CONSUMER LITIGATION ASSOCIATES, PC
12515 Warwick Boulevard # 101
Newport News, VA 23606
(757) 930-3660

Dated: August 19, 2011                    *Attorneys for Plaintiffs*

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 19th day of August, 2011, I caused a true and correct copy of the foregoing Plaintiffs' Brief in Opposition to Motion to Dismiss to be served via ECF upon all counsel of record.

<u>/s/ Irv Ackelsberg</u>
Irv Ackelsberg