## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| KEESHA GOODE and | : | |
| VICTORIA GOODMAN, on behalf of themselves | : | |
| And others similarly situated, | : | |
| | : | CIVIL ACTION |
| Plaintiffs, | : | |
| v. | : | No. 11-2950 |
| | : | |
| | : | |
| LEXISNEXIS RISK & INFORMATION | : | |
| ANALYTICS GROUP, INC., | : | |
| | : | |
| Defendant. | : | |

## REPLY BRIEF IN FURTHER SUPPORT
## OF DEFENDANT LEXISNEXIS RISK SOLUTIONS INC.'S MOTION TO DISMISS

Andrew J. Soven
Mark S. Melodia
**REED SMITH LLP**
2500 One Liberty Place
1650 Market Street
Philadelphia, PA 19103-7301
(215) 851-8100

Attorneys for Defendant
LexisNexis Risk Solutions Inc.

Dated: August 29, 2011

# TABLE OF CONTENTS

Page

I.    INTRODUCTION ...................................................................................................1

II.   ARGUMENT ..........................................................................................................2

      A.    Plaintiffs Fail To Cite Any Authority In Support Of Their Interpretation of
            FCRA § 1681b(b)(3); LexisNexis' Generation Of The Esteem Consumer
            Report Is Not An Adverse Action For Purposes of § 1681b(b)(3) .........................2

      B.    Plaintiffs' New Claim Based On What Plaintiffs Calls The "Wild-Card"
            Section Of The FCRA Fails.....................................................................................5

      C.    LexisNexis' Generation Of A Consumer Report Is Not An Adverse Action..........8

      D.    Plaintiffs Fail To State A Claim In Count II That LexisNexis Willfully
            Violated FCRA § 1681g(a) ...................................................................................13

III.  CONCLUSION......................................................................................................18

## TABLE OF AUTHORITIES

### OTHER AUTHORITIES

*Adams v. National Engineering Service Corporation,*
    620 F. Supp. 2d 319 (D. Conn. 2009) .................................................................. 8, 9

*Austin v. J.C. Penney Co, Inc.,*
    162 F. Supp. 2d 495 (E.D. Va. 2001) ................................................................. 11, 12

*Cortez v. Trans Union,*
    617 F.3d 688 (3d Cir. 2010) ......................................................... 1, 13, 14, 15

*Crane v. Am. Home Mortg. Corp.,*
    2004 U.S. Dist. LEXIS 12770 (E.D. Pa. July 1, 2004) ................................... 7

*Ehrheart v. Lifetime Brands, Inc.,*
    498 F. Supp. 2d 753 (E.D. Pa. 2007) ................................................................ 17

*Estiverne v. Sack's Fifth Avenue,*
    9 F.3d 1171 (5th Cir. 1993) ................................................................................ 6

*Gilliespie v. Trans Union Corp.,*
    482 F.3d 907 (7th Cir. 2007) ....................................................................... 14, 15

*Government of Virgin Islands v. Berry,*
    604 F.2d 221 (3d Cir. 1979) ............................................................................... 4

*Hedlund v. Hooters of Houston,*
    2008 U.S. Dist LEXIS 38926 (N.D. Tex. May 13, 2008) .............................. 17

*In re Kaiser Aluminum Corp.,*
    456 F.3d 328 (3d Cir. 2006) ............................................................................... 4

*In re: Farmers Ins. Co., Inc. FCRA Litigation,*
    2007 U.S. Dist. LEXIS 87896 (W.D. Ok. 2007) ...................................... 10, 11

*Johnson v. ADP Screening and Selection Services, Inc.,*
    768 F. Supp. 2d 979 (D. Minn. 2011) ............................................................. 10

*King v. MovieTickets.com, Inc.,*
    555 F. Supp. 2d 1339 (S.D. Fla. 2008) ........................................................... 17

*Klotz v. Trans Union, LLC,*
    2008 U.S. Dist. LEXIS 54002 (E.D. Pa. July 16, 2008) .................................. 6

*Korman v. Walking Co.,*
    503 F. Supp. 2d 755 (E.D. Pa. 2007) .............................................................. 17

*Long v. Tommy Hilfiger U.S.A., Inc.,*
    2011 U.S. Dist. LEXIS 13782 (W.D. Pa. 2011) ............................................. 17

*Miller v. Sunoco, Inc.,*
    2008 U.S. Dist LEXIS16813 (E.D. Pa. Mar. 4, 2008) ................................... 17

*Obabueki v. Int'l Business Machines Corp.*,
  145 F. Supp. 2d 371 (S.D.N.Y. 2001), *aff'd*, 319 F.3d 87 (2d Cir 2003) ...................... 9, 10, 11

*Safeco Insurance Co. of America v. Burr*,
  551 U.S. 47 (2007) ............................................................................................... 13

*Shlahtichman v. 1-800 Contacts, Inc.*,
  615 F.3d 794 (7th Cir. 2010) ............................................................................... 17

*Simonoff v. Kaplan, Inc.*,
  2010 U.S. Dist. LEXIS 125414 (S.D.N.Y. 2010) ................................................ 17

*Thomas v. Cendant*,
  2004 U.S. Dist. LEXIS 23081 (E.D. Pa. Nov. 15, 2004) ..................................... 3,7

*Treadway v. Gateway Chevrolet Oldsmobile, Inc.*,
  362 F.3d 971 (7th Cir 2004) ................................................................................. 7

*Weidman v. Federal Home Loan Mortg. Corp.*,
  338 F. Supp. 2d 571 (E.D. Pa. 2004) .................................................................. 10

## STATUTES

15 U.S.C. § 1681a(f) ............................................................................................... 3

15 U.S.C. § 1681a(g) ............................................................................................. 14

15 U.S.C. § 1681a(k)(1)(A) ..................................................................................... 6

15 U.S.C. § 1681a(k)(1)(b)(iv) ............................................................................... 5

15 U.S.C. § 1681b(b)(3) .................................................................................. 3, 4, 10

## REGULATIONS

16 C.F.R. pt 600, App. § 603 ................................................................................ 14

## OTHER AUTHORITIES

Federal Trade Commission, *Forty Years of Experience with the Fair Credit Reporting Act, An
  FTC Staff Report with Summary of Interpretations*, at 53, July 2011 ......................... 5, 6, 7, 12

## I.   <u>INTRODUCTION</u>

Plaintiffs' opposition to Defendant LexisNexis Risk Solutions Inc.'s motion asks the Court to make what would be an unprecedented ruling – specifically, that a consumer reporting agency that compiles information and provides a consumer report to a user of the report (bank, employer, etc.) takes an "adverse action" against the consumer if the report contains negative information which ultimately leads to an adverse credit or employment decision.  <u>Not one case cited by Plaintiffs reaches this result</u>.  Because Plaintiffs fundamentally take issue with the reliability of the Esteem reports generated by LexisNexis, they want the Court to eliminate the obvious boundary between a consumer reporting agency that compiles a report and the person that uses the report to make a decision.  Plaintiffs scoured the country hoping to find a decision which eliminates the legal separation between consumer reporting agency and user, but their Brief proves that their search failed.  The Court should not depart from the language of the Fair Credit Reporting Act ("FCRA"), the cases, and the clear guidance of the Federal Trade Commission ("FTC").  Count I, Plaintiffs' adverse action claim, should be dismissed.

In Count II, Plaintiffs claim that LexisNexis willfully violated the FCRA in 2009 by allegedly failing to provide Plaintiffs with a copy of the Verified Admission Statement ("VAS") referenced in the Esteem report which they each admit that they received from LexisNexis. Plaintiffs ask the Court to find that LexisNexis willfully violated the FCRA *in 2009* based on law purportedly established by the Third Circuit in *2010*.  Although Plaintiffs' interpretation of the Third Circuit's 2010 decision in *Cortez v. Trans Union*, 617 F.3d 688 (3d Cir. 2010), is wrong, even if it was correct, Plaintiffs' claim fails because Plaintiffs cite no legal authority which was contrary to LexisNexis' alleged policy of not providing consumers with a copy of the VAS when

the Esteem report was provided to them.   Without such authority, Plaintiffs' willful violation claim in Count II fails.

Suffice it to say that LexisNexis takes issue with Plaintiffs' version of the facts in the Complaint and the even more slanted presentation of the "facts" averred in their Brief.  Plaintiffs make numerous statements in their Brief (*e.g.*, LexisNexis renders applicants unemployable, LexisNexis brands people as thieves) that are gross exaggerations of the allegedly "well pled" averments in the Complaint.  Fortunately, it is unnecessary for LexisNexis to disprove a single fact alleged in the lengthy Complaint to demonstrate that LexisNexis' motion should be granted. Plaintiffs insist "this is not a close case."   On this point, LexisNexis concurs; the Motion to Dismiss should be granted.

II.    **ARGUMENT**

     A.    **Plaintiffs Fail To Cite Any Authority In Support Of Their Interpretation of FCRA § 1681b(b)(3); LexisNexis' Generation Of The Esteem Consumer Report Is Not An Adverse Action For Purposes of § 1681b(b)(3)**

Plaintiffs contend that they properly allege a claim that LexisNexis violated FCRA § 1681b(b)(3) because LexisNexis "failed to provide a Pre-Adverse Action notification *before* negatively 'adjudicating' the ESTEEM inquiries."  [Oppos. at 12.]   Although their point is poorly phrased in their Brief, what Plaintiffs are trying to say is that the very act of compiling information which might negatively impact an employment decision (*i.e.*, "verifying an Esteem match" [Compl. ¶ 110]) constitutes an adverse action under the FCRA and triggers the Pre-Adverse Action Notice requirement.   The plain language of the statute shows that Plaintiffs are wrong.

- 2 -

Section 1681b(b)(3) provides in pertinent part:

[I]n using a consumer report for employment purposes, before taking any adverse action *based in whole or in part on the report*, the person intending to take such adverse action shall provide to the consumer . . . (i) a copy of the report; and (ii) a description in writing of the rights of the consumer[.]

15 U.S.C. § 1681b(b)(3) (emphasis added).  Therefore, the statute requires that a Pre-Adverse Action Notice be sent by a person who takes "any adverse action *based in whole or in part on the [consumer] report*." 15 U.S.C. § 1681b(b)(3) (emphasis added).  On its face, the statute does not apply to consumer reporting agencies, which are defined by the FCRA as entities involved in "assembling or evaluating consumer credit information or other information on consumers for the purpose of . . . furnishing consumer reports to third parties." 15 U.S.C. § 1681a(f).  Section 1681b(b)(3) applies only to persons who take adverse actions "based in whole or in part on the report." 15 U.S.C. § 1681b(b)(3); *Thomas v. Cendant*, 2004 U.S. Dist. LEXIS 230817, at *10 (E.D. Pa. Nov. 15, 2004) ("Thomas must also allege that Cendant based that action on information contained in a consumer report.").

Although the language of the statute is quite clear, the FCRA's legislative history reinforces that an "adverse action" is only an action taken "based on" a consumer report by someone who "obtains" a credit report.  Below are several examples of applicable legislative history:

- "It is the Committee's intent that, whenever a consumer report is obtained for a permissible purpose under section 604(a), *any action taken based on that report* that is adverse to the interests of the consumer triggers the adverse action notice requirements under Section 1681m." H.R. 1015, Consumer Reporting Reform Act of 1994, H.R. No. 103–486, Explanation of Legislation § 102  (April 28, 1994) (Section 1681m has an analogous adverse action notice requirement) (emphasis supplied).

- "The Committee bill therefore defines an 'adverse action' as any action that is adverse to the interests of the consumer and is *based in whole or in part on a consumer report.* . . . Section 101 amends section 603 of the FCRA, by defining an 'adverse action' as an action *based in whole or in part on a consumer report that is 'less favorable to the*

*interest of the consumer*,' and lists examples involving denials of credit, insurance, employment, or business transactions that are initiated by the consumer." S.B. 783, Consumer Reporting Reform Act of 1994, S.R. No. 103–209, Summary of Legislation (December 9, 1993) (emphasis supplied).

- "[T]he Committee bill requires that employers, *before taking an adverse action based on a consumer report*, provide the current or prospective employee with a copy of the report, a description of the individual's rights under the FCRA, and a reasonable opportunity to respond to any information that is disputed by the consumer. S.B. 783, Consumer Reporting Reform Act of 1994, S.R. No. 103–209, Section by Section Analysis (December 9, 1993) (emphasis supplied).

Plaintiffs do not plausibly allege that LexisNexis (as opposed to the employers at issue) took an action "based in whole or in part on" a consumer report. 15 U.S.C. § 1681b(b)(3). Notably, Plaintiffs say nothing at all about the key phrase "based in whole or in part on the report" in § 1681b(b)(3). Notwithstanding what Plaintiffs might say about LexisNexis' "adjudication" of "non-competitive scores", etc., Plaintiffs' reading of the statute produces counterintuitive results. For example, if a consumer reporting agency is asked to run a criminal background check in connection with an employment application and its investigation uncovers a criminal record, the consumer reporting agency would need to provide the consumer with a Pre-Adverse Action Notice before furnishing the report to its user. Congress never intended this result. "All laws should receive a sensible construction." *Government of Virgin Islands v. Berry*, 604 F.2d 221, 225 (3d Cir. 1979). Courts "should avoid a statutory interpretation that leads to absurd results." *In re Kaiser Aluminum Corp.*, 456 F.3d 328, 330 (3d Cir. 2006).

Plaintiffs' theory also has no support in the case law and runs contrary to the overt and obvious distinctions throughout the FCRA between CRAs which generate consumer reports and the users of consumer reports.

**B.    Plaintiffs' New Claim Based On What Plaintiffs Calls The "Wild-Card" Section Of The FCRA Fails**

In an effort to salvage their adverse action claim, for the first time Plaintiffs assert that the generation of the Esteem report is an "adverse action" because it was an "adverse action taken or determination . . . made in connection with an application." 15 U.S.C. § 1681a(k)(1)(b)(iv).[1]   Without citation to any on-point authority, Plaintiffs contend that § 1681a(k)(1)(B)(iv) is "an additional wild-card definition intended to expand the scope of all of the previously stated, core definitions of adverse action."   Plaintiff's "wild card" argument fails for several reasons.

First, the FTC completely disagrees with Plaintiffs that § 1681a(k)(1)(B)(iv) is a "wild card" that can be played as Plaintiffs suggest.   On July 20, 2011, the FTC published a comprehensive Staff Report which explains the purpose of § 1681a(k)(1)(B)(iv).   *See* Federal Trade Commission, *Forty Years of Experience with the Fair Credit Reporting Act, An FTC Staff Report with Summary of Interpretations*, July 2011 (hereinafter "2011 Staff Report").[2]   In the 2011 Staff Report, the FTC states that "[t]he term 'adverse action' is defined in the credit context by section 603(k)(1)(A), in the insurance context by section 603(k)(1)(B)(i), *in the employment context by section 603(k)(1)(B)(ii)*, in the context of a license or benefit granted by the government by section 603(k)(1)(B)(iii), *and in other contexts by section 603(k)(1)(B)(iv).*"   2011 Staff Report at 33 (emphasis supplied).   The FTC further explained that the subsections of the "adverse action" definition § 1681a(k)(1) "parallel the permissible purposes provided for

---

[1]      In their Complaint, Plaintiffs allege that LexisNexis' "adverse action" was based on § 1681a(k)(1)(B)(ii) only and do not mention § 1681a(k)(1)(B)(iv).

[2]      Cites excerpts of the 2011 Staff Report are attached as Exhibit A.   The complete report is available at http://www.ftc.gov/os/2011/07/110720fcrareport.pdf.

credit, insurance, employment, governmental benefit or license, and other consumer purposes provided in section 604(a)(3)."[3]  *Id.*

The 2011 Staff Report goes on to state that what Plaintiffs call the "wild card" *only* applies to situations *not covered by other subsections of § 1681a(k)(1)(B):*

> Subsection 1681(k)(1)(B)(iv) provides a specific "adverse action" definition in the context of consumer transactions *other than those involving credit, insurance, employment or government benefits,* such as an apartment rental or a purchase by personal check.

*Id.* at 35 (emphasis supplied).

Therefore, it is perfectly clear that that the FTC does *not* consider § 1681a(k)(1)(B)(iv) to be a "wild card" which consumers may use to expand the scope of the adverse action subsection that applies to a particular context for which there already is a subsection (in this case, employment).  The 2011 Staff Report must be given "considerable weight." *See Estiverne v. Sack's Fifth Avenue,* 9 F.3d 1171, 1173 (5th Cir. 1993); *Klotz v. Trans Union, LLC,* 2008 U.S. Dist. LEXIS 54002, at *14-*15 (E.D. Pa. July 16, 2008) ("The Court's conclusion is reinforced by guidelines promulgated by the Federal Trade Commission … The FTC's guidelines are persuasive authority").  *See* 2011 Staff Report, at 6-7 (stating that courts "have accorded it [FTC commentary] weight as a policy statement of the primary agency responsible for enforcing the FCRA" and noting that the FTC provides extensive guidance to the private sector on the requirements of the FCRA).

Second, Plaintiff's only case law authority does *not* hold that § 1681a(k)(1)(b)(iv) is a "wild card" that radically expands the adverse action definition in the manner proposed.  In

---

[3]     For example, § 1681b(a)(3)(A), which permits a CRA to furnish a credit report in connection with extending credit, parallels § 1681a(k)(1)(A), and section 1681b(a)(3)(B), permits a CRA to furnish a credit report for "employment purposes," parallels § 1681a(k)(1)(B)(ii).

*Crane v. Am. Home Mortg. Corp.,* 2004 U.S. Dist. LEXIS 12770 (E.D. Pa. July 1, 2004), the mortgage company argued that its rejection of a consumer's attempt to prequalify for a loan was not an "adverse action" under § 1681a(k)(1)(A), which provides that an adverse action "has the same meaning as in section 1691(d)(6)" (the Equal Credit Opportunity Act).   15 U.S.C. § 1681a(k)(1)(A).  The bank was arguing that there were no adverse action notice requirements because no formal loan application had been made.  Judge Hutton disagreed and sensibly found that "the catch-all provision applies to credit transactions like the pre-qualification process alleged by Crane" because Congress intended to provide an avenue for relief in connection with an adverse action "whenever a consumer report is obtained for a permissible purpose."  *Id.* at *16-*19.  The so-called catch-all applied only because the bank had turned down the plaintiff, after pulling his credit report, before an ECOA loan application was made.

*Treadway v. Gateway Chevrolet Oldsmobile, Inc.,* 362 F.3d 971 (7th Cir 2004), is based on the same reasoning.  In *Treadway,* the court held that the decision of a car dealer who had pulled the consumer's credit report to not even send the consumer's application to lenders was an adverse action under the "catch-all" provision.  Once again, the ruling was based on the fact that no ECOA-covered "adverse action" had been taken.  *Id.* at 982-83.

*Thomas v. Cendant Mortg.,* 2004 U.S. Dist. LEXIS 23081, at *24-25 (E.D. Pa. Nov. 15, 2004) (O'Neill, J.), is exactly the same.  In *Thomas,* the bank argued that it had not taken an adverse action against the consumer because although it had decided that the plaintiff did not qualify for a special loan program, it was willing to entertain counteroffers from the plaintiff. The court held that § 1681a(k)(1)(B)(iv) applied, but only because the bank insisted that there was no "adverse action" under the ECOA.

Not one of Plaintiffs' cases hold that 1681a(k)(1)(B)(iv) is a "wild card" to be used or, in this case, misused, where the application clearly falls within the reach of a subsection which specifically deals with the context at issue (here, employment).  As the FTC explained just last month, § 1681a(k)(1)(B)(iv) applies only in "other" contexts, such as when a landlord pulls a credit application and turns down an apartment application. 2011 Staff Report at 35.   It is not the "wild card" (and claim saver) that Plaintiff would like it to be.

### C.    LexisNexis' Generation Of A Consumer Report Is Not An Adverse Action

There also is no authority which supports finding that the alleged conduct of LexisNexis here – searching its Esteem database for records, scoring the Plaintiffs' employment application according to the employer's guidelines and providing an Esteem report to the employer – is an "adverse action" under the FCRA.   It should not come as a surprise that Plaintiffs cannot find judicial support for their novel theory.   Plaintiff's theory, that "intermediaries" who prepare consumer reports take an adverse action when they evaluate information, if accepted, would mean that every time Trans Union or Equifax compiles account data, "adjudicates" the consumer's credit score and provides a credit report to a potential creditor, it takes an adverse action under the FCRA.   Plaintiffs cite no cases which reach this unprecedented result.

The only case which Plaintiffs cite for their blanket statement that § 1681b(b)(3) is not limited to adverse actions taken by employers in reliance on consumer reports is *Adams v. Nat'l Engineering Serv. Corp.*, 620 F. Supp. 2d 319 (D. Conn. 2009).  In *Adams*, the plaintiff asserted a 1681b(b)(3) claim against NESC, *a staffing agency*, and asserted a § 1681e(b) claim and a § 1681k claim against Verifications, a company which, like LexisNexis, generates consumer reports used in hiring decisions.  Contrary to Plaintiffs' suggestion, *there was no adverse action claim against Verifications, the consumer reporting agency.*   The plaintiff's § 1681(e)b claim was based on Verifications' alleged failure to follow reasonable procedures in conducting a

criminal background check, and the plaintiff's § 1681k claim was based on a failure to ensure that the public information in its consumer report was up to date. *Id.* at 334. The plaintiffs did not assert an adverse action claim against Verifications.

Moreover, the *Adams* court's rulings as to the adverse action claim asserted against the staffing agency are distinguishable and of course non-binding on this Court. Unlike LexisNexis here, the staffing agency had identified the plaintiff as a job candidate, *communicated the job offer to the plaintiff* and communicated numerous times with the candidate and Verifications, the consumer reporting agency, after the candidate said that there were errors in Verifications' background check report. *Id.* at 323-26. The court found that the § 1681b(b)(3) claim against *the staffing agency* survived summary judgment because a reasonable jury could find that *the staffing agency's* decision to furnish an allegedly inaccurate background investigation report to the employer after the staffing agency communicated the decision to offer the job on a condition basis could constitute an adverse action. Notably, the *Adams* court did not cite any cases, FTC guidance, or legislative history to reach its ruling. *Id.* Moreover, LexisNexis, a company actively engaged in compiling consumer reports, cannot be analogized to a staffing agency hired by an employer to find and interview candidates and obtain background check reports. Plaintiffs do not identify one case in which an adverse action claim was asserted against an entity which compiles consumer reports.

*Adams* also runs directly counter to *Obabueki v. Int'l Business Machines Corp.* 145 F. Supp. 2d 371 (S.D.N.Y. 2001), *aff'd,* 319 F.3d 87, 88 (2d Cir 2003), which, as shown by LexisNexis in its opening Brief, holds that an internal (or, to use Plaintiffs' word, "intermediate") analysis is not an adverse action under the FCRA. Plaintiffs' only real rejoinder to *Obabueki* is that it was decided on summary judgment. In making this argument, Plaintiffs'

ignore that the *Obabueki* court *did not need any factual record* to hold that it would be an "absurdity" to hold that "an employee may suffer an adverse action as a result of an internal decision of the employer." *Id.* at 392.  Plaintiffs only other point about *Obabueki* is to say that the plaintiff did not raise a claim under the so-called "wild card" provision.[4]

Furthermore other courts have relied on *Obabueki* to dismiss claims analogous to Plaintiffs' claim.  In *Johnson v. ADP Screening and Selection Services, Inc.*, 768 F. Supp. 2d 979 (D. Minn. 2011), the court held that "an automated internal decision . . . is not an adverse action for purposes of the FCRA [Section 1681b(b)(3)]."  *Id.* at 982.  There, the plaintiff, a prospective employee, filed a FCRA action against the employer based on § 1681b(b)(3) and argued that *the employer* was required to provide a Pre-Adverse Action Notice after it obtained an automated background report which "adjudicated" his application but before a decision was made.  *Id.* at 982.  The court rejected the argument and entered judgment for the defendant.

In *In re: Farmers Ins. Co., Inc. FCRA Litigation*, 2007 U.S. Dist. LEXIS 87896 (W.D. Okla. Nov. 29, 2007), the court, relying on *Obabueki*, held that the defendant did not take adverse action until it sent the plaintiffs a bill with an increased insurance premium, and not when it had previously decided to "place plaintiffs in a class of insureds receiving higher premiums based on information in their credit reports." 2007 U.S. Dist. LEXIS 87896, at *22-*25.  The insurance company had obtained approval from the insurance commissioner to increase premium rates for homeowners' insurance policies.  *Id.* at 7-8.  The rating program used

---

[4]        In their Opposition, Plaintiffs try to distinguish *Weidman v. Federal Home Mortg. Corp.*, 338 F. Supp. 2d 571, 576 (E.D. Pa. 2004), but the crux of *Weidman* is what is important here:  "an agent using a consumer report for the purpose of 'making a decision,' 'taking action,' or 'evaluating information' for his principal is not subject to [the FCRA's] adverse action notification requirements."  Plaintiffs' smokescreen arguments about the role of joint users and CRAs are inapplicable.  Whether LexisNexis is a CRA is inconsequential because 1681b(b)(3) applies only to the principal user of the consumer report that takes the adverse action.  Rite Aid and Family Dollar, the employers, are the "takers" of adverse action, not LexisNexis.  In accordance with *Weidman*, LexisNexis should not be held liable under § 1681b(b)(3).

insurance bureau scores based on consumer report information from Trans Union, a CRA. *Id.* The plaintiff filed a class action alleging that the initial decision to place plaintiffs into a class of higher premiums based on information in their credit reports was an adverse action. *Id.* at 18.

Relying on *Obabueki*, the *Farmers Ins.* court rejected the claim and held that the defendant's internal decision to charge a higher premium did not amount to taking adverse action against the insureds. *Id.* at 22-24. The court explained:

> Based upon the statutory language and relevant authorities, the court holds that defendant was not required to send plaintiff an FCRA notice until it sent plaintiffs their renewal premium bills because defendant did not "take any adverse action" with respect to the plaintiffs until it actually charged them a higher premium for their homeowner's insurance, *i.e.,* billed them for a higher premium. . . . The court finds that defendant's internal analysis to determine which insureds were to receive the letter advising of the premium increase did not amount to "tak[ing]" adverse action against the insureds. The court concludes that the notice obligation under § 1681m(a) was not triggered until the increased charge was actually billed to the policyholder. Only at that point did the defendant take adverse action.
>
> While the court's decision is dictated by the plain language of the relevant provisions of the FCRA, *the court is also persuaded by decisions of other courts which have considered the meaning of the term "takes" . . . and the question of whether a preliminary internal decision amounts to taking adverse action. "Applying this plain-meaning, dictionary definition, a person 'takes' an adverse action when the person does or performs the action."*

*Id.* at *22-*25 (citations omitted) (emphasis supplied).

The Eastern District of Virginia reached a similar conclusion in an action in the credit context. Again relying on *Obabueki*, in *Austin v. J.C. Penney Co, Inc.*, 162 F. Supp. 2d 495 (E.D. Va. 2001), the court held that a preliminary decision to refuse to accept a check was not an "adverse action" under the FCRA:

> [U]nder the reading of the FCRA advanced in the Complaint, any provider of goods or services who declines to accept a consumer's credit card, check, or other form of non-cash payment based on the consumer's credit

> history would have to immediately provide the consumer with [the adverse action notice]. . . . Under [the plaintiff's] theory, any failure to do so would violate the FCRA. The Court declines to adopt such an expansive reading of the provisions of the FCRA.

*Id.* at 498.  Plaintiffs never explain why the logic of these cases does not apply here.

Moreover, in the 2011 Staff Report, the FTC reiterates that providing a negative consumer background report in connection with an employment application is not an "adverse action."  The 2011 Staff Report provides: "*Employers* must comply with the pre-adverse action disclosure requirement even where the information contained in the consumer report (such as a criminal record) would automatically disqualify the individual from employment or lead to an adverse employment action." 2011 Staff Report at 53 (emphasis supplied).  In other words, even where the consumer report automatically disqualifies the applicant, the *employer* must comply with the pre-adverse action disclosure requirement.  This in turn also means that the consumer report itself cannot be the adverse action.  The Staff Report does not state that the consumer reporting agency must comply with the pre-adverse action disclosure requirement.  To the contrary, the Staff Report addresses its guidance to "*employer[s]* intending to take adverse action." *Id.* at 52 (emphasis supplied).

Plaintiffs' novel claim runs completely counter to the FCRA's scheme and logic.  There is no authority for asserting an "adverse action" claim against a consumer reporting agency and the Court should not create a new cause of action.[5]  Count I should be dismissed with prejudice.

---

[5]      Plaintiffs' citation to the consent decree related to mailing of notices entered into in *Beverly v. Wal-Mart Stores, Inc.*, No. 07-469 (E.D. Va.), reveals Plaintiffs' desperation.  A decision to settle litigation, which Plaintiffs concede involved completely different issues, is not authority for establishing a new cause of action.

**D.    Plaintiffs Fail To State A Claim In Count II That LexisNexis Willfully Violated FCRA § 1681g(a)**

Plaintiffs' arguments in opposition to LexisNexis' motion to dismiss the Plaintiffs' claim for statutory and punitive damages in connection with Count II should be rejected.  A substantial part of Plaintiff's argument is devoted to arguing that the VAS constitutes a part of the consumer's "file" for purposes of the FCRA § 1681g(a) and that, as a result, the Complaint "sufficiently alleges a violation" of § 1681g(a).  [Oppos. at 25].   However, LexisNexis does not seek complete dismissal of Count II.  The only issue raised by LexisNexis with respect to § 1681g(a) in its Motion to Dismiss is whether the Complaint states a claim that LexisNexis *willfully* violated 1681g(a).

Plaintiffs spend pages of argument trying to muddy the waters by arguing about what standard applies with respect to alleged willful violations of the FCRA.  On this issue, however, there should be no disagreement that the U.S. Supreme Court's decision in *Safeco Insurance Co. of America v. Burr*, 551 U.S. 47 (2007), controls.  *See Cortez*, 115 F.3d at 721 n.39 (3d Cir. 2010) ("The Supreme Court's decision in *Safeco* defined the standard for all willful violations of FCRA").  As explained in *Safeco*, "[A] company subject to FCRA does not act in reckless disregard of it unless the action is not only a violation under a reasonable reading of the statute's terms, but shows that the company ran a risk of violating the law substantially greater than the risk associated with a reading that was merely careless." *Safeco*, 551 U.S. at 69.[6]  As further explained in *Cortez*, a credit reporting agency "may act in reckless disregard of a statute's requirements by adopting an objectively unreasonable interpretation of the law" and "[a] credit

---

[6]      Plaintiffs suggest that LexisNexis does not acknowledge the "reckless disregard" standard.   To the contrary, on page 13 of its opening Brief, LexisNexis acknowledges that willfulness can be shown if the defendant took an action in "reckless disregard" of the plaintiff's rights under the FCRA.  [LexisNexis Br. at 13].

reporting agency may willfully violate the FCRA by adopting a policy with reckless disregard of whether it contravenes a plaintiff's rights under the FCRA." *Cortez*, 617 F.3d at 721.

Therefore, for Plaintiffs to succeed in proving a willful violation of § 1681g, Plaintiffs must cite to some authority which shows that in 2009, when the Esteem reports were provided by LexisNexis to Plaintiffs, LexisNexis' alleged failure to provide the VAS with the Esteem reports was an objectively unreasonable reading of the FCRA.   Plaintiffs fail to cite to a single decision or regulation which LexisNexis could have relied on in 2009 which compels this conclusion.

Plaintiffs mainly argue that the FCRA defines the term "file" to include "all of the information on that consumer recorded and retained by a consumer reporting agency regardless of how that information is stored" and, therefore, the VAS must be provided when the Esteem report is provided.   15 U.S.C. § 1681a(g).   However, the FTC's regulations, the legislative history, and the leading case on the issue in 2009, *Gilliespie v. Trans Union Corp.*, 482 F.3d 907 (7th Cir. 2007), are contrary to Plaintiffs' limitless reading of the definition of the term "file."

In *Gillespie*, the plaintiffs made the exact same argument that Plaintiffs make here, and the court held that Trans Union's more narrow reading of the term "file" "must carry the day" if all of the subsections of § 1681g were to be given effect.   *Gilliespie*, 482 F.3d at 908. Additionally, *Gillespie* based its holding on the FTC's commentary to § 1681g(a), which provides that the term "file" denotes "only that information that might be furnished, or has been furnished, in a consumer report on that consumer."   16 C.F.R. pt 600, App. § 603.   *Gilliespie* further noted that the legislative history of § 1681a(g) demonstrates that Congress intended to provide consumers with what the recipients of their credit reports received *but "not their entire files in whatever form maintained by the CRA."*   *Gillespie*, 482 F.3d at 909 (emphasis supplied).

As a result of these findings, *Gillespie* held that the consumer reporting agency should provide to the consumer the same information which it provided to the end user of the report.

There is no dispute that LexisNexis did exactly that here when it provided Plaintiffs with the Esteem reports also provided to Rite Aid (for Goodman) and Family Dollar (for Goode) in 2009. Thus, LexisNexis' alleged policy was completely consistent with *Gillespie*, the FTC's guidance and the legislative history.

Nonetheless, Plaintiffs claim that *Cortez*, decided in 2010, is "controlling" and "authoritative" with respect to LexisNexis' actions in 2009. Obviously, any guidance which *Cortez* might provide on the issue was not available when LexisNexis provided Esteem reports to Plaintiffs in 2009 and, therefore, cannot be used to establish that LexisNexis *willfully* violated § 1681a(g) in 2009. Moreover, the Third Circuit's affirmance of the jury's willfulness verdict in *Cortez* was based in a large part on the fact that Trans Union's failure to provide the OFAC alert to the plaintiff was directly contrary to "the OFAC regulations and the Treasury Department's website [which] both indicate that OFAC information in a credit report is in fact governed by FCRA" and "that website goes as far as to mention that the FCRA and the FTC provide consumers with a remedy when an invalid OFAC Alert is on their credit reports." *Cortez*, 617 F.3d at 722.

In other words, Trans Union's conduct in *Cortez* was contrary to well-publicized legal authority. Plaintiffs fail to identify any authority that was available to LexisNexis in 2009 which suggested that its alleged policy was objectively unreasonable. Furthermore, in *Cortez,* the Third Circuit went out of its way to make clear that the court "express[es] no opinion on whether the term 'file' is limited to the information a credit reporting agency includes in the credit report." *Cortez*, 617 F.3d at 711 n.27. The case contains no holding related to the issue at hand.

Accordingly, Plaintiffs' contention that *Cortez* is "controlling" is contrary to the language of the decision.

Plaintiffs do not dispute that, unlike the consumer in *Cortez*, they received the exact same information from LexisNexis that the purchasers of the Esteem report received.[7]   Although Plaintiffs make a strained argument that "the admission statement is literally part of what is being furnished to the employer," a VAS is no more "literally a part of" an Esteem report than an account statement reflecting an unpaid debt is "literally a part of" a credit report or a bankruptcy petition is "literally a part of" a credit report reflecting a bankruptcy filing.   Plaintiffs do not cite any authority holding that a credit reporting agency must provide copies of account statements and bankruptcy court filings if a consumer requests a copy of their "file."[8]

Just as credit reporting agencies summarize the information provided by creditors, LexisNexis summarizes information, including VASs, provided by employers, and no one could plausibly argue that credit reporting agencies must provide the underlying records or data provided by each creditor so that a consumer receives the "primary source" records.   When Plaintiffs received their Esteem reports, there was no appellate court or regulatory authority

---

[7]         As the Esteem reports attached as exhibits to the Complaint demonstrate, each Plaintiff was provided with the name of the store which reported the theft, the store number and/or location, the source of the information (a VAS), whether legal action had been taken, the type of offense, the date of the incident and the dollar amount of the theft.   If either Plaintiff wished to dispute the accuracy of the information contained therein, the Esteem report provided all of the information necessary to do so.

[8]         Plaintiffs' personal opinions concerning the "importance" of the VAS are completely irrelevant.   The issue is whether there was legal authority standing for the proposition that in 2009, LexisNexis was obligated to provide the VAS.   Although *Cortez* makes distinctions between "harmful" information and information related to "record keeping," the holding in *Gillespie*, indisputably the leading case in 2009, does not turn on the subjective "importance" of the information allegedly not provided to the consumer.   To the contrary, *Gillespie* straightforwardly holds that the term "file" means the information which was provided or might have been provided to the acquirer of the report, and not every piece of information related to the consumer or, as Plaintiffs would have it, every piece of information which the consumer considers "important."

which arguably should have told LexisNexis to provide the VAS with the Esteem report.  As a result, Plaintiffs can never prove that LexisNexis willfully violated § 1681g(a).

The issue can be decided now.  Plaintiffs fail to address any of the cases cited by LexisNexis in support of its argument that the willful violation claim can be dismissed on a Rule 12(b)(6) motion.  *See Long v. Tommy Hilfiger U.S.A., Inc.*, 2011 U.S. Dist. LEXIS 13782, at *20-*23 (W.D. Pa. 2011); *Shlahtichman v. 1-800 Contacts, Inc.*, 615 F.3d 794, 803-04 (7th Cir. 2010) (noting that "[t] o date, there has been no contrary opinion from a court of appeals or federal agency suggesting that the company's understanding of the statute is wrong"); *Simonoff v. Kaplan, Inc.*, 2010 U.S. Dist. LEXIS 125414, at *23-*26 (S.D.N.Y. No. 29, 2010); *King v. MovieTickets.com, Inc.*, 555 F. Supp. 2d 1339, 1342-43 (S.D. Fla. 2008).   In each of these cases, the court dismissed the plaintiff's willful violation claim pursuant to a motion to dismiss because the defendant's conduct was not objectively contrary to existing legal authority.

By contrast, in all four of the cases cited by Plaintiffs where a willfulness claim survived a motion to dismiss, the defendant had failed to adopt well-publicized new rules and legal authority regarding credit card number truncation on credit card receipts.    In *Hedlund v. Hooters of Houston*, No. 08-45, 2008 U.S. Dist LEXIS 38926, at *3 (N.D. Tex. May 13, 2008), *Ehrheart v. Lifetime Brands, Inc.*, 498 F. Supp. 2d 753 (E.D. Pa. 2007), *Miller v. Sunoco, Inc.*, No. 07-1456, 2008 U.S. Dist LEXIS16813, at *2 (E.D. Pa. Mar. 4, 2008), and *Korman v. Walking Co.*, 503 F. Supp. 2d 755 (E.D. Pa. 2007), each court held that the plaintiff adequately alleged a willful violation of the FCRA because the defendants had allegedly failed to comply with a well-publicized new law despite receiving actual notice of the new FACTA requirements from credit card companies, notices from the FTC and other public information.

Plaintiffs fail to identify authority which could have lead LexisNexis to the conclusion, in 2009, that the VAS must be provided if a consumer requests a copy of the Esteem report. Plaintiffs also fail to say why discovery is needed in order for the Court to decide this issue of law. Therefore, the issue is ripe for decision, and dismissal of the willful violation claim in Count II is required under *Safeco*.

## III.    CONCLUSION

For the foregoing reasons, Defendant requests that this Court grant its Motion to Dismiss.


Respectfully submitted,


/s/ Andrew Soven
Andrew J. Soven
Mark S. Melodia
**REED SMITH LLP**
2500 One Liberty Place
1650 Market Street
Philadelphia, PA 19103-7301
(215) 851-8100

Counsel for LexisNexis Risk Solutions Inc.

Dated: August 29, 2011

- 18 -

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 29th day of August, 2011, I caused a true and correct copy of the foregoing Defendant LexisNexis Risk Solutions Inc.'s Reply Brief in Further Support of Motion to Dismiss Plaintiff's Complaint to be served via ECF upon all counsel of record.

*/s/ Andrew J. Soven*
Andrew J. Soven

**<u>Exhibit A</u>**

# 40 YEARS OF EXPERIENCE

## WITH THE FAIR CREDIT REPORTING ACT

### AN FTC STAFF REPORT WITH SUMMARY OF INTERPRETATIONS

July 2011 | Federal Trade Commission

coordination with one or more of the other agencies that enforce the FCRA.[25] Under the CFPA, this rulemaking responsibility will transfer to the CFPB, with the exception of rules governing the proper disposal of consumer report information and the requirements that companies maintain a program to detect and address the "red flags" of identity theft. The CFPA provides that the FTC will continue to have rulemaking authority in those two discrete areas,[26] as well as with respect to automobile dealers.[27]

Separate from the Commission's rulemaking authority, Commission staff has offered extensive informal interpretation and guidance since the FCRA's adoption in 1970, including the issuance of over 430 opinion letters[28] and the publication of a staff compliance manual.[29] Although staff opinion letters do not represent the formal policy or views of the Commission and are not binding, they provide important guidance on issues of statutory interpretation. Some courts have cited to staff letters to support their findings,[30] although others have rejected them.[31] In addition to the staff opinion letters, the Commission itself issued eight formal interpretations of the FCRA in the 1970s.[32]

Given the volume of formal and informal FCRA interpretations, in May 1990 the Commission created a consolidated, inclusive document that gathered together Commission guidance in

---

25. For example, the FTC was given sole authority to promulgate rules implementing the free annual credit report and prescreen opt-out notice requirements. *See* Section 612(a) (annual credit report), 615(d)(2)(B) (prescreen opt-out notice). Examples of joint or coordinated rules include the risk-based pricing rule (jointly with the Federal Reserve), the disposal, furnisher accuracy, and identity theft red flags rules (coordinated with all of the federal financial agencies), and the furnisher direct dispute rule (jointly with all of the federal financial agencies). The FACT Act also imposed certain non-rulemaking obligations on the FTC, including, for example, the determination of a "fair and reasonable" fee for credit scores and the promulgation of notices of user and furnisher obligations. Section 609(f)(8). Other responsibilities were imposed on other FCRA agencies (*e.g.*, the Federal Reserve Board was required to issue the model disclosure for furnishing negative information). Section 623(a)(7)(D). Many of these responsibilities transfer to the CFPB effective July 21, 2011. CFPA § 1088(a)(2).

26. CFPA §1088(a)(2).

27. CFPA §1029(a) and (d).

28. *See* http://www.ftc.gov/os/statutes/fcra/index.htm for a compilation of FTC informal staff opinion letters dated June 27, 1997 and thereafter.

29. The manual (titled "Compliance with the Fair Credit Reporting Act") was first published shortly after enactment and was last updated in March 1979.

30. E.g., *Levine v. World Financial Network Nat'l Bank*, 437 F.3d 1118, 1122 (11th Cir. 2006); *Fischl v. General Motors Acceptance Corp.*, 708 F.2d 143, 147 (5th Cir. 1983).

31. E.g., *Johnson v. Federal Express Corp.*, 147 F. Supp. 2d 1268, 1272 (M.D. Ala. 2001) ("The letters are not binding and not persuasive."); *Hartman v. Lisle Park District*, 158 F. Supp. 2d 869, 876 (N.D. Ill. 2001).

32. 16 CFR §§ 600.1 through 600.8 (withdrawn in August 1990, contemporaneously with publication of the Commentary, described in footnote 33, *infra*).

a single source, its comprehensive Commentary on the FCRA (the "1990 Commentary"),[33] providing broad guidance on the Commission's interpretation of the provisions of the FCRA.[34] The Commentary had no binding effect, but some courts have accorded it weight as a policy statement of the primary agency responsible for enforcing the FCRA.[35]

## V.  FTC Staff Summary and Relationship to 1990 Commentary

Through the passage of time and the adoption of significant amendments to the FCRA, the 1990 Commentary has become partially obsolete, and does not reflect the most current interpretive guidance on the FCRA.  Prior to the passage of the CFPA, FTC staff had been working on an updated Commentary as a replacement for the 1990 Commentary.  As a result of the CFPA, however, much of the authority of the Commission and the federal financial agencies to publish rules, regulations, or guidelines under the FCRA transfers to the CFPB.  In this changed context, staff is instead publishing a compendium of interpretations that it believes will be of use to the CFPB staff, the businesses subject to the Commission's jurisdiction under the FCRA, public representatives, and consumers.  The Staff Summary incorporates material from the following sources:

- Interpretations from the 1990 Commentary on sections of the FCRA that have not been amended, which staff continues to believe are timely, accurate, and helpful;

- Issues addressed in informal staff opinions issued after the 1990 Commentary, including post-1996 letters that appear on the Commission's public web site;

- Informal interpretations provided by staff not otherwise reflected in written staff opinions, typically in response to specific questions or fact patterns presented by industry;[36] and

- Commission enforcement actions, and rulemaking proceedings required by the FACT Act.

---

33.   55 Fed. Reg. 18804 (May 4, 1990). The 1990 Commentary was the culmination of a proposal published in August 1988 and the Commission's review of over 100 submissions it received in response to its request for public comments on that proposal. 53 Fed. Reg. 29696 (Aug. 8, 1988).

34.   The Commission specified that the interpretations set forth in the 1990 Commentary were not trade regulation rules or regulations and, as provided in section 1.73 of the Commission's rules, did not have the force or effect of statutory provisions.

35.   E.g., *Davenport v. Farmers Ins. Group*, 378 F. 3d 839, 843 (8th Cir. 2004); *Estiverne v. Saks Fifth Avenue*, 9 F.3d 1171, 1173 (5th Cir. 1993). The FTC provides extensive guidance and assistance to the private sector and consumers on the requirements and protections of the FCRA. The FTC does outreach to the business community through presentations at industry meetings and conferences, informal advice, and published guidance materials.

36.   It had been commonly assumed that the Commission would update the 1990 Commentary at some point. Thus, we continue to receive regular public input on various interpretations of the FCRA.

the provision of health care to an individual; or (C) the payment for the provision of health care to an individual." **Section 603(i)(2)** excludes identifying and other non-germane information, "including the existence or value of any insurance policy."

1.   RELATION TO OTHER SECTIONS

Sections 603(d)(3), 604(g), 605(a)(6), and 623(a)(9) set forth standards concerning the use or communication of medical information. The Federal financial agencies have issued rules specifying "necessary and appropriate" uses of medical information. See comment 604(g)-1.

**Section 603(j)** sets forth definitions with respect to child support obligations.

**Section 603(k)(1)** defines the term "adverse action."

1.   RELATION TO OTHER SECTIONS

The term "adverse action" is defined in the credit context by section 603(k)(1)(A), in the insurance context by section 603(k)(1)(B)(i), in the employment context by section 603(k)(1)(B)(ii), in the context of a license or benefit granted by the government by section 603(k)(1)(B)(iii), and in other contexts by section 603(k)(1)(B)(iv). The subsections of the "adverse action" definition in section 603(k)(1) thus parallel the permissible purposes provided for credit, insurance, employment, governmental benefit or license, and other consumer purposes provided in section 604(a)(3).[76] See comment 604(a)-1.

Section 615(a) requires users of consumer reports to provide notice to consumers against whom they take "adverse action" based in whole or in part on a consumer report. Section 615(b) imposes notice requirements on creditors who take "adverse action" based on information other than consumer reports.

**Section 603(k)(1)(A)** states that the term adverse action "has the same meaning as in section 701(d)(6) of the Equal Credit Opportunity Act."

1.   RELATION TO OTHER LAWS

Under regulations implementing the Equal Credit Opportunity Act ("ECOA"), an "adverse action" is "a refusal to grant credit in substantially the amount or on substantially the same terms requested in an application unless the creditor makes a counteroffer (to grant credit in a different amount or on other terms) and the applicant expressly accepts the credit offered ...." 12 CFR § 202.2(c)(1)(i).

2.   ACTION ON CREDIT APPLICATION

Under the definition of "adverse action" set forth in the ECOA and incorporated into the FCRA, where a consumer applies for credit on particular terms and is offered credit only on less favorable terms, such as a lower credit limit, or a higher interest rate, based in whole or in part on information from a consumer report, and the consumer refuses to accept those terms or use the credit offered, the consumer has suffered an "adverse action." (An example of an application for credit on particular terms is an application that provides information regarding the type and amount of credit sought, the down payment amount, and the annual percentage rate.) However, if the applicant accepts the less favorable terms counter offered, the applicant does not suffer an "adverse action."[77] See also comments 615(a)-1B, 615(a)-2A, and 615(h) concerning "risk based pricing" notices

33

provided to credit applicants who receive less than optimal terms in whole or in part because of a consumer report.

3. PRIMARY CREDIT APPLICANT, CO-APPLICANT, AND GUARANTOR

Because the FCRA adopts the definition of "adverse action" from the ECOA, only an "applicant" experiences "adverse action" in the context of a credit transaction. See 12 CFR § 202.2(c)(1). A co-applicant is an "applicant" but a guarantor is not. 12 CFR. § 202.2(e). Therefore, where a creditor denies an application, both the primary applicant and any co-applicant have suffered an "adverse action," but any guarantor has not. See comment 615(a)-2B.[78]

4. DECISION NOT TO SOLICIT FOR CREDIT

It is not an "adverse action" for a creditor to decide not to include a current borrower in a credit solicitation based in whole or in part on the creditor's review of consumer report information because that decision does not involve either (a) an "application" by the consumer or (b) a termination of the consumer's account or an unfavorable change in the terms of that account. 12 CFR §202.2(c)(1)(i-ii).[79]

**Section 603(k)(1)(B)(i)** defines the term adverse action as including "a denial or cancellation of, an increase in any charge for, or a reduction or other adverse or unfavorable change in the terms of coverage or amount of, any insurance, existing or applied for, in connection with the underwriting of insurance."

1. INITIAL PREMIUM

The term "increase in any charge for" insurance applies to the initial premium charged to the consumer, as well as to a premium that is raised during the term a policy is in effect. If an insurer considers an applicant's credit history (or a score based on that history) as part of the application process, and offers a higher premium than it would otherwise have offered, the higher premium is an "increase in (the) charge for" insurance. The consumer has suffered an adverse action because the insurance would cost more than it would if the consumer's credit history had not been considered.

2. MORTGAGE INSURANCE

A mortgage insurer's refusal to insure a consumer loan is an "adverse action" under this subsection because it is a "denial in connection with the underwriting of insurance."[80]

**Section 603(k)(1)(B)(ii)** defines the term adverse action as including "a denial of employment or any other decision for employment purposes that adversely affects any current or prospective employee."

1. RELATION TO OTHER SECTIONS

The term "employment purposes" is defined in section 603(h).

2. DISCIPLINARY ACTION TAKEN BY AN EMPLOYER

Corrective or disciplinary action taken by an employer based in whole or in part on a consumer report is an "adverse action."[81]

34

3.  CHANGE IN DUTIES OR STATUS

An employer's decision may "adversely" affect an employee even if his or her pay is not reduced. For example, an employee who is denied an assignment requiring a security clearance that is withheld in whole or in part because of a consumer report suffers an "adverse action" in employment even if the assignment would not have raised the employee's salary.

**Section 603(k)(1)(B)(iii)** defines the term adverse action as including "a denial or cancellation of, an increase in any charge for, or any other adverse or unfavorable change in the terms of, any license or benefit described in section 604(a)(3)(D)."

1.  GENERAL

Subsection 603(k)(1)(B)(iii) provides a specific "adverse action" definition in the context of a consumer's application for a license or other governmental benefit where the applicant's financial responsibility or status is a factor that must be considered.

2.  WORKER'S COMPENSATION CLAIM

The use of information from a consumer report to deny worker's compensation benefits to the consumer or to grant less than the amount claimed is an "adverse action."[82]

**Section 603(k)(1)(B)(iv)** defines the term adverse action as including "an action taken or determination that is (I) made in connection with an application that was made by, or a transaction that was initiated by, any consumer, or in connection with a review of an account under section 604(a)(3)(F)(ii); and (II) adverse to the interests of the consumer."

1.  GENERAL

Subsection 603(k)(1)(B)(iv) provides a specific "adverse action" definition in the context of consumer transactions other than those involving credit, insurance, employment or government benefits, such as an apartment rental or a purchase by personal check.

2.  ACTION BASED ON CO-SIGNER'S OR GUARANTOR'S REPORT

A landlord's decision to deny a rental application based on a co-signer or guarantor's consumer report is an "adverse action" with respect to the co-signer or guarantor. By voluntarily assuming liability for the tenant's rental payments, a co-signer or guarantor seeks to ensure that the tenant receives housing, as in the case of a parent who co-signs a rental application submitted by a son or daughter. The rejection is thus "adverse" to the "interests" of the potential co-signor or guarantor.[83] But see comments 603(k)(1)(A)-3 and 615(a)-2B, concerning the application of "adverse action" to a guarantor in a credit context where the definition is tied to the ECOA.

3.  DEPOSIT REQUIREMENT

A business that determines, based on information contained in a consumer report, that a consumer must pre-pay, pay a cash deposit, or pay a larger deposit rather than would normally be required, has taken adverse action against that consumer.[84]

35

5.  REFUSAL TO CONSENT

The FCRA does not prohibit an employer from taking adverse action against an employee or applicant who refuses to authorize the employer to procure a consumer report. However, it does not specifically authorize such action.[165]

**Section 604(b)(3)** provides that, except for employment in the trucking industry, an employer intending to take adverse action shall, before taking such action, provide the consumer a copy of his or her consumer report and a summary of the consumer's rights under the FCRA. The summary is to be in a form prescribed by the FTC under section 609(c)(3).

1.  GENERAL RULE

Section 604(b)(3)(A) imposes a specific disclosure obligation on employers. Before taking any adverse action based on a consumer report, employers must provide the consumer with a copy of the report and a written summary of consumer rights under the FCRA. This requirement is generally known as a "pre-adverse action notice."

2.  TRUCKING INDUSTRY EXCEPTION

In the trucking industry, the employer is not required to provide a written summary and copy of the consumer report before taking adverse action. Section 604(b)(3)(B-C) provides alternate pre-adverse action notices for consumers who have applied for jobs in the trucking industry by mail, phone, or computer.

3.  RELATION TO OTHER SECTIONS – ADVERSE ACTION REQUIREMENTS

This paragraph requires employers to provide to the consumer, before taking any adverse action based on a consumer report, a copy of the report, and a written summary of consumer rights under the FCRA. Section 615(a) applies more generally to any party who has taken adverse action that is based, in whole or in part, on a consumer report, and requires the report user to notify the consumer of the fact that adverse action was taken based on a consumer report. Because the notice under this paragraph must be provided to consumers before adverse action is taken, and a section 615(a) notice must be provided after adverse action is taken, the notices may not be included in the same document.[166]

An employer may provide this section 615(a) adverse action notice in a way that minimizes duplication with the pre-adverse action notice under this section. For example, in its adverse action notice, it could note that the consumer has already received a copy of his or her report and a summary of consumer rights under the FCRA.[167]

4.  RELATION TO OTHER SECTIONS – SUMMARY OF CONSUMER RIGHTS

This section requires employers to provide a written summary of consumer rights under the FCRA as part of a pre-adverse action disclosure. Section 609(c) requires CRAs to provide the summary to a consumer who requests disclosure of the information in his or her file.

5.  TIMING OF PRE-ADVERSE ACTION DISCLOSURE

There is no specific period of time an employer must wait after providing a pre-adverse action notice and before taking adverse action against the consumer. Some reasonable period of time must elapse, but the minimum length will vary depending on the particular circumstances involved.[168] An

52

employer can comply with the pre-adverse action disclosure requirement by sending a copy of the report to the consumer (with the summary of consumer rights) as soon as it is prepared by the CRA or received by the employer.[169]

6.   REQUIREMENT TO INCLUDE "A COPY OF THE REPORT"

   A.   Redacted report. Because the requirement that an employer provide "a copy of the report" is unqualified, an employer who uses an investigative consumer report may not redact references to investigative sources if those sources are included in the report.[170] To preserve the confidentiality of sources, CRAs may provide employers with reports that do not specifically identify sources, and employers may release the reports to consumers as they have received them.[171]

   B.   Oral report. Where the employer possesses no written report because the information is provided verbally by the CRA, the employer may tell the applicant orally what is in the report before taking adverse action. Because the report itself is oral, an oral "copy" is the proper method of compliance, as it conveys the information that Congress intended the consumer to know prior to suffering adverse action.[172]

7.   SOURCE OF CONSUMER RIGHTS SUMMARY

   The CRA is responsible for sending the summary of consumer rights to employers. The employer must supply the summary to consumers before taking any adverse action based on a consumer report.[173]

8.   PROVISION OF NOTICE BY THIRD PARTY

   Employers may arrange to have the CRA provide pre-adverse action notices directly to consumers, but the employer is liable if the CRA does not provide the notices.[174]

9.   CERTAINTY OF ADVERSE ACTION

   Employers must comply with the pre-adverse action disclosure requirement even where the information contained in the consumer report (such as a criminal record) would automatically disqualify the individual from employment or lead to an adverse employment action.[175]

**Section 604(c)** governs the practice of "prescreening" in connection with credit and insurance solicitations. Subsection (1) allows prescreened solicitations only if the consumer consents or if the "transaction consists of a firm offer of credit or insurance" and the consumer has not opted out of receiving such solicitations. Subsection (2) limits the information that the CRA can provide to the business seeking the information for prescreening purposes. Subsection (3) prohibits the CRA from informing anyone other than the consumer that his or her information has been provided by a CRA to a business for prescreening purposes.

**Section 604(d)** is reserved.

**Section 604(e)** requires CRAs to allow consumers to opt out of prescreened offers. CRAs must establish and maintain a toll-free telephone number that a consumer