**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

_____

| | | |
|---|---|---|
| **KEESHA GOODE and VICTORIA** | : | **CIVIL ACTION** |
| **GOODMAN, on Behalf of Themselves and** | : | |
| **Others Similarly Situated,** | : | |
| | : | |
| **Plaintiffs,** | : | **NO.  2:11-cv-2950-JD** |
| | : | |
| **v.** | : | |
| | : | |
| **LEXISNEXIS RISK & INFORMATION** | : | |
| **ANALYTICS GROUP, INC.,** | : | |
| | : | |
| **Defendant.** | : | |

_____

**DuBOIS, J.**                                                           **March 22, 2012**

## M E M O R A N D U M

### I. INTRODUCTION

In this putative class action, plaintiffs allege that defendant's system for conducting

background checks violates the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. § 1618 et seq.

Plaintiffs are employees who were fired by their employers, and potential employees who were

denied employment, based on background checks that defendant conducted as a service to those

employers.

Defendant LexisNexis Screening Solutions, Inc.,[1] ("LexisNexis") filed a Motion to

Dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6).[2] For the reasons stated below, the

Court grants in part and denies in part defendant's Motion to Dismiss.

_____

[1] Defendant was formerly known as ChoicePoint Work Solutions, Inc. (Mem. Law Supp. of Def.
LexisNexis Screening Solutions Inc.'s Mot. Dismiss ("Def.'s Mem. Law") 3 n.4.). Its  name was

## II. BACKGROUND[3]

### A. The "Esteem" System

Defendant operates a proprietary system called "Esteem" that "helps organizations identify applicants with [a] history of theft or fraud." (Compl. ¶¶ 14, 15.) Subscribing member employers ("members") pay a fee based on the number of their employees, and in return, defendant performs background checks on current and potential employees. Members must also give defendant new records of theft incidents involving their own employees and customers ("incident reports" or "reports"). (Id. ¶ 20.) Members may only submit incident reports in one of two situations: (1) if the member referred the incident for criminal prosecution, or (2) if the employee admits guilt. (Id. ¶ 21.) If, as is alleged in this case, the employee admits guilt, the member employer includes an "admission statement"—a statement describing the incident and admitting guilt signed by the person who committed the theft—with the report. (Id. ¶ 23.)

When a member requests information about a current or potential employee, defendant searches its system for possible matches between the employee's personal information and a record on file. (Id. ¶ 28.) If a match is found, defendant "verifies" the match by comparing the personal data from the inquiry with the incident data and the admission statement supporting the

---

changed to LexisNexis Screening Solutions, Inc. This Memorandum will refer to it simply as LexisNexis.

[2] Defendant filed its Motion to Dismiss on July 25, 2011. Plaintiffs filed their response on August 19, 2011, and defendant filed a reply on August 29, 2011. At the request of the parties, the Court deferred ruling on the Motion to Dismiss until the question of settlement was fully explored, by Order of September 13, 2011. The parties reported to the Court on March 2, 2012, that they failed to reach a settlement and requested that the Court decide the pending Motion to Dismiss.

[3] As required on a motion to dismiss, the Court takes all plausible factual allegations contained in plaintiffs' complaint to be true.

incident. (Id.) Once a match is verified, defendant classifies the employee in accordance with adjudication scores agreed upon by defendant and the member ("adjudication"). (Id. ¶ 45.) If the employee falls below a certain threshold, defendant assigns the employee a "noncompetitive" score. (Id. ¶ 46.) Defendant then generates a "report" detailing the match and the adjudication and sends the report to the inquiring member. (Id. ¶ 31.) The admission statement is not provided as part of the report. (Id. ¶ 32.)

The FCRA requires, inter alia, that before taking any "adverse action" against an employee, the person taking such action must send the employee a copy of the report and a notice of the consumer's rights under the FCRA. 15 U.S.C. § 1681b(b)(3). As an additional service, defendant sends these "pre–adverse action letters" on members' letterhead to employees or potential employees whose information results in a match. (Id. ¶ 50.) Defendant sends the pre–adverse action letter to employees or potential employees after it completes the adjudication and sends the report to the member. (Id. ¶ 48.) While the pre–adverse action letter contains a copy of the report, it does not contain a copy of the admission statement. (Id. ¶¶ 50, 51.) The pre–adverse action letter also contains a disclaimer that defendant "did not participate in any employment decision and will be unable to provide any specific reasons as to why [the employer] may choose to take an adverse employment action." (Id. Ex. B.) Several days after it sends the pre–adverse action letter, defendant sends the employee a final "adverse action letter" on the member's letterhead. (Id. ¶ 48.)

**B. Facts Pertaining to Plaintiff Keesha Goode**

Plaintiff Keesha Goode worked as a customer service representative and cashier in a Forman Mills store from November 2006 to October 2008. (Id. ¶ 53.) Forman Mills is a subscribing member of Esteem. (Id. ¶ 54.) Forman Mills fired Ms. Goode in October 2008 based

3

upon an accusation of theft against her. (Id. ¶¶ 54, 61.) Forman Mills submitted an incident

report, including an admission statement, to defendant following Ms. Goode's termination. (Id.

¶¶ 60, 61.)

      In May 2009 Ms. Goode applied for a job at a store owned by the Family Dollar Stores

chain. (Id. ¶ 57.) Soon after applying, she received a pre–adverse action letter from defendant

telling her that it had matched her information to the incident report Forman Mills submitted in

October 2008. (Id. Exs. B, C.) The pre–adverse action letter was on Family Dollar Stores'

letterhead, but was actually sent by defendant pursuant to the Esteem member services

agreement between defendant and Family Dollar Stores. (Id. ¶ 59.) The letter told Ms. Goode to

contact defendant LexisNexis if she wished to contest "the accuracy or completeness of any of

the information provided by [defendant]." (Id. Ex. B.)

      Some time thereafter, Ms. Goode sent defendant a letter requesting her entire "file" and

disputing the alleged theft from Forman Mills.[4] (Id. ¶ 64.) Defendant responded with a letter

dated August 6, 2009, stating that defendant had reinvestigated the incident and that "the original

information provided on the background report was reported accurately." (Id. ¶ 65, Ex. E.)

Attached to the letter was a copy of the same report that defendant had supplied to Ms. Goode in

the pre–adverse action letter. (Id. ¶ 65.). Ms. Goode then sent a second letter requesting copies of

"whatever information you are relying on." (Id. ¶ 66, Ex. F.) She did not receive a response from

defendant. (Id. ¶ 67.) Nothing in the Complaint suggests that Family Dollar Stores knew that Ms.

Goode contested the accuracy of the report or that she received any communication directly from

Family Dollar Stores after her interview.

---

[4] In this letter, Ms. Goode stated, "I was accused of not reporting on a former employee who was
stealing merchandise, but I did not steal anything myself." (Id. Ex. D.)

### C. Facts Pertaining to Plaintiff Victoria Goodman

From June 2005 to June 2006 Ms. Goodman worked as a cashier and stock person at a Dollar General store. (Id. ¶ 69.) In June 2006, her supervisor informed her that Dollar General was investigating her in relation to a theft and that she should go home. (Id. ¶ 70.) Dollar General asked Ms. Goodman to sign an admission statement, which she did. (See Def.'s Mem. Law Ex. 2.) Dollar General never informed her of the outcome of its investigation, and Ms. Goodman applied and was approved for unemployment compensation benefits.[5] (Compl. ¶¶ 73, 75.)

On October 2, 2006, Ms. Goodman began work as a cashier at a Rite Aid store. (Id. ¶ 75.) In November 2009, she applied for a promotion. (Id. ¶ 76.) In response to Ms. Goodman's application, Rite Aid submitted an inquiry to the Esteem system. (Id. ¶ 78.) Rite Aid fired her on November 30, 2009. (Id. ¶ 79.) On December 2, 2009, defendant sent her a pre–adverse action letter on Rite Aid's letterhead with the report attached. (Id. Exs. G, H.) Defendant sent Ms. Goodman a final adverse action letter on Rite Aid's letterhead on December 7, 2009. (Id. Ex. I.)

Ms. Goodman wrote to defendant during December 2009 disputing the report. (Id. ¶ 91.) Defendant responded on December 22, 2009, stating that it had "completed [its] reinvestigation of the disputed information and . . . verified that the original information provided on the background report was reported accurately." (Id. ¶ 92.) Ms. Goodman contacted Community Legal Services, which sent defendant a request for Ms. Goodman's admission statement. (Id. Ex. L.) Defendant did not respond. (Id. ¶ 93.) Ms. Goodman later filed a union grievance and was reinstated as a cashier at Rite Aid. (Id. ¶ 94.)

---

[5] Plaintiffs state in the Complaint that "had she, in fact, been discharged for committing a theft or other 'willful misconduct,' Dollar General would not have been liable for her Unemployment Compensation." (Compl. ¶ 74.)

Defendant attached Ms. Goodman's admission statement to its motion to dismiss. (Def.'s Mem. Law Ex. 2.) The admission statement appears to contain two different sets of handwriting. (Id.) The first describes the alleged incident. (Id.) The second states, "I really thought I bought the fan," and denies that she intended to steal it. (Id.) The Complaint does not state whether Rite Aid ever saw the admission statement or knew that Ms. Goodman had disputed the accuracy of the report.

## III.    LEGAL STANDARD

To survive a motion to dismiss under Rule 12(b)(6), a civil plaintiff must allege facts that "'raise a right to relief above the speculative level.'" Victaulic Co. v. Tieman, 499 F.3d 227, 234 (3d Cir. 2007) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007)). A complaint must contain "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 129 S. Ct. 1937, 1949 (2009) (quoting Twombly, 550 U.S. at 570). To satisfy the plausibility standard, a plaintiff's allegations must show that defendant's liability is more than "a sheer possibility." Id. "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'" Id. (quoting Twombly, 550 U.S. at 557).

In Twombly, the Supreme Court used a "two-pronged approach," which it later formalized in Iqbal. Iqbal, 129 S. Ct. at 1950; Fowler v. UPMC Shadyside, 578 F.3d 203, 210–11 (3d Cir. 2009). Under this approach, a district court first identifies those factual allegations that constitute nothing more than "legal conclusions" or "naked assertions." Twombly, 550 U.S. at 555, 557. Such allegations are "not entitled to the assumption of truth" and must be disregarded. Iqbal, 129 S. Ct. at 1950. The court then assess "the 'nub' of the plaintiff['s]

complaint—the well-pleaded, nonconclusory factual allegation[s] . . . to determine" whether it

states a plausible claim for relief. Id.

## IV. DISCUSSION

The Complaint contains two counts. The Court addresses each in turn.

### A. Count I: Violation of 15 U.S.C. § 1681b(b)(3)(A)

Plaintiffs claim that defendant violated 15 U.S.C. § 1681b(b)(3)(A), which states:

> in using a consumer report for employment purposes, before taking any adverse action based in whole or in part on the report, the person intending to take such adverse action shall provide to the consumer to whom the report relates—
>
> > (i) a copy of the report; and
> >
> > (ii) a description in writing of the rights of the consumer under this subchapter . . . .

Under the FCRA, plaintiffs are "consumers," § 1681a(c), defendant is a "person," § 1681a(b),

and the reports are "consumer reports," § 1681a(d)(1)(B). Thus, § 1681b(b)(3)(A) required

defendant to send each plaintiff a pre–adverse action letter containing a copy of the report and a

description of her rights before taking any "adverse action" against her. The "'clear purpose'" of

this section is to afford employees time to "'discuss reports with employers or otherwise respond

before adverse action is taken.'" Lynne B. Barr, The New FCRA: An Assessment of the First

Year, 54 Bus. Law. 1343, 1348 (1999) (quoting Letter from William Haynes, Attorney, FTC, to

Harold R. Hawkey, Attorney, Employers Association of New Jersey (Dec. 18, 1997), available at

http://www.ftc.gov/os/statutes/fcra/hawkeycb.htm), cited in Obabueki v. Int'l Bus. Machs. Corp.,

145 F. Supp. 2d 371, 392 (S.D.N.Y. 2001).

Plaintiffs argue that defendant took an adverse action against them when it verified an Esteem match and adjudicated them as noncompetitive. This occurred before defendant sent them the pre–adverse action letters, in violation of § 1681b(b)(3)(A).[6]

Defendant makes three arguments in response. First, defendant argues that verifying an Esteem match and adjudicating the employee do not qualify as adverse actions. Second, defendant argues that the employer, not the consumer reporting agency ("CRA"), is solely responsible for fulfilling the requirements of § 1681b(b)(3)(A). Finally, defendant argues that, as an agent for the employer, it cannot be liable under § 1681b(b)(3)(A). The first argument poses the question of "when"—that is, does the adverse action take place when defendant adjudicates the employee or when the employer formally fires or rejects the employee? The second and third arguments pose the question of "who"—that is, who is liable for a violation of § 1681b(b)(3)(A): the CRA, the employer, or both? This Memorandum will address these two questions in turn.

## 1. When Does the Adverse Action Take Place?

In the employment context, an "adverse action" is "a denial of employment or any other decision for employment purposes that adversely affects any current or prospective employee." 15 U.S.C. § 1681a(k)(1)(B)(ii). The FCRA definition of adverse action also includes a catch-all clause: "any action taken or determination that is (I) made in connection with an application that was made by, or a transaction that was initiated by, any consumer, . . . ; and (II) adverse to the interests of the consumer." § 1681a(k)(1)(B)(iv). Plaintiffs argue that defendant's "adjudication" of plaintiffs as "noncompetitive" is an adverse action because it is, in effect, "a denial of

---

[6] Rite Aid may have also violated the FCRA when it fired Ms. Goodman on November 30, 2009, three days before she received the pre–adverse action letter. However, Rite Aid is not named in this case, and Ms. Goodman's only claim is that defendant violated the FCRA when it adjudicated her as noncompetitive before sending her a pre–adverse action letter.

employment or any other decision for employment purposes that adversely affects" plaintiffs.

§ 1681a(k)(1)(B)(ii). Plaintiffs argue in the alternative that defendant's adjudication of plaintiffs

as noncompetitive fits the catch-all definition in § 1681a(k)(1)(B)(iv). Plaintiffs are correct on

both points.

### i. Defendant Took an Adverse Action Against Plaintiffs Under the Definition in § 1681a(k)(1)(B)(iv).

In <u>Adams v. National Engineering Service Corp.</u>, plaintiff Adams sought work through a

temporary employment "staffing agency." 620 F. Supp. 2d 319, 323 (D. Conn. 2009). The

staffing agency requested a background check from a CRA, which uncovered negative

information about Adams. <u>Id.</u> at 324. The staffing agency forwarded the background check to the

ultimate employer for whom Adams hoped to work. <u>Id.</u> at 325. The staffing agency argued that

only the ultimate employer's final decision was an adverse action. <u>Id.</u> at 332. The <u>Adams</u> court

disagreed, holding that, under the plain meaning of § 1681a(k)(1)(B)(ii), the staffing agency's

decision to furnish the report to the ultimate employer was an adverse action. <u>Id.</u> In doing so, the

<u>Adams</u> court focused on the words "any other decision" in subsection (ii).

Under <u>Adams</u>, LexisNexis's action in providing the report to the employer would

constitute an "adverse action." However, LexisNexis did more than simply send the report to

plaintiffs' employers. LexisNexis also adjudicated plaintiffs. The member employers did not

conduct any review of the adjudication,[7] and thus the adjudication of plaintiffs is, quite literally,

a "decision for employment purposes that adversely affects" plaintiffs. § 1681a(k)(1)(B)(ii).

---

[7] The Complaint does not define the role member employers play once defendant adjudicates the
employee or potential employee. For instance, Ms. Goode never heard from Family Dollar Stores
after the adjudication. Further, when Ms. Goode challenged her adjudication, defendant sent her
a letter stating, "[a]t your request, LexisNexis will notify anyone you specify who received your
background report . . . that the information was disputed." (Letter from LexisNexis Consumer
Center to Keesha Goode (August 6, 2009), Compl. Ex. E.) However, that letter arrived months
after Ms. Goode received the pre–adverse action letter from defendant, presumably too late for

Defendant attempts to distinguish Adams based on the fact that the adverse action in that case was taken by a staffing agency rather than the CRA. Defendant's argument is unpersuasive. As explained below, see infra Section IV.A.2, any "person" who takes an adverse action must comply with § 1681b(b)(3)(A), be it a CRA, an employer, or a staffing agency. Adams holds that a decision to furnish a report to an employer can be an "adverse action." That is the case even though the party taking the adverse action "did not have the ultimate authority to make the hiring decision." Adams, 620 F. Supp. 2d at 332.

In arguing that it did not take an adverse action, defendant relies principally on Obabueki v. International Business Machines Corp., 145 F. Supp. 2d 371 (S.D.N.Y. 2001). In Obabueki, plaintiff Obabueki applied for a job with defendant IBM and was hired, contingent on the outcome of a background check. Id. at 376. The background check revealed a prior criminal conviction. Id. Members of IBM's human resources department met on October 11, 1999, and "decided to withdraw plaintiff's conditional offer." Id. at 377. IBM sent plaintiff a pre–adverse action letter on October 13, 1999. Id. Obabueki attempted to explain the convictions but was unsuccessful. Id. at 378. On October 18, 1999, IBM sent plaintiff a letter formally withdrawing the offer of employment. Id.

Obabueki argued that IBM took an adverse action when members of its human resources department met to review the background check on October 11, 1999. Because that occurred before IBM sent Obabueki its pre–adverse action letter on October 13, 1999, Obabueki argued that IBM violated § 1681b(b)(3)(A). The court disagreed, holding that "[a]n internal decision to rescind an offer is not an adverse action." Id. at 391.

---

Ms. Goode to effectively contest the adjudication with the employer. (Compl. ¶¶ 56, 65.) In Ms. Goodman's case, Rite Aid fired her before defendant sent her the pre–adverse action letter and she had a chance to contest the adjudication. (Compl. ¶¶ 79, 80.) At the very least, this evidences a lack of coordination between defendant and the member employers.

Obabueki is distinguishable from the present case. In Obabueki, IBM made its ultimate decision to revoke the offer after careful consideration of the results of the background check and Obabueki's response. Id. at 377. Thus, when IBM sent Obabueki the pre–adverse action letter on October 13, 1999, Obabueki had a genuine opportunity to contest the accuracy of the report or explain his prior criminal conviction. See id. at 392 ("After receipt of the [October 13, 1999,] letter, plaintiff could have come forward with information responding to the [report] that showed he had not lied on his application."). This multi-step process was precisely what Congress envisioned when it enacted § 1681b(b)(3)(A). See Barr, supra Section IV.A, at 1348.

Unlike IBM's role in Obabueki, plaintiffs allege that the member employers in this case do not conduct any analysis or engage in any decisionmaking after defendant adjudicates the employee or prospective employee. As another court distinguishing Obabueki put it, "an adverse action occurs when the decision is carried out, when it is communicated or actually takes effect, and an actor has until that time to take the necessary steps to comply with the FCRA's requirements." Burghy v. Dayton Racquet Club, Inc., 695 F. Supp. 2d 689, 703 (S.D. Ohio 2010) (emphasis added). Defendant's adjudication of plaintiffs in the instant case "actually [took] effect" before defendant sent out the pre–adverse action letters because there was no real opportunity for plaintiffs to contest the adjudication or change its outcome thereafter. This scheme is missing the crucial last step—present in Obabueki—where the employer makes a final decision based on both the report and any information the employee uses to contest the report. Further, the pre‒adverse action letters that defendant sent to plaintiffs instructed plaintiffs to contact defendant rather than the employer to dispute the report. (Compl. Ex. B, G.) In fact, as noted above, the Complaint does not state whether the member employers ever learned that

11

plaintiffs disputed the adjudications. Thus, defendant's system undermines the goal of § 1681b(b)(3)(A), unlike IBM's deliberate decisionmaking process in <u>Obabueki</u>.

Defendant also cites <u>In re Farmers Insurance Co., Inc. FCRA Litigation</u>, in which the court held that an insurance company did not take an adverse action against plaintiffs when it made an internal decision to raise their rates based in part on their credit reports. No. CIV-03-158, 2007 WL 4215833, at *6 (W.D. Okla. Nov. 29, 2007). However, the <u>In re Farmers</u> court dealt with the definition of adverse action as it relates to insurance coverage. <u>See</u> 15 U.S.C. § 1681a(k)(1)(B)(i). That definition does not include the phrase "or any other decision," which is present in the definition of adverse action in the employment context. <u>Compare</u> § 1681a(k)(1)(B)(i), <u>with</u> § 1681a(k)(1)(B)(ii). The <u>Adams</u> court explicitly relied on this "any other decision" language in concluding that the defendant in that case had taken an adverse action. 620 F. Supp. 2d at 332. Thus, the text of the employment-related definition is broader than the insurance-related definition, at least as it relates to "decisions," making <u>In re Farmers</u> inapposite.[8]

### ii. Defendant Also Took an Adverse Action Against Plaintiffs Under § 1681a(k)(1)(B)(iv).

<u>Obabueki</u> and <u>In re Farmers</u> are distinguishable for another reason; they did not consider the catch-all definition of adverse action in § 1681a(k)(1)(B)(iv). That section defines adverse

---

[8] The other cases upon which defendant relies are similarly distinguishable. <u>Austin v. J.C. Penny Co., Inc.</u>, 162 F. Supp. 2d 495 (E.D. Va. 2001), considered whether a retail store defendant's initial refusal of a check plaintiff tendered constituted an adverse action where defendant accepted the check forty-five minutes thereafter. <u>Id.</u> at 496. <u>Austin</u> is irrelevant, especially given that the entire episode took place within the span of an hour and was conducted in person.

Defendant also cites <u>Johnson v. ADP Screening and Selection Servs., Inc.</u>, 768 F. Supp. 2d 979 (D. Minn. 2011). The facts of <u>Johnson</u> are almost identical to those of <u>Obabueki</u>, and thus, <u>Johnson</u> is distinguishable for the same reasons as <u>Obabueki</u>. The employer in <u>Johnson</u> put plaintiff's application "on hold" while plaintiff disputed the background check, thus allowing plaintiff to contest the outcome of that background check, and fulfilling the purpose of § 1681b(b)(3)(A).

action as "any action taken or determination that is (I) made in connection with an application that was made by, or a transaction that was initiated by, any consumer, . . . ; and (II) adverse to the interests of the consumer." As the catch-all definition is much broader than the employment-specific definition in § 1681a(k)(1)(B)(ii), defendant's adjudication of plaintiffs is clearly an adverse action under § 1681a(k)(1)(B)(iv).

Defendant argues that the catch-all definition should apply only in contexts that are wholly distinct from those specified in subsections (A) and (B)(i)–(iii) and should not apply to situations ostensibly covered by one of those subsections.  Those subsections deal with extensions of credit (subsection (A)), insurance (subsection (B)(i)), employment (subsection (B)(ii)), and government licensing (subsection (B)(iii)). Defendant relies on an FTC Staff Report stating that subsection (B)(iv) "provides a specific 'adverse action' definition in the context of consumer transactions other than those involving credit, insurance, employment or government benefits, such as an apartment rental or a purchase by personal check." Fed. Trade Comm'n, 40 Years of Experience with the Fair Credit Reporting Act 35 (July 2011) (emphasis added) (attached as Exhibit A to Reply Brief in Further Support of Defendant LexisNexis Risk Solutions Inc.'s Motion to Dismiss).

Defendant's argument is unavailing. First, although the FTC Staff Report states that subsection (B)(iv) applies in contexts other than those specified in subsections (A) and (B)(i)−(iii), it does not say that it is limited to those other contexts or that subsection (B)(iv) cannot be used in contexts related to those covered by subsections (A) or (B)(i)–(iii).

Second, even if the FTC Staff Report were read to bar the use of subsection (B)(iv) in contexts ostensibly covered by subsections (A) or (B)(i)–(iii), this Court would decline to follow it. Agency interpretations like this FTC Staff Report that do not carry the "force of law" are

"'entitled to respect' . . . but only to the extent that they are persuasive." <u>Christensen v. Harris Cnty.</u>, 529 U.S. 576, 587 (2000) (quoting <u>Skidmore v. Swift & Co.</u>, 323 U.S. 134, 140 (1944)).[9] Inasmuch as the FTC Staff Report states that subsection (B)(iv) is inapplicable to this case, the Court finds the FTC Staff Report unpersuasive. Courts in this District and around the country have held that subsection (B)(iv) is capable of expanding subsection (A)—extensions of credit. <u>See, e.g.</u>, <u>Treadway v. Gateway Chevrolet Oldsmobile, Inc.</u>, 362 F.3d 971, 982 (7th Cir. 2004); <u>Barnes v. DiTech.com</u>, No. 03-CV-6471, 2005 WL 913090, at *2 (E.D. Pa. Apr. 19, 2005); <u>Thomas v. Cendant Mortg.</u>, No. 03-1672, 2004 WL 2600772, at *7 (E.D. Pa. Nov. 15, 2004); <u>Crane v. Am. Home Mortg. Corp.</u>, No. 03-5784, 2004 WL 1529165, at *6 (E.D. Pa. July 7, 2004). There is no reason why the rationale of those cases does not apply equally to subsections (B)(i)–(iii). Further, the legislative history of the 1994 amendments to the FCRA that added subsection (B)(iv) did not mention any limit on that subsection's reach. <u>See</u> H.R. Rep. No. 103-486, at 33 (1994) ("<u>[A]ny action</u> taken based on that report that is adverse to the interests of the consumer triggers the adverse action notice requirements." (emphasis added)). To the contrary, subsection (B)(iv) was meant to expand the FCRA's reach; the Court interprets it to have that effect.

     For the above-stated reasons, the Court concludes that defendant took an adverse action against plaintiffs when it adjudicated them as noncompetitive. This occurred before defendant sent plaintiffs the required notice under § 1681b(b)(3)(A). Thus, plaintiff has pled facts sufficient to state a claim for relief.

---

[9] "Interpretations such as those in opinion letters—like interpretations contained in policy statements, agency manuals, and enforcement guidelines, all of which lack the force of law—do not warrant <u>Chevron</u>-style deference." <u>Christensen</u>, 529 U.S. at 587 (2000); <u>cf.</u> <u>Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.</u>, 467 U.S. 837 (1984).

### 2. Who Is a Proper Defendant?

Nothing in the text of § 1681b(b)(3)(A) excludes defendant, as a CRA, from its scope. The requirements of 15 U.S.C. § 1681b(b)(3)(A) apply to any "person intending to take such adverse action." Under the FCRA, "'person' means any individual, partnership, corporation, trust, estate, cooperative, association, government or governmental subdivision or agency, or other entity." § 1681a(b). Thus, defendant is a person and must comply with § 1681b(b)(3)(A).

Defendant offers two arguments as to why a CRA cannot be liable for a violation of 15 U.S.C. § 1681b(b)(3)(A). First, defendant cites two 1998 Federal Trade Commission ("FTC") staff opinion letters stating that an employer is liable for a violation of § 1681b(b)(3)(A) even if the employer hires an outside company to fulfill its FCRA obligations. Letter from William Haynes, Attorney, Federal Trade Commission, to A. Michael Rosen, Senior Vice President and General Counsel, Background America, Inc. (June 9, 1998) (attached as Exhibit 3 to Def.'s Mem. Law); Letter from William Haynes, Attorney, Federal Trade Commission, to John Beaudette, Operations Manager, Employment Screening Services (June 9, 1998) (attached as Exhibit 4 to Def.'s Mem. Law). However, the FTC letters say only that the employer does not absolve itself of liability by outsourcing FCRA compliance. They do not say that the CRA cannot be liable itself.

Second, defendant argues that, as an agent for the member employers, it cannot be liable for a violation of § 1681b(b)(3)(A). In support of this, defendant cites Weidman v. Federal Home Loan Mortgage Corp., 338 F. Supp. 2d 571 (E.D. Pa. 2004). In that case, the plaintiffs sued Freddie Mac under § 1681m, a provision of the FCRA that, like § 1681b(b)(3)(A), requires anyone taking an adverse action to notify the consumer against whom the action is taken. The Weidman plaintiffs argued that Freddie Mac had taken an adverse action against them by

assigning a "caution" label to their loan application. Id. at 576. The court held that Freddie Mac could not be liable under the FCRA because it was statutorily barred from extending credit and therefore barred from making any actual decision about the consumer's loan application. Id. at 577; see also Ashby v. Farmers Grp., Inc., 261 F. Supp. 2d 1213, 1222 (D. Or. 2003) (holding that a defendant was not liable under FCRA because it was not capable of changing the terms of plaintiffs' insurance contracts).

Weidman is distinguishable from the present case. The Weidman court relied on the fact that the "caution" label was "intended to be filtered by an autonomous decision-maker with the authority to offer credit." Weidman 338 F. Supp. at 577. In this case, plaintiffs have alleged a complete lack of "filtering" by the employers. Defendant adjudicates employees based on a rubric set out by the member employer and classifies the employees as competitive or noncompetitive. Nothing in the Complaint suggests that the member employer is involved in analyzing the initial adjudication or any subsequent challenge to the adjudication by an employee.  Further, unlike Weidman, there is no statutory bar preventing defendant in this case from making employment decisions with respect to plaintiffs.

Defendant's arguments as to who is a proper defendant are thus unavailing.

### 3. Willful Noncompliance and Damages

Under § 1681n(a)(2), a willful failure to comply with the FCRA makes defendant liable for statutory and punitive damages. If the violation is negligent, plaintiffs can recover only actual damages under § 1681o(a). Plaintiffs seek damages under § 1681n, and thus must show that defendant's violation was willful. See Long v. Tommy Hilfiger U.S.A., Inc., No. 09-1701, 2011 WL 635271, at *6 (W.D. Pa. Feb. 11, 2011).

The Supreme Court defined the standard for willful failure to comply under § 1681n in

<u>Safeco Insurance Co. of America v. Burr</u>, 551 U.S. 47 (2007). "Willful" violations include "not

only knowing violations . . . but reckless ones as well." <u>Id.</u> at 57. "[A] company subject to FCRA

does not act in reckless disregard of it unless the action is not only a violation under a reasonable

reading of the statute's terms, but shows that the company ran a risk of violating the law

substantially greater than the risk associated with a  reading that was merely careless." <u>Id.</u> at 69.

<u>Safeco</u> instructs that in determining whether a reading of the statute was reckless, a court should

examine the text of the statute, case law that existed at the time of the alleged violation, and any

agency interpretations. <u>Id.</u> at 69–70.[10]

Plaintiffs have failed to plead facts demonstrating that defendant's reading of the

definition of adverse action in the FCRA was "objectively unreasonable," and thus, that

defendant's violation of § 1681b(b)(3)(A) was willful. <u>See id.</u> at 69. As cases such as <u>Obabueki</u>

and <u>In re Farmers</u> demonstrate, what constitutes an adverse action under § 1681a(k)(1)(B)(ii) is

not always clear. Although the Court finds <u>Adams</u> to be persuasive and <u>Obabueki</u> and <u>In re</u>

<u>Farmers</u> distinguishable, this is a close case, especially given that "no court of appeals had

spoken on the issue." <u>Safeco</u>, 551 U.S. at 70. Further, the FTC Staff Report that defendant cites

supports its interpretation of § 1681a(k)(1)(B)(iv), and <u>Safeco</u> instructs that parties may rely on

"authoritative guidance" from the FTC in interpreting the FCRA. <u>Id.</u> Again, although the Court

---

[10] Courts frequently state that willfulness is a question of fact for the jury. <u>See, e.g.</u>, <u>Howley v.</u>
<u>Experian Info. Solutions, Inc.</u>, 813 F. Supp. 2d 629, 641–42 (D.N.J. 2011); <u>Edwards v. Toys "R"</u>
<u>Us</u>, 527 F. Supp. 2d 1197, 1210–13 (C.D. Ca. 2007). However, those cases usually involve
questions of fact as to what the defendant knew at the time of the alleged violation. <u>See</u> <u>Howley</u>,
813 F. Supp. 2d at 641 ("Plaintiffs have offered evidence that Experian was put on notice of the
mixed file by plaintiff in 2003."); <u>Edwards</u>, 527 F. Supp. 2d at 1213 (stating that question of fact
existed as to whether person involved in FCRA violation was defendant's agent, and thus
whether vicarious liability attached). That is not an issue in this case. The issue of willfulness in
this case turns on whether the law was clear at the time of the alleged violation.

finds cases such as <u>Treadway</u> and <u>Crane</u> to be instructive on this issue, defendant's interpretation of § 1681a(k)(1)(B)(iv) was not objectively unreasonable.

Only paragraphs 113 and 114 of the Class Action Complaint specifically address the question of willfulness under § 1681n. In those paragraphs, plaintiff points out that defendant executed a consent order in a prior case from the Eastern District of Virginia, <u>Beverly v. ChoicePoint Inc.</u>, No. 3:07cv541. (Compl. ¶¶ 112, 113.) Plaintiff Beverly was hired as an associate at a Walmart store, conditioned on a background check to be performed by defendant. <u>Beverly v. Wal-Mart Stores, Inc.</u>, No. 3:07cv541, 2008 WL 149032, at *1 (E.D. Va. Jan. 11, 2008). Defendant uncovered a criminal conviction and sent Beverly a pre–adverse action letter on September 1, 2005. <u>Id.</u> Defendant sent Beverly a second letter on September 6 on the employer's behalf stating that the employer had decided not to hire him. <u>Id.</u> Beverly received both letters on September 7, 2005. <u>Id.</u> In ruling on a motion for summary judgment, the <u>Beverly</u> court concluded that the September 6, 2005, letter was an adverse action, and since plaintiff did not receive a pre–adverse action letter before he received the September 6, 2005, adverse action letter, defendant violated § 1681b(b)(3)(A). <u>Id.</u> at *3. The <u>Beverly</u> litigation ended with a consent order directing defendant to "conform its business practices so that the mailing of [adverse action letters] on behalf of its customers shall occur no earlier than five business days after the mailing of the [pre–adverse action letters]." (Consent Order, Def.'s Mem. Law Ex. M.)

Contrary to plaintiffs' argument, the <u>Beverly</u> Consent order does not demonstrate that defendant willfully violated § 1681b(b)(3)(A). The <u>Beverly</u> court did not discuss whether defendant's furnishing the report to the member employers or adjudicating plaintiffs as noncompetitive were adverse actions. Instead, it held only that defendant must wait five days after sending a pre–adverse action letter before sending a final adverse action letter. Thus, the

Beverly consent order has no bearing on the willfulness of defendant's alleged violation of § 1681b(b)(3)(A).

For the reasons stated above, the Court concludes that plaintiffs have failed to plead facts sufficient to state a plausible claim of willfulness under § 1681n. Accordingly, plaintiffs' relief is limited to actual damages, costs, and "reasonable attorney's fees as determined by the [C]ourt" under § 1681o(a) for defendant's alleged violation of § 1681b(b)(3)(A).

**B. Count II: Violation of 15 U.S.C. 1681g(a)(1)**

15 U.S.C. § 1681g(a)(1) states that every CRA "shall, upon request . . . clearly and accurately disclose to the consumer all information in the consumer's file." Plaintiffs contend that defendant violated this provision when it refused to turn over the admission statements upon plaintiffs' request. Further, plaintiffs argue that such violation was "willful," which would allow plaintiffs to recover punitive damages. See § 1681n. In its Motion to Dismiss, defendant argues that, even if it did violate § 1681g(a)(1), such violation was not willful. Thus, the question is whether, at the time of the events in question, the law was clear that § 1681g(a)(1) required defendant to turn over the admission statement as being "information in the consumer's file." See Safeco, 551 U.S. at 69; supra Section IV.A.3.

The FCRA defines "file" as "all of the information on [a] consumer recorded and retained by a consumer reporting agency regardless of how the information is stored." § 1681g(a)(1). Under a plain reading of the statute, the admission statement is clearly part of the file and defendant was required to turn it over to plaintiffs upon plaintiffs' request. Moreover, "[a] primary purposes of the statutory scheme provided by the disclosure in § 1681g(a)(1) is to allow consumers to identify inaccurate information in their credit files and correct this information." Gillespie v. Equifax Info. Servs., L.L.C., 484 F.3d 938, 941 (7th Cir. 2007). The admission

statement is the most important part of the file because it is the only evidence of the theft incident underlying the report and adjudication. There is no way for plaintiffs to challenge inaccurate information without the admission statement.[11]

Defendant argues that its violation of § 1681g(a)(1) was not willful because the law was unsettled at the time of the events in question. In support of this, defendant cites one case: Gillespie v. Trans Union Corporation, 482 F.3d 907 (7th Cir. 2007). The plaintiffs in that case wanted the defendant—a CRA—to provide them with the so-called "purge dates" associated with their file. Id. at 908. The CRA used the purge dates to determine when certain data should be eliminated from a consumer's file. Id. The Gillespie court held that the purge dates were not part of the "file" for the purposes of § 1681g(a)(1). Id. at 909. Gillespie is not on point. Internal record-keeping data is wholly different than the admission statement in this case, which is the central piece of information relevant to the report that LexisNexis generates.

The Third Circuit recently distinguished Gillespie on similar grounds in Cortez v. Trans Union, LLC, 627 F.3d 688, 711–12 (3d Cir. 2010). The Cortez court held that Gillespie did not govern that case because the information that the consumer in Cortez requested was "far more than a mere internal record-keeping mechanism." Id. at 712. Defendant points out that the Third Circuit decided Cortez after the events in question in this case took place and thus Cortez could not have directly influenced defendant's reading of § 1681g(a)(1) in this case. However, the Cortez court upheld a jury's finding of willfulness on an issue that was similar to the one in this case. Id. at 720–23. The Cortez court did so despite the fact that the defendant in that case

_____

[11] Ms. Goodman's admission statement makes this point clear. The admission statement had two different sets of handwriting and denies that she intended to steal the merchandise, undermining defendant's adjudication in her case.

20

claimed to have relied on <u>Gillespie</u>. Thus, plaintiffs have pled facts sufficient to demonstrate that

defendant's reliance on <u>Gillespie</u> was not "objectively reasonable." <u>Safeco</u>, 551 U.S. at 69.

Defendant also cites FTC commentary on § 1681g(a)(1) that concludes that "[t]he term

'file' denotes all information on the consumer that is recorded and retained by a consumer

reporting agency that might be furnished, or has been furnished, in a consumer report on that

consumer." 16 C.F.R. pt. 600, app. § 603. Defendant argues that it interpreted this statement to

mean that § 1681g(a)(1) required it to turn over only the actual report, and nothing more. The

Court disagrees. If the admission statement is not "information on the consumer," the Court

cannot fathom what might be. Further, defendant's interpretation would give "file" and

"consumer report" identical meanings. This interpretation is rejected because it would make

§ 1681g(a)(1) superfluous. Congress clearly intended for § 1681g(a)(1) to give consumers the

opportunity to request something more—"all information in the consumer's file"—than the

report they automatically receive under § 1681b(b)(3)(A).[12]

Finally, defendant argues, relying on <u>Gillespie</u>, that if file really meant all of the

information that it kept on plaintiffs, other subsections of § 1681g would be superfluous. Those

subsections allow consumers to request disclosure of, <u>inter alia</u>, the sources of the information,

§ 1681g(a)(2), and the recipients of reports, § 1681g(a)(3). First, this argument does not

undermine the basic fact that defendant's reading of § 1681g(a)(1) is contrary to the text, which

calls for disclosure of "[a]ll information in the consumer's file." Further, the sources of the

information in the reports and the recipients of those reports are more akin to the purge dates in

_____

[12] The <u>Gillespie</u> court cited this FTC commentary to exclude the purge dates from the definition of file because they were not "information on the consumer" that had ever been, or ever would be, furnished as part of a consumer report. 482 F.3d at 909. The Court agrees with this rationale, as the purge dates are not substantive information regarding the consumer's behavior. The <u>Gillespie</u> court's eminently logical reading of the FTC interpretation does not apply to the situation presented in this case.

21

<u>Gillespie</u>: they are internal records relating to the CRA's processing of the information in the reports. Defendant's other textual arguments are rejected because they do nothing to alter the clear meaning of § 1681g(a)(1).

For the above-stated reasons, the Court concludes that plaintiffs have stated a claim against defendant for a willful violation of § 1681g(a)(1).

## V. CONCLUSION

Plaintiffs have stated a claim against defendant for a violation of 15 U.S.C. § 1681b(b)(3)(A). Thus, defendant's Motion to Dismiss is denied in this respect. However, plaintiffs have failed to plead sufficient facts to demonstrate that such violation was willful. Plaintiffs are thus entitled only to actual damages, costs and "reasonable attorney's fees as determined by the [C]ourt" under § 1681o for Count I, which asserts a violation of § 1681b(b)(3)(A).

Plaintiffs have alleged facts sufficient to state a claim against defendant for a willful violation of § 1681g(a)(1). Thus, defendant's Motion to Dismiss is denied as to Count II, which asserts a willful violation of § 1681g(a)(1).